**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| ESSOCIATE, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-cv-727-bbc |
| | ) | |
| EPIC MEDIA GROUP, INC., ET AL, | ) | **[FILED UNDER SEAL]** |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**DEFENDANTS' REPLY TO PLAINTIFF ESSOCIATE, INC.'S RESPONSE TO**
**DEFENDANTS' STATEMENT OF PROPOSED FINDINGS OF FACT IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

---

The defendants, (collectively "Epic"), reply as follows to plaintiff Essociate, Inc.'s ("Essociate") Response to Defendants' Statement of Proposed Findings of Fact in Support of Motion for Summary Judgment.

**A.      Background Of The Parties**

**Epic Fact No. 1.**      Essociate, Inc. ("Essociate") is the plaintiff and the owner of the patent asserted in this patent infringement case, namely U.S. Patent No. 6,804,660.  Dkt. No. 58, First Amended Complaint, ¶ 6.

      **Essociate Resp.**    Undisputed.

**Epic Fact No. 2.**      Michael Landau and Evan Horowitz are the founders of Essociate, and are the inventors of the '660 patent.  Declaration of James D. Peterson, ("Peterson Decl."), ¶ 7, Ex. 5 ('the 660 patent); Dkt. No. 58, First Amended Complaint, ¶¶ 15-18.

      **Essociate Resp.**    Undisputed.

Redacted Public Version

**Epic Fact No. 3.**    Essociate was founded in 1998 and is run by its founders.  Dkt. No. 80, January 6, 2010 Deposition of Michael Landau in *Essociate, Inc. v. Clickxchange Corp.*, No. 09-536 (C.D. Cal.) ("2010 Landau Dep.) at 17:3-13; Dkt. No. 58, First Amended Complaint, ¶¶ 15-18.

        **Essociate Resp.**    Undisputed.

**Epic Fact No. 4.**    Essociate has run a small affiliate network since 2008. Dkt. No. 78, Oct. 9 2012 Deposition of Michael Landau as Essociate Rule 30(b)(6) designee ("Oct. 9. 2012 Rule 30(b)(6) Landau Dep."), at 129: 3-10.

        **Essociate Resp.**    **Disputed.** Essociate has achieved relative success notwithstanding Defendants' infringement. February 22, 2012 Declaration of Michael Landau ("Landau Decl.") ¶ 4.

        **Epic Reply.**    **No genuine dispute**.  Essociate's response adds an immaterial opinion and argument and does not dispute the proposed fact.

**Epic Fact No. 5.**    Essociate has realized the majority of its revenue from settlements from enforcing the '660 patent.  Oct. 9. 2012 Rule 30(b)(6) Landau Dep at 155:20-160:21.

        **Essociate Resp.**    Undisputed.

**Epic Fact No. 6.**    The '660 patent originated in another business founded and run by Michael Landau and Evan Horowitz, a company called XPays, LLC.  Peterson Decl., ¶ 12, Ex. 10 (Essociate's response to Interrogatory No. 4); Dkt. No. 76, October 8, 2012 Deposition of Michael Landau ("Oct. 8, 2012 Landau Deposition") at 154:4-156:6.

        **Essociate Resp.**    Undisputed.

Redacted Public Version

**Epic Fact No. 7.** Before Essociate operated its affiliate network, XPays has operated an affiliate network to promote adult entertainment websites since 1998. Oct. 8, 2012 Landau Deposition at 94: 5-7; 103: 14-17.

**Essociate Resp.** Undisputed.

**Epic Fact No. 8.** The alleged invention in the '660 patent is an improvement to the XPays affiliate system. To take advantage of a promotional campaign offered by SexToy.com, XPays needed a new way of tracking internet traffic from XPays affiliates. Oct. 8, 2012 Landau Deposition, 154: 4 - 156:6.

**Essociate Resp.** **Disputed.** The invention disclosed by the '660 Patent is an improvement to hub affiliate networks—such as LinkShare—and merchant affiliate networks—such as Amazon.com's affiliate network. Xpays needed a way to enable tracking by a merchant affiliate network of the Xpays referring source webmaster when the merchant had a system for tracking referrals from affiliates at the sub-ID level. The first example of this occurred when XPays began participating in the SexToy.com merchant affiliate network. Landau Decl. ¶ 5.

**Epic Reply.** **No genuine dispute.** Essociate does not dispute the proposed fact. Essociate adds additional information that, even if true, does not raise a dispute.

**Epic Fact No. 9.** The defendant Azoogle.com, Inc. operated an affiliate network, called Azoogle Ads, beginning in about 2000. Dkt. No. 69, Oct. 2, 2012 Rule 30(b)(6) Deposition of Richard Okin ("Rule 30(b)(6) Okin Dep.") 82:20-23.

**Essociate Resp.** Undisputed.

**Epic Fact No. 10.** In 2008 Azoogle.com, Inc. changed its name to Epic Media Group, Inc. and the affiliate network was renamed the Epic Direct System. Dkt. No. 69, Oct. 2, 2012

Redacted Public Version

Rule 30(b)(6) Deposition of Richard Okin ("Rule 30(b)(6) Okin Dep.") at 23: 6-14; Declaration of Young Kim ¶3.

> **Essociate Resp.     Disputed.** The affiliate network accused of infringement in this case (the "Accused Epic Network") was created in 2008. The affiliate network operated by Azoogle.com, Inc., from 2000 to 2008 (the "Old Azoogle Network") is a predecessor which was replaced by the Accused Epic Network. The Old Azoogle Network was written in the PHP source code programming language and is an entirely different device from the Accused Epic Network which is written in the Erlang source code programming language. October 2, 2012 Deposition of Rick Okin ("October 2 Okin Dep.") 84:2-86:12. Replacement of the Old Azoogle Network by the Accused Epic Network became necessary when Epic's principals concluded the Old Azoogle Network was technologically inadequate. Deposition of Don Mathis ("Mathis Dep.") at 157:12–158:1.

> **Epic Reply.     No genuine dispute.** The testimony of Epic's witnesses that the affiliate network was the same in all material respects is unrebutted.  Essociate has even proposed a fact that indicates that the Azoogle Network and the Epic Network are one and the same.  *See* Essociate Proposed Fact 74 (" Epic's witnesses testified that the Old Azoogle Network operated in the same way as the Accused Epic Network. Mathis Dep. 64:11-65:18; October 2 Okin 84:2-13"). Essociate's own infringement contentions refer to the network as one device – the contentions refer to the "[a]ccused device" as "[t]he online affiliate marketing network operated by Defendants at <<http://www.epicdirectnetwork.com>> and previously at <<http://www.azoogleads.com>>."  Peterson Decl., Dkt. No. 89, ¶

Redacted Public Version

12, Ex. 10, Dkt. No. 95, Essociate's Infringement Contentions (Essociate's Responses to Epic Media's First Set of Interrogatories), at 2.

**Epic Fact No. 11.** In a corporate restructuring in 2011, Epic Media Group, Inc. became Epic Media Group, LLC, which is now a subsidiary of FAS Labs, Inc. Declaration of Young Kim ¶ 10.

**Essociate Resp.** Undisputed.

**Epic Fact No. 12.** The defendant Social Assets, LLC was spun off from Epic Media, and it is an indirect subsidiary of FAS Labs, Inc. Declaration of Young Kim ¶¶ 6, 9.

**Essociate Resp. Disputed.** Social Assets, LLC is not a spin-off company. Social Assets, LLC was formed as a debt-free receptacle to receive the last remaining assets and business divisions of Epic which were transferred to Social Assets for no consideration within weeks of this lawsuit being filed. (This action commenced on October 21, 2011 Social Assets was formed on November 18, 2011.) October 5, 2012 Deposition of Young Kim ("Kim Dep.") 22:5–10, 25:9–17, 45:10–14, 46:20– 23; January 21, 2013 Deposition of Don Mathis ("Mathis Dep.") 88:14-90:24, 103:20–111:14; August 20, 2012 Declaration of David Graff (Dkt. No. 55) at ¶ 7, Ex. A; Complaint for Patent Infringement (Dkt. No. 1). *See also* Kim Dep. 25-9-:26:15.

**Epic Reply. No genuine dispute**. Epic's evidence that Social Assets is a spin-off of Epic Media is unrebutted. The cited evidence does not support Essociate's contention that "Social Assets, LLC was formed as a debt-free receptacle."

**Epic Fact No. 13.** Social Assets, doing business as Kinetic Social, is in the business of targeting social media advertising. Declaration of Young Kim ¶5.

Redacted Public Version

**Essociate Resp.      Disputed.** Social Assets took over Epic's entire ad placement and social media marketing divisions. Kim Dep. 21:3-9, 22:5–10, 25:9–17, 46:20–23; Mathis Dep. 103:20–104:4; October 4, 2012 Deposition of Charles Nowaczek ("Nowaczek Dep.") 93:21-94:23.

**Epic Reply.     No genuine dispute**.  Essociate does not dispute the proposed fact. The cited evidence does not establish that the ad placement business was taken over by Kinetic Social.

**Epic Fact No. 14.**      Social Assets does not operate an affiliate network and it is not accused of infringement in this case.  Declaration of Young Kim ¶ 20.

**Essociate Resp.**     Undisputed.

**Epic Fact No. 15.**      Social Assets is a defendant because Essociate contends that it is a successor to the liability of Epic Media Group.  Dkt. No. 58, First Amended Complaint ¶ 2-4.

**Essociate Resp.      Disputed.** Essociate also accuses Social Assets of alter ego liability and fraudulent transfer liability. First Amended Complain (Dkt. No.58.) ¶¶ 30-39.

**Epic Reply.     No genuine dispute**.  Essociate adds additional argument but does not place this fact into genuine dispute.

**B.     This Court's Jurisdiction Over the Action**

**Epic Fact No. 16.**      This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1338(a). Dkt. No. 58, First Amended Complaint ¶ 13.

**Essociate Resp.**     Undisputed.

**Epic Fact No. 17.**      This court has personal jurisdiction over the defendants.  Dkt. No. 58 First Amended Complaint ¶ 14; Dkt No. 63, Answer to First Amended Complaint ¶14.

**Essociate Resp.**     Undisputed.

Redacted Public Version

**Epic Fact No. 18.** Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), (c), and/or 1400(b). Dkt. No. 58 First Amended Complaint ¶ 14; Dkt No. 63, Answer to First Amended Complaint ¶14.

**Essociate Resp.** Undisputed.

**C.** **The Patent-in-Suit, U.S. Patent No. 6,804,660**

**Epic Fact No. 19.** The patent-in-suit, U.S. Patent No. 6,804,660 (the '660 patent), entitled "System Method and Article of Manufacture for Internet Based Affiliate Pooling," was issued to inventors Michael Landau and Evan Horowitz on October 12, 2004. Peterson Decl. ¶ 7, Ex. 5 (the '660 patent).

**Essociate Resp.** **Disputed.** The '660 Patent was issued to Essociate, and Mr. Landau and Mr. Horowitz are the listed inventors. Landau Decl. ¶ 14.

**Epic Reply.** **No material dispute.** Epic Media agrees that Landau and Horowitz are the listed inventors on the patent and that the patent was issued to Essociate as the assignee.

**Epic Fact No. 20.** Application serial no. 09/846,159, which resulted in the '660 patent, was filed on May 1, 2001. Peterson Decl. ¶ 7, Ex. 5 (the '660 patent).

**Essociate Resp.** Undisputed.

**Epic Fact No. 21.** Application serial no. 09/846,159 and the '660 patent claim priority to U.S. provisional patent application serial no. 60/201,041 , which was filed on May 1, 2000. Peterson Decl. ¶ 7, Ex. 5 (the '660 patent).

**Essociate Resp.** Undisputed.

**Epic Fact No. 22.** The invention date of the invention claimed in the '660 patent was May 5, 1999, which is the date that XPays launched an advertising campaign for the SexToy.com website. Peterson Decl., ¶ 12, Ex. 10 (Essociate's response to Interrogatory No. 4).

7

       **Essoiate Resp.**    Undisputed.

   **Epic Fact No. 23.**    The '660 patent discloses and claims a method, system and computer program for providing "virtual affiliates" access to an existing affiliate system. Peterson Decl. ¶ 7, Ex. 5 ('the 660 patent).

       **Essoiate Resp.**    Undisputed.

   **Epic Fact No. 24.**    Virtual affiliates are affiliates of one affiliate system, referred to in the patent as the "source system" which can send traffic to an existing system, the "target system" without actually joining the target affiliate network. Peterson Decl. ¶ 7, Ex. 5 ('the 660 patent).

       **Essoiate Resp.**    **Disputed.** "Virtual affiliates" carries the meaning set forth in the '660 Patent—which does not prohibit the virtual affiliate from being a member of the target affiliate network. Acting as a virtual affiliate merely requires that the webmaster in question be sending traffic to the target affiliate system independent of any membership that webmaster might have in the target affiliate network. Landau Decl. ¶ 15, Ex. A ('660 Patent) at 1.

       **Epic Reply.**    **No genuine dispute of fact or law.** Essoiate's response is a claim construction argument and it does not contradict Epic's position. "Independent of any membership" is essentially the same as "without actually joining."

   **Epic Fact No. 25.**    The '660 patent does not claim to have invented the concept of virtual affiliates, it claims a particular multi-step technique for providing virtual affiliates to a target affiliate system. Peterson Decl. ¶ 7, Ex. 5 ('the 660 patent); Dkt. No. 85, Landau Report at 32.

Redacted Public Version

**Essociate Resp.     Disputed.** Essociate disputes Defendants' characterization of the '660 Patent. The patent speaks for itself and its construction is a legal matter, not a factual one.

**Epic Reply.    No genuine dispute of fact or law**.  Although claim construction is a legal matter, Essociate's expert has conceded that the patent does not cover all virtual affiliate networks.  Essociate does not raise a factual dispute – it merely objects to the characterization of the '660 patent.

**D.     The plaintiff's delay in filing suit against the defendants**

**Epic Fact No. 26.**     Essociate identified Azoogle as a target for enforcement and accused Azoogle of infringement in a letter on October 19, 2004.  Peterson Decl., ¶ 15, Ex. 13 (Coleman Letter, Oct. 19, 2004).

**Essociate Resp.     Disputed.** Essociate communicated its belief that the Old Azoogle Network may have infringed the '660 Patent. But Azoogle's counsel communicated that the Old Azoogle Network did not enable tracking through the inclusion of affiliate codes in Destination Landing Page URLs. And Essociate lacked technological evidence to disprove the representation or conduct a Rule 11 investigation sufficient to learn whether the Old Azoogle Network in fact infringed. Landau Decl. ¶ 16, Exs. C-G (Letters between Essociate's prior counsel and Azoogle's counsel).

**Epic Reply.    No genuine dispute**.  Essociate does not dispute the proposed fact. Essociate's response quibbles with the characterization of the letter and attempts to provide an explanation for its delay in filing suit.

**Epic Fact No. 27.**     On October 25, 2004, Azoogle's counsel sent a letter to Essociate's counsel indicating that a substantive response to the October 19, 2004 letter would follow after a

9

review of the file history for the '660 patent.  Peterson Decl., ¶ 16, Ex. 14 (Raskin Letter, Oct. 25, 2004).

> **Essociate Resp.     Disputed.** Essociate disagrees with Defendants' characterization of this letter, which speaks for itself.
>
> **Epic Reply.     No genuine dispute**.  Essociate does not identify any inaccuracy in the description of the letter.

**Epic Fact No. 28.**     On November 3, 2004, Azoogle's counsel sent a letter to Essociate's counsel indicating its belief that Azoogle was not infringing the '660 patent. Peterson Decl., ¶ 17, Ex. 15 (Raskin Letter, November 3, 2004)

> **Essociate Resp.     Disputed.** Essociate disagrees with Defendants' characterization of this letter, which speaks for itself.
>
> **Epic Reply.     No genuine dispute**.  Essociate does not identify any inaccuracy in the description of the letter.

**Epic Fact No. 29.**     On November 23, 2004, Essociate's counsel sent a letter to Azoogle's counsel indicating that it still believed that Azoogle was infringing the '660 patent. Peterson Decl., ¶ 18, Ex. 16 (Coleman Letter, Nov. 23, 2004)

> **Essociate Resp.     Disputed.** Essociate disagrees with Defendants' characterization of this letter, which speaks for itself. The letter expresses Essociate's suspicion that the Old Azoogle Network may have been infringing because it directs traffics from its affiliates to merchants who operated their own affiliate networks. The letter postulates that some kind of tracking must have been necessary for that process to operate successfully. But Essociate did not state knowledge that the Old Azoogle Network enabled the URL-based tracking

10

necessary to infringe the '660 Patent. And Azoogle denied that it did. Because Essociate lacked technological evidence of the enablement of URL-based tracking it could not satisfy its Rule 11 obligations and it could not know whether the Old Azoogle Network in fact infringed.

**Epic Reply.**   **No genuine dispute.**  Essociate's response does not dispute the proposed fact, but instead advances an argument to justify its delay in filing suit. Essociate cites no evidence to support any factual assertion.

**Epic Fact No. 30.**     On November 30, 2004, Azoogle's counsel sent a letter to Essociate's counsel  indicating its position that it did not infringe the '660 patent.  Peterson Decl., ¶ 19, Ex. 17 (Raskin Letter, Nov. 30, 2004).

**Essociate Resp.**   Undisputed.

**Epic Fact No. 31.**     The November 30, 2004 letter from Azoogle's counsel to Essociate's counsel asserts that Azoogle did not infringe Essociate's patent because it engaged in the "cookie and pixel" method of tracking transactions and because it did not perform the "configuring," "correlating," and "generating" operations required by the claims in the patent. Peterson Decl. ¶ 19. Ex. 17 (Raskin Letter, Nov. 30, 2004).

**Essociate Resp.**   **Disputed**. Essociate disagrees with Defendants' characterization of this letter, which speaks for itself. This letter affirmatively represents that the Old Azoogle Network did not enable the URL-based tracking necessary to infringe the '660 Patent.

**Epic Reply.**   **No genuine dispute**.  Essociate's response does not identify any inaccuracy in the description of the letter.  The letter does not make the affirmative representation as asserted by Essociate.

Redacted Public Version

**Epic Fact No. 32.**     The first page of the three page November 30, 2004 letter from Azoogle's counsel to Essociate's counsel is missing.  Peterson Decl., ¶ 19, Ex. 17 (Raskin Letter, Nov. 30, 2004).

> **Essociate Resp.     Disputed.** Azoogle's counsel failed to preserve the entire letter, not just the first page. February 22, 2013 Declaration of John Du Wors ("Du Wors Decl.") ¶ 9.

> **Epic Reply.     No genuine dispute.**  Essociate does not dispute the proposed fact. The Du Wors declaration is not admissible evidence of any historical fact in this case even if it did contradict the proposed fact, which it does not.

**Epic Fact No. 33.**     Joshua Raskin, the attorney for Azoogle who sent the November 30, 2004 letter, changed law firms since the time the letter was sent and could not find an original copy of the letter.  Peterson Decl., ¶ 6.

> **Essociate Resp.     Undisputed.**

**Epic Fact No. 34.**     Essociate has produced no evidence of any communication between Azoogle and Essociate, between the time when Azoogle's counsel mailed the November 30, 2004 letter and Essociate's filing suit in this case in October 2011.  Oct. 9, 2012 Rule 30(b)(6) Landau Deposition, 94:10 – 95:18.

> **Essociate Resp.     Undisputed.**

**Epic Fact No. 35.**     On May 19, 2005 Michael Landau emailed Evan Horowitz, the title of which was "hitlist draft . . . pls turnaround quickly so I can send."   Peterson Decl., ¶ 21, Ex. 19 (Landau Email to Horowitz, May 19, 2005).

> **Essociate Resp.     Disputed.** Essociate disputes that this was the title of the email. Peterson Decl., ¶ 21, Ex. 19 (Landau Email to Horowitz, May 19, 2005).

Redacted Public Version

>**Epic Reply.**    **No material dispute**.  The subject line of the email was "hitlist
>
>draft . . . pls turn around quickly so I can send."

**Epic Fact No. 36.**        The May 19, 2005 email from Michael Landau to Evan Horowitz
identified Azoogleads.com as Essociate's "[b]iggest target" on its list of "[p]reliminary targets"
and stated that "they claim to pay out $3mil per month in commissions . . . Infringing because
they appear to be pooling with True.com and may have integrated with CardTraffic."  The email
acknowledged that cookie and pixel tracking does not infringe the '660 patent.  Peterson Decl.,
¶ 21, Ex. 19 (Landau Email to Horowitz, May 19, 2005).

>**Essociate Resp.**    **Disputed.** Essociate disputes that the email acknowledges that
>
>the use of cookie and pixel tracking precludes infringement of the '660 Patent.
>
>Peterson Decl., ¶ 21, Ex. 19 (Landau Email to Horowitz, May 19, 2005).
>
>**Epic Reply.**    **No genuine dispute**.  The email acknowledges that pixel tracking
>
>is not "as described in the patent."  In the email, Landau states that "not
>
>everything that Azoogle advertises infringes on the patent.  Exclusive offers and
>
>products and services that are completely tracked within their internal affiliate
>
>system probably do not cross affiliate system boundaries . . . Further, it is possible
>
>that a company like Azoogle uses tracking as described in the patent for some
>
>products/services when available and pixel tracking when the target affiliate
>
>system cannot provide Affiliate Pooling customization/configuration."

**Epic Fact No. 37.**        On May 25, 2005, Michael Landau forwarded the body of the May
19, 2005 email to John Hopf, a potential investor.  Peterson Decl., ¶ 20, Ex. 18 (Landau Email to
Hopf, May 25, 2005).

>**Essociate Resp.**    Undisputed.

Redacted Public Version

**Epic Fact No. 38.**     Michael Landau prepared a chart analyzing Azoogle's response to the allegation of infringement.  Peterson Decl., ¶ 20, Ex. 18 (Landau Email to Hopf, May 25, 2005).

> **Essociate Resp.     Disputed.** This letter indicates Michael Landau's belief that the Old Azoogle Network may still use infringing URL-based tracking methods even though the Old Azoogle Network claims to rely primarily on cookie and pixel tracking. But Landau was never able to obtain evidence to disprove Azoogle's representation or satisfy Essociate's Rule 11 obligations. Peterson Decl., ¶ 20, Ex. 18 (Landau Email to Hopf, May 25, 2005); Landau Decl. ¶ 22.
>
> **Epic Reply.    No genuine dispute**.  Essociate does not dispute the proposed fact that, as Landau states in the email, he had prepared a chart analyzing Azoogle's response and that he sent that chart to Essociate's counsel.  Essociate's response is argument to justify its delay in filing suit.

**Epic Fact No. 39.**     Michael Landau acknowledged that it had an exchange of letters with Azoogle's attorneys regarding the '660 patent. Peterson Decl., ¶ 20, Ex. 18 (Landau Email to Hopf, May 25, 2005).

> **Essociate Resp.     Disputed.** The email does not contain the alleged acknowledgement. Peterson Decl., ¶ 20, Ex. 18 (Landau Email to Hopf, May 25, 2005).
>
> **Epic Reply.    No genuine dispute**.  The email to Hopf states that Essociate's counsel "has correspondence from [Azoogle's] counsel denying infringing behavior, but the letter we received from them seems to be weak and unconvincing.  I will forward a copy of the email and chart I sent to Brian

14

analyzing Azoogle's response."  Peterson Decl., ¶ 20, Ex. 18 (Landau Email to

Hopf, May 25, 2005, at 4).  Brian is a reference to Brian Coleman, Essociate's

predecessor counsel.  *See* Peterson Decl., ¶ 18, Ex. 16 (Coleman Letter, Nov. 23,

2004).

**Epic Fact No. 40.**      Essociate was asked to provide any evidence indicating that the

defense of laches should not be applied in this case and failed to do so.  Peterson Decl., ¶ 14, Ex.

12, (Essociate's Response to Epic Media's Third Set of Interrogatories and Third Set of Requests

for Production, Nov. 26, 2012, p. 8).

> **Essociate Resp.      Disputed.** Essociate properly objected to Defendants'
>
> interrogatories and Defendants' failed to challenge the objections or move to
>
> compel. Peterson Decl., ¶ 14, Ex. 12, (Essociate's Response to Epic Media's
>
> Third Set of Interrogatories and Third Set of Requests for Production, Nov. 26,
>
> 2012, p. 8); Du Wors Decl. ¶ 10.
>
> **Epic Reply.    No genuine dispute**. Essociate responds with argument that its
>
> objections were justified, but it does not dispute the proposed fact.

**Epic Fact No. 41.**      Essociate was asked to provide any evidence indicating that the

defense of equitable estoppel should not be applied in this case and failed to do so.  Peterson

Decl., ¶ 14, Ex. 12, (Essociate's Response to Epic Media's Third Set of Interrogatories and Third

Set of Requests for Production, Nov. 26, 2012, p. 8-9).

> **Essociate Resp.      Disputed.** Essociate properly objected to Defendants'
>
> interrogatories and Defendants' failed to challenge the objections or move to
>
> compel. Peterson Decl., ¶ 14, Ex. 12, (Essociate's Response to Epic Media's

Redacted Public Version

Third Set of Interrogatories and Third Set of Requests for Production, Nov. 26, 2012, p. 8); Du Wors Decl. ¶ 10.

**Epic Reply.    No genuine dispute**. Essociate responds with argument that its objections were justified, but it does not dispute the proposed fact.

**Epic Fact No. 42.**      In response to deposition questions regarding more than twenty facts relevant to this case, Landau indicated that his memory was diminished by the passage of time or that he had no recollection of the fact in question.  Dkt. No. 76 Oct. 8, 2012 Deposition of Michael Landau ("Landau Deposition, Oct. 8, 2012") 155: 5-10, 165:12-19, 166:18-167:1, 171:11 - 176:4, 174: 9-12, 90: 16-22, 104: 12-16, 142: 14-20, 72:10 - 73: 2, 76:11 – 22, 77: 7-9, Dkt. No. 77 (Oct. 9, 2012 Deposition of Michael Landau, ("Landau Deposition, Oct. 9, 2012"), 12:3-10; Dkt. No. 78 Oct. 9, 2012 Rule 30(b)(6) Deposition of Essociate (Michael Landau), ("Oct. 9, 2012 Rule 30(b)(6) Deposition of Landau") 21: 6-14, 54:15, 21:4 -22:9,  22:24 - 23:21; 25 8-18; 33 9-16; 36:5 - 40:9; 42 5-9; 51: 11-17; 59: 3-7; 61:19 – 62:2; 62: 3-5; 64:22 – 65:5; 71 4-10; 71: 11-17, 93 10-13, 108 2-6, 167: 9-19.

**Essociate Resp.    Disputed.** Defendants' questions did not seek facts relevant to this case and Mr. Landau had a satisfactory recollection of all facts relevant to the case. Dkt. No. 76 Oct. 8, 2012 Deposition of Michael Landau ("Landau Deposition, Oct. 8, 2012") 155: 5-10, 165:12-19, 166:18-167:1, 171:11 - 176:4, 174: 9-12, 90: 16-22, 104: 12-16, 142: 14-20, 72:10 - 73: 2, 76:11 – 22, 77: 7-9, Dkt. No. 77 (Oct. 9, 2012 Deposition of Michael Landau, ("Landau Deposition, Oct. 9, 2012"), 12:3-10; Dkt. No. 78 Oct. 9, 2012 Rule 30(b)(6) Deposition of Essociate (Michael Landau), ("Oct. 9, 2012 Rule 30(b)(6) Deposition of Landau") 21: 6-14, 54:15, 21:4 - 22:9, 22:24 - 23:21; 25 8-18; 33 9-16; 36:5 - 40:9; 42 5-9;

Redacted Public Version

51: 11-17; 59: 3-7; 61:19 – 62:2; 62:3-5; 64:22 – 65:5; 71 4-10; 71: 11-17, 93 10-13, 108 2-6, 167: 9-19.

> **Epic Reply.**   **No genuine dispute**.  Essociate does not dispute that Landau could not remember facts during his deposition or that he indicated that his memory was diminished by the passage of time.  Essociate's response is merely argument that Epic's inquiry into the operation of Old XPays was irrelevant.

**Epic Fact No. 43.**   Essociate did not take steps to preserve the computer scripts, code, or other documentation relating to the first use of the technology it patented in this case except for the X make.CGI script. Oct 8, 2012 Landau Deposition, 171:11 - 176:4.

> **Essociate Resp.**   **Disputed.** The X make.CGI script does not relate to the technology disclosed by the '660 Patent. Essociate has met its preservation obligations in all respects and Defendants have not challenged them. Landau Decl. ¶ 23; Du Wors Decl. ¶ 11.

> **Epic Reply.**   **No genuine dispute**.  Essociate does not dispute the proposed fact that it did not preserve Old XPays evidence.  Even now, in an attempt to deny that Epic has suffered prejudice, Essociate contends that "[T]he evidence Defendants allege was lost would have been gone by 2001, if it ever even existed."  Landau Decl. ¶ 118.  The Landau Declaration further states that "[a]ll materials relating to the operation of XPays' affiliate system in 1998, 1999, and 2000 were lost or discarded by 2001 in the normal course of business."  Landau Decl. ¶ 120.

**Epic Fact No. 44.**   The X make.CGI script constitutes only one small component of the overall XPays system that embodied the patented invention and was practiced in the May

17

Redacted Public Version

1999 sextoy.com launch.  Oct. 8, 2012 Landau Deposition, 139:18 – 140:5; Dkt. No. 80, 2010

Landau Deposition, Ex. 2-3.

> **Essociate Resp.     Disputed.** The X make.CGI script was not used in any system
>
> that embodied the invention disclosed by the '660 Patent. Landau Decl. ¶ 24.
>
> **Epic Reply.    No genuine material dispute**.  Essociate does not dispute the
>
> material portion of the proposed fact, which is that, at best.  Essociate has
>
> preserved only a fragment of the system that it contends was the first reduction to
>
> practice of the invention in the '660 Patent.

**Epic Fact No. 45.**     In 2008, Epic Media undertook a major development of the Epic

Direct software, re-writing the entire code in the Erlang programming language.  Deposition of

Richard Okin, October 10, 2012, 84:7- 85:11; Kim Decl., 4.

> **Essociate Resp.     Disputed.** The Accused Epic Network—which is the Erlang-
>
> based software program at issue in this case—first came into existence in 2008. It
>
> was a replacement for the PHP-based Old Azoogle Network. October 2 Okin Dep.
>
> 84:2-86:12. Mathis Dep. 157:12-158:3.
>
> **Epic Reply.    No genuine dispute**. Epic's evidence that the Epic Direct network
>
> was the same network as the Azoogle network is unrebutted.  The cited deposition
>
> testimony provides no support for Essociate's argument that Epic Direct is a
>
> different network from Azoogle, or that Epic Direct "first came into existence" in
>
> 2008.  Even Essociate's infringement contentions refer to the network as one
>
> device – the contentions refer to the "[a]ccused device" as "[t]he online affiliate
>
> marketing network operated by Defendants at
>
> <<http://www.epicdirectnetwork.com>> and previously at

Redacted Public Version

<<http://www.azoogleads.com>>." Peterson Decl., Dkt. No. 89, ¶ 12, Ex. 10, Dkt. No. 95, Essociate's Infringement Contentions (Essociate's Responses to Epic Media's First Set of Interrogatories), at 2.

**Epic Fact No. 46.**     Epic Media Group invested $4.2 million in the development of and improvements to Epic Direct version 2.0 from 2005 to 2010.  Kim Decl. 4.

> **Essociate Resp.     Disputed.** The $4.2 million Defendants claim to have spent in development costs are divided between the Old Azoogle Network and the Accused Epic Network at issue in this case. *See* October 2 Okin Dep. 84:2-86:12; Mathis Dep. 63:10-65:18.

> **Epic Reply.     No material dispute**.  Essociate does not dispute that Epic has invested $4.2 million in its network software.

**Epic Fact No. 47.**     The Epic Direct system underwent constant refinement and revision.  Appiah Decl., ¶ 5.

> **Essociate Resp.     Disputed.** The Old Azoogle Network is a distinct device from the Accused Epic Network. October 2 Okin Dep. 84:2-86:12; *see* Mathis Dep. 63:10-64:4, 157:12-158:3.

> **Epic Reply.     No genuine dispute**.  Epic's evidence that the Epic Direct is merely a new name for the Azoogle network stands unrebutted.  *See* October 2 Okin Dep. 84:2-86:12; Mathis Dep. 63:10-65:18; 157:12-158:3.

**Epic Fact No. 48.**     If Essociate's allegations has been pressed to resolution sooner, Epic Media could have redesigned its affiliate system to limit the circumstances in which the Epic affiliate ID was appended to the merchant's landing page URL, Epic Media could have prohibited use of the affiliate ID variable in any transaction that involved other affiliate

19

networks, and Epic Media could have prohibited the use of this pre-set variable entirely and developed an alternative means of reporting the Epic affiliate IDs to merchants who wanted this information.  For example, Epic Media could have arranged for batch reporting of transactions or automatic real time reporting via email or some other channel.  Appiah Decl., ¶ 5.

> **Essociate Resp.    Disputed.** Alex Zhardanovsky—founder of Azoogle and, later, Epic, from 2000 until September 2009—testified that no business or technical decision or any other kind of decision was made in reliance on the absence of any lawsuit or other enforcement effort by Essociate. Zhardanovsky Dep. 6:6-24, 30:13-31:10, 32:15-33:10. Azoogle and Epic simply never believed they infringed the '660 Patent and never considered changing their business model or technological infrastructure. (*Id.* at 33:11-17.) Don Mathis, Azoogle/Epic's COO from 2006 to 2010, and CEO from 2010 through 2011, testified that Azoogle/Epic had never even heard of Essociate. Mathis Dep. 46:8-23, 154:8-155:23, 156:21-157:5.
>
> **Epic Reply.    No genuine dispute**.  The deposition testimony cited by Essociate shows that Epic did not believe that it infringed the '660 patent and did not take steps to design around it.  Epic's evidence that it could have designed around the '660 patent, had Essociate's claim been pressed to resolution sooner, stands unrebutted.

**Epic Fact No. 49.**      Essociate filed its first lawsuit to enforce the '660 patent in May 2009.  Peterson Decl., ¶ 22, Ex. 20 (Clickxchange docket sheet).

> **Essociate Resp.    Undisputed.**

Redacted Public Version

**Epic Fact No. 50.**     Essociate filed at least 12 lawsuits to enforce the '660 patent between 2009 and January, 2013.  Peterson Decl., ¶ 23, Ex. 21 (PACER Essociate cases with 830 case code).

   **Essociate Resp.**     Undisputed.

**Epic Fact No. 51.**     Essociate has had multiple lawsuits against multiple defendants active at the same time.  Peterson Decl., ¶ 23, Ex. 21 (PACER Essociate cases with 830 case code).

   **Essociate Resp.**     Undisputed.

**Epic Fact No. 52.**     Essociate's enforcement litigation of the '660 patent has all been conducted on a contingency fee basis.  Oct. 8, 2012 Landau Deposition, 7:22 – 10:2.

   **Essociate Resp.     Disputed**. Essociate has been forced to advance several
   hundred thousand dollars in costs which has imposed a substantial burden on
   Essociate. Essociate was unable to fund those costs until 2009, primarily due to
   the market share wrongfully appropriate by large infringers such as Defendants.
   Landau Decl. ¶ 25.

   **Epic Reply.     No genuine dispute**.  Essociate does not dispute the proposed fact.
   The Landau declaration does not identify any costs specifically associated with its
   suit against Azoogle and Epic Media.  Moreover, the poverty of the plaintiff is
   immaterial.

**E.**     **The operation of the Epic Direct system accused of infringing the '660 patent.**

**Epic Fact No. 53.**     The transaction tracking method used by the Epic system is referred to variously as "cookie tracking," "pixel tracking" or "cookie and pixel tracking."  Dkt. No. 82  Responsive Expert Report of Peter Kent of Infringement of the Patent-in-Suit ("Kent Infringement Report") ¶ 6; Dkt. No. 83 Declaration of Peter Kent ("Kent Decl.") ¶3; Dkt. No. 71

Redacted Public Version

Declaration of Sasenarine "Rocky" Appiah ("Appiah Decl.") ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22
(Advertiser Implementation Guide), p. 8-10;

> **Essociate Resp.    Disputed.** The Accused Epic Network enables URL-based
> tracking by including a hybrid string of characters composed of the source
> webmaster ID and the source system ID assigned to the Accused Epic Network by
> merchant customers of that network, in the merchant Destination Landing Page
> URLs reached by users originated from affiliated webmasters within the Accused
> Epic Network. The purpose of including these hybrid values is to enable Epic's
> merchant customers to track which source affiliates within the Accused Epic
> Network originated the traffic at issue for statistical and other purposes.
> Sometimes these values are included in the Destination Landing Page URL in
> literal form and sometimes in encrypted form—such as a click-hash. Defendants
> used this click-hash as a secondary tracking method to the cookie and pixel
> tracking they also used in order to audit and confirm the information tracked by
> cookie or pixel. To utilize this URL-based tracking a merchant customer that
> operates its own merchant affiliate network who becomes a merchant customer of
> the Accused Epic Network provided an Epic customer service representative with
> a Destination Landing Page URL which was part of the merchant's affiliate
> system. That Destination Landing Page URL contained a hard-coded static value
> field with a code inside of it identifying the Accused Epic Network as the
> referring source system. The Epic customer service representative would then
> configure that Destination Landing Page URL to include a sub-ID landing field
> with a variable source code command (a "macro"). That macro resulted in the ID

Redacted Public Version

code the Accused Epic Network assigned to its referring source webmaster being included in that sub-ID field in the Destination Landing Page URL ultimately reached by the user referred by the Accused Epic Network. October 2 Okin Dep. 73:18-74:9, 116:17-22, 118:12-24, 144:11–155:7, 213:15-214:16; October 2, 2012 Deposition of Rocky Appiah ("October 2 Appiah Dep.") 10:19-11:2, 11:19-12:23, 19:24-20:24; October 3, 2012 Deposition of Rocky Appiah ("October 3 Appiah Dep.") 43:9-17, 44 44:16-24, 45:15-46:1; Du Wors Decl. ¶ 19, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 3, 8, 14.

**Epic Reply.** **No genuine dispute.** Essociate's response is argument that does not dispute the proposed fact that the Epic network uses cookie and pixel tracking.

**Epic Fact No. 54.** The Epic system tracking method is similar to the one used by Linkshare in the mid-1990s. Kent Infringement Report ¶ 6, Ex. 15; Kent Decl. ¶ 3; Appiah Decl. ¶ 3-4.

**Essociate Resp.** **Disputed**. The Accused Epic Network utilizes URL-based tracking to refer traffic to merchant customers' existing target affiliate systems. There is no evidence that Linkshare ever utilized that tracking method or referred traffic to an existing target affiliate system before the priority date for the '660 Patent. October 2 Okin Dep. 125:19-128:24; October 2 Appiah Dep. 26:10-16, 26:23-27:14; Du Wors Decl. ¶ 17, Ex. F (Advertiser Cheat Sheet and Implementation Guide); Landau Decl. ¶ 26, Ex. A ('660 Patent); Edwards Report at p. 3, 8.

**Epic Reply.** **No genuine dispute.** As established in proposed fact No. 53, the Epic network uses cookie and pixel tracking. Exhibit 15 to the Kent Infringement

Redacted Public Version

Report is U.S. Patent No. 5,991,740 to Messer.  The Messer patent describes the operation of the Linkshare system which also uses cookie and pixel tracking.

**Epic Fact No. 55.**     In the Epic Media system, the process begins with a merchant setting up an "offer" to be promoted in the Epic system.  Kent Infringement Report ¶ 7; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 15;

> **Essociate Resp.     Disputed.** The Epic customer service representative set up the offers for its merchant customers and configured the Destination Landing Page URLs for those customers when the customer requested that the Destination Landing Page URL ultimately reached by users referred from the Accused Epic Network contained an identifier for the referring Epic Source Webmaster for requisite tracking. October 2 Okin Dep. 73:18-74:9, 213:15-214:16; October 2 Appiah Dep. 10:19-11:2, 11:19-12:23, 19:24-20:24; Du Wors Decl. ¶ 18, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 3, 8.

> **Epic Reply.    No genuine material dispute**.  Essociate's response contains additional (inaccurate) information but it does not place proposed fact No. 55 in dispute.

**Epic Fact No. 56.**     All offers require the merchant to have a "landing page," which is identified with a URL.  When a user clicks through from an affiliate's promotion of the offer, the user will ultimately be directed to the merchant's landing page.  Kent Infringement Report ¶ 8; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 4.

Redacted Public Version

**Essociate Resp.**     Undisputed.

**Epic Fact No. 57.**     The landing page is the place where the user can complete some action, such as making a purchase or signing up for some service.  Kent Infringement Report ¶ 9; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 4.

> **Essociate Resp.**     **Disputed.** The Destination Landing Page need not allow the user to take any action for the '660 Patent to be infringed. For example, sometimes compensation will become owing purely as a result of the user having visited the merchant's site. Landau Decl. ¶ 27.
>
> **Epic Reply.**     **No genuine material dispute**.  There is no evidence that Epic operated on a pay-per-click basis.  Whether the '660 patent reads on a pay-per-click system is immaterial.  Moreover, paragraph 27 of the Landau declaration is merely a conclusory argument about the scope of the 660 patent which the Court should disregard.

**Epic Fact No. 58.**     The format and content of the landing page and its URL are determined by the merchant, not Epic.  Commonly, the merchant will set up a landing page to receive users from affiliate networks that is distinct from its standard home page or signup page. Kent Infringement Report ¶ 10; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 4.

> **Essociate Resp.**     **Disputed.** The format and content of the Destination Landing Page URL was often dictated by Epic's customer service representative— especially when the merchant operated an existing target affiliate system and requested that the Destination Landing Page ultimately reached by the users

Redacted Public Version

referred from the Accused Epic Network contain values to enable requisite tracking of the referring source webmaster affiliate. And Epic further configured these URLs to include encrypted click-hashes containing these identifying values which the Accused Epic Network used for secondary tracking. The formatting of these Destination Landing Page URLs occurred when they were configured by an Epic customer service representative who modified the Destination Landing Page URLs provided by merchant customers operating an existing target affiliate system to include macros that in turn caused the destination landing page URLs reached by referred users to contain source webmaster identifiers. October 2 Okin Dep. 73:18- 74:9, 116:17-22, 118:12-24, 144:11–155:7, 213:15-214:16; October 2 Appiah Dep. 10:19-11:2, 11:19-12:23, 19:24-20:24; October 3 Appiah Dep. 43:9-17, 44:16-24, 45:15-46:1; Du Wors Decl. ¶ 19, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 3, 8, 14.

**Epic Reply.    No genuine dispute**.  None of the evidence cited by Essociate disputes the proposed fact.  The proposed fact is confirmed by Essociate's own supplemental proposed fact No. 93 which provides that "the merchant would provide Epic a format for a destination landing pledge URL to which Epic should redirect traffic from Epic's affiliates."

**Epic Fact No. 59.**      Merchants use many variations on how they structure their landing pages and the landing page URLs to suit their own purposes.  Kent Infringement Report ¶ 11; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 4.

**Essociate Resp.**      Undisputed.

Redacted Public Version

**Epic Fact No. 60.**     In setting up an offer that will be available to its affiliates, Epic creates a "jump link," also referred to in the Advertiser Implementation Guide as an Advertiser link.  A jump link will be created for and provided to each Epic affiliate who would like to promote the offer.   Kent Infringement Report ¶ 12; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 7.

**Essociate Resp.**     Undisputed.

**Epic Fact No. 61.**     A jump link in the Epic system will appear in a format like this: x.azjmp.com/009GvKent Infringement Report ¶ 12; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 7.

**Essociate Resp.**     Undisputed.

**Epic Fact No. 62.**     In this example, "x.azjmp.com" is the domain and subdomain on the Epic system where user requests will be processed.   "009Gv" is the Epic link ID which encodes pertinent information for this link, including at least the affiliate ID, the offer ID and the traffic type.  Kent Infringement Report ¶ 13; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 7.

**Essociate Resp.**     Undisputed.

**Epic Fact No. 63.**     The affiliate ID is the numerical code that is assigned to each affiliate in the Epic system.  Kent Infringement Report ¶ 13; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 7.

**Essociate Resp.**     Undisputed.

**Epic Fact No. 64.**     The offer ID is a numerical code that is assigned to each offer.  A merchant will have as many offer IDs as it has separate offers.  Kent Infringement Report ¶ 13;

Redacted Public Version

Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 7.

      **Essociate Resp.**    Undisputed.

    **Epic Fact No. 65.**    The traffic type indicates what type of user traffic the affiliate would provide, such as web traffic from a website or traffic from an email campaign.  Kent Infringement Report ¶ 13; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 7.

      **Essociate Resp.**    Undisputed.

    **Epic Fact No. 66.**    Other variables might also be encoded in the link ID, depending on the offer and the needs of the merchant and the affiliates.  Kent Infringement Report ¶ 13; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 6.

      **Essociate Resp.**    Undisputed.

    **Epic Fact No. 67.**    To promote the offer, the Epic affiliate will place the jump link on its own materials that it publishes.  Kent Infringement Report ¶ 14; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 7.

      **Essociate Resp.**    Undisputed.

    **Epic Fact No. 68.**    The affiliate might, for example, simply place the jump link in an email.  Commonly, the affiliate will place the jump link on its website as part of a banner advertisement.  Kent Infringement Report ¶ 14; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 12.

      **Essociate Resp.**    Undisputed.

Redacted Public Version

**Epic Fact No. 69.**      When a user clicks on the banner ad, the user is directed by the jump link to the Epic system, where the Epic system decodes the link ID.  The Epic system makes a record of the user request, and it places a cookie (a small, hidden text file) on the user's computer for tracking purposes.  The cookie stores the offer ID and the affiliate ID on the user's computer.  The Epic system then redirects the user to the merchant's landing page URL.  These steps are invisible to the user, to whom it appears that the banner ad linked directly to the merchant's website. Kent Infringement Report ¶ 15; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 8.

>    **Essociate Resp.      Disputed.** The transmission path from a webmaster's web page through the Epic system to the Destination Landing Page URL is often visible in the user's browser address bar and browser history. Landau Decl. ¶ 28.

>    **Epic Reply.      No dispute, as corrected**.  Epic agrees that the transmission path would be visible to a user who was paying attention to the browser address bar and browser history.  The remaining elements of proposed fact No. 69 are undisputed by Essociate.

**Epic Fact No. 70.**      If the user completes the transaction for which the merchant has agreed to pay, the user is brought to a lead conversion page on the merchant's system.  The lead conversion page, or the "success" page, will typically say something like "thanks for signing up" to the user.  Kent Infringement Report ¶ 16; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 8.

>    **Essociate Resp.      Undisputed.**

**Epic Fact No. 71.**      The purpose of the lead conversion page in the Epic system is that it includes a "tracking pixel."  The pixel is invisible to the user, because it is set up to display as

Redacted Public Version

a one-pixel by one-pixel transparent square.  The function of the pixel is to prompt the user's browser to process a line of code that triggers the execution of a script on the Epic system.  The script reads the cookie from the user's computer, and the Epic system makes a record of the successful transaction.  After recording both the offer ID and the affiliate ID from the cookie on the user's computer, Epic tracks the required payment information.  Kent Infringement Report ¶ 16; Kent Decl. ¶ 3; Appiah Decl. ¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 8-9.

> **Essociate Resp.**    Undisputed.

**Epic Fact No. 72.**    Neither Epic nor the affiliate relies on the merchant system for tracking transactions or commissions.  The merchant likely knows that the Epic system has provided a referral, because it can monitor its incoming web traffic.  Also, the merchant may have set up a special landing page for Epic traffic.  Kent Infringement Report ¶ 17; Kent Decl. ¶3; Appiah Decl. ¶ 3-4.

> **Essociate Resp.**    **Disputed.** Often, the Accused Epic Network used the click-hash and the source webmaster identifier contained within the click-hash to function as a secondary tracking method to audit or confirm the information obtained by the Accused Epic Network through its use of cookies or pixels. This fact is also disputed because, with respect to some of its merchants, Epic did not perform some of its own tracking but instead relied on the merchants' tracking. October 2 Okin Dep. 112:2-114:2, 115:10-17, 116:17-22, 118:12-24, 144:11–155:7; October 3 Appiah Dep. 43:9-17, 44:16-24, 45:15-46:1; Du Wors Decl. ¶ 20, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 8, 14.

Redacted Public Version

**Epic Reply.    No genuine dispute**.  There is no evidence that Epic or the affiliate

relied on the merchant system for tracking referrals or commissions.  The cited

deposition testimony establishes that an Epic merchant advertiser could use the

affiliate ID for its own internal purposes.  The deposition testimony establishes,

however, that Epic did its own tracking and paid its affiliates based on its

tracking.  The click-hash method of transaction tracking (which has not been

timely accused of infringement) involves a code generated by the Epic system that

would be meaningless to the merchant.  It could be decoded by the Epic system,

but not by the merchant and thus it cannot be used by the merchant for tracking.

*See* Epic Reply Br. at Section III.C.

Epic Fact No. 73.     The Epic system does not rely on merchants to track transactions

and commissions for particular affiliates, and thus there is no need for the Epic system to provide

the identity of the affiliate to the merchant.  However, some merchants request that the affiliate

ID or other information is passed along to them for their own purposes.  Some merchants would

like to determine which affiliates are most productive, or which affiliates are sending low-quality

traffic.  If, for example, some affiliates produce a large number of bogus transactions, the

merchant may investigate and ultimately seek to disqualify that affiliate.  Kent Infringement

Report ¶ 25; Kent Decl. ¶3; Appiah Decl. ¶ 3-4.

**Essociate Resp.    Disputed.** The Accused Epic Network needs to provide its

affiliate IDs to merchants who request that it be included in their Destination

Landing Page URLs for the merchants' requisite tracking in order to be

marketable to the merchants who desire that service. Additionally, the Accused

Epic Network can use the click-hash it includes in those Destination Landing

31

Redacted Public Version

Page URLs as a secondary method of tracking and it can also use non-click-hash URLs contained within its merchant's records to reconcile disputes between the Accused Epic Network and its merchant customers over transaction tracking. All that is required to infringe the '660 Patent is for the use of the source webmaster ID values included in Destination Landing Page URLs to become a possible source of tracking for either the merchant or the Accused Epic Network or both. October 2 Okin Dep. 73:18-74:9, 116:17-22, 118:12-24, 144:11–155:7, 213:15-214:16; October 2 Appiah Dep. 10:19-11:2, 11:19-12:23; October 3 Appiah Dep. 43:9-17, 44:16-24, 45:15-46:1; Du Wors Decl. ¶ 21, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 8, 14 (stating that "click_hash variables . . . should be reported under [the Afill ID] field."); Landau Decl. ¶ 29, Ex. A ('660 Patent).

**Epic Reply.    No genuine dispute**.  Essociate's response is merely argument about the scope of the '660 patent and the value of its technology.  Nothing in the cited evidence places any portion of proposed fact No. 73 in dispute.

**Epic Fact No. 74.**    To serve the various needs of its merchants and its affiliates, Epic allows, upon request, certain preset variables to be passed along to the merchant system.  These variables include: the affiliate ID, affiliate sub-ID, click hash value, and a fixed code to represent the Epic system, "az2."  The requested variables are appended to the merchant landing page URL.  Kent Infringement Report ¶ 26; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 5.

**Essociate Resp.**    Undisputed.

Redacted Public Version

**Epic Fact No. 75.**      When variables are to be passed along, the merchant landing page URLs are formatted to include variables that will be filled in when the user clicks on the jump link.  For example, if Netflix had requested that the affiliate ID be passed along, the Netflix landing page URL would be pre-formatted on the Epic system like this:

www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIATE_ID%% Kent Infringement Report ¶ 27; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 5.

> **Essociate Resp.      Disputed.** The affiliate ID values contained within an
> infringing Destination Landing Page URL are not "passed along"—they are
> created anew and included in a hybrid string of characters along with a value
> identifying the Accused Epic Network as the referring system as a function of the
> macros an Epic customer service representative configures the Destination
> Landing Page URL to include. Landau Decl. ¶ 30.
>
> **Epic Reply.    No genuine dispute**.  Essociate's response is merely argument
> about the scope of the 660 patent.  Paragraph 30 of the Landau declaration is
> inadmissible as untimely expert testimony, and is itself merely argument.

**Epic Fact No. 76.**      In the syntax of protocols used on the Epic system (and in internet protocols generally), the "?" designates the end of the location part of the URL.  The "%%" designates the beginning and the end of the label of the variable.  Then, when a user clicks on the jump link, the Epic system fills in the variables in the pre-formatted URL to complete the merchant landing page URL.  If the affiliate's ID were 12354, the landing page URL would look like this: www.netflix.com/affiliates/signup.html?affiliate_id=12345 Kent Infringement Report ¶ 28; Kent Decl. ¶3; Appiah Decl. ¶ 3-4.

Redacted Public Version

**Essociate Resp.**     Undisputed.

**Epic Fact No. 77.**     The merchant would then be able to record the affiliate's ID for whatever purposes it wanted.  However, the Epic system would still use the cookie and pixel method for tracking this transaction and any resulting commissions, just as though the affiliate ID had not been passed on to the merchant.  Kent Infringement Report ¶ 29; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 5.

> **Essociate Resp.**     **Disputed.** Where a click-hash containing an encrypted reference to the source webmaster's identifier is included in the Destination Landing Page URL the accused Epic Network uses that encrypted set of values as a secondary method of tracking to audit or confirm the tracking data obtained through its use of cookies or pixels. Also, the Accused Epic Network can use the literal referred webmaster values for tracking either form its own records or the merchants'—especially where there is a dispute over transaction data. October 2 Okin Dep. 112:2-114:2, 115:10-17, 116:17-22, 118:12-24, 144:11–155:7; October 3 Appiah Dep. 43:9-17, 44:16-24, 45:15-46:1; Du Wors Decl. ¶ 22, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 8, 14.

> **Epic Reply.**     **No genuine dispute**.  Essociate's description of the use of the click hash does not place any portion of proposed fact No. 77 in dispute.  The click-hash method of transaction tracking (which has not been timely accused of infringement) involves a code generated by the Epic system that would be meaningless to the merchant.  It could be decoded by the Epic system, but not by

Redacted Public Version

the merchant and thus it cannot be used by the merchant for tracking.  *See* Epic

Reply Br. at Section III.C.

**Epic Fact No. 78.**      If the merchant requests it, the Epic system can also allow use of a

sub ID variable, which can be useful for affiliates.   Imagine, for example, that the affiliate is a

website operated by a local newspaper at the domain name www.citytoday.com.  The website,

like the newspaper, has various sections, including news, sports, and arts.  The affiliate promotes

Epic offers, and it would like to keep track of whether the offers were more successful in the

sports section or the arts section.  Let's say that CityToday puts the Netflix offer in both the

sports section and the arts section.  When the affiliate places the offer in the sports section, the

"sub_ID=001" is appended to the jump link.  When the affiliate places the offer in the arts

section, it appends "sub_ID=002."  Kent Infringement Report ¶ 30; Kent Decl. ¶3; Appiah Decl.

¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 5.

      **Essociate Resp.**      Undisputed.

**Epic Fact No. 79.**      When the user clicks on the jump link, the landing page URL is

completed by filling in the variables.  The pre-formatted landing page URL would look like this:

www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIATE_ID%%&

sub_id=%%SUB_ID%% Kent Infringement Report ¶ 31; Kent Decl. ¶3; Appiah Decl. ¶ 3-4.

      **Essociate Resp.**      Undisputed.

**Epic Fact No. 80.**      If the user clicked on the jump link in the sports section, the

landing page URL would be completed to look like this:

www.netflix.com/affiliates/signup.html?affiliate_id=12345&sub_id=001 Kent Infringement

Report ¶ 32; Kent Decl. ¶3; Appiah Decl. ¶ 3-4.

      **Essociate Resp.**      Undisputed.

Redacted Public Version

**Epic Fact No. 81.**      In transaction and commission reports, both the merchant and the affiliate would know that the commission was earned by affiliate 12345 and that the traffic came from a link that had sub id 001 associated with it.  Kent Infringement Report ¶ 33; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 5.

       **Essociate Resp.**      Undisputed.

**Epic Fact No. 82.**      After it received Essociate's infringement contentions, and after it had provided to Essociate a table listing all the URLs used for Epic transactions, Epic requested that Essociate specify which transactions it regarded as infringing.  Essociate declined to do so at that time, objecting on several grounds and contending that it would require an Essociate representative to have access to material designated as attorney-eyes only under the protective order.  Peterson Decl. ¶ 24, Ex.22 (responses to 3rd rogs).

       **Essociate Resp.**      **Disputed.** Essociate properly objected to Defendants' interrogatories and the Defendants apparently agreed with Essociate's objections because they declined to challenge the objections or move to compel. Du Wors Decl. ¶ 13.

       **Epic Reply.**      **No genuine dispute**.  Du Wors's declaration paragraph 13 argues that Essociate's objections were legitimate, but it does not place any portion of proposed fact No. 82 in dispute.

**Epic Fact No. 83.**      In this example, the affiliate would thus know that this successful transaction came from the sports page.  Again, however, Epic would be tracking the transaction and commission by using its cookie and pixel tracking method, and Epic would not use the passed-along variables for its own transaction and commission reports.  Kent Infringement

Redacted Public Version

Report ¶ 33; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 5.

> **Essociate Resp.     Disputed.** The Accused Epic Network relied on the inclusion of click-hashes of Destination Landing Page URLs for secondary tracking and was able to use the literal values in those Destination Landing Page URLs for tracking as well which is all that is necessary to infringe the '660 Patent. October 2 Okin Dep. 112:2-114:2, 115:10-17, 116:17-22, 118:12-24, 144:11–155:7; October 3 Appiah Dep. 43:9-17, 44:16-24, 45:15-46:1; Du Wors Decl. ¶ 23, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 8, 14 (stating that "click_hash variables . . . should be reported under [the Afill ID] field."); Landau Decl. ¶ 31, Ex. A ('660 Patent).

> **Epic Reply.     No genuine dispute**.  Essociate's response is argument about the scope of the '660 patent.  The information concerning Epic's use of the click hash is inaccurate and even if true would not place any portion of proposed fact No. 83 in dispute.

**Epic Fact No. 84.**     SpeedDate.com is an Epic client, a merchant who uses the Epic system.  Appiah Decl. ¶ 7; *see also* Kent Infringement Report ¶ 35-36; Kent Decl. ¶3.

> **Essociate Resp.**     Undisputed.

**Epic Fact No. 85.**     A 2009 insertion order documents the relationship between SpeedDate.com and Epic.  The insertion order also shows that SpeedDate.com would use the cookie and pixel method of transaction tracking.  The insertion order demonstrates that SpeedDate.com used basic cookie and pixel tracking, because it indicates that SpeedDate.com was able to display the pixel on its conversion page and that "Epic/Azoogle will provide HTTP

Redacted Public Version

tracking pixel code to the Advertiser."  Appiah Decl. ¶ 7; *see also* Kent Infringement Report ¶ 35-50; Kent Decl. ¶3.

> **Essociate Resp.     Disputed.** This insertion order reveals that SpeedDate.com requested a customer service representative on behalf of the Accused Epic Network configure the Destination Landing Page URL that is part of SpeedDate.com's existing target affiliate network to include both the source webmaster ID and sub-ID of the referring source webmaster affiliate to be included in the Destination Landing Page URL as target webmaster identifier functional within SpeedDate.com's target affiliate network to be used for requisite tracking. October 2 Okin Dep. 73:18-74:9, 213:15-214:16; October 2 Appiah Dep. 10:19-11:2, 11:19-12:23, 19:24-20:24; Du Wors Decl. ¶ 24, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 3, 8; Appiah Decl. Ex. A (Insertion Order) at 2.
>
> **Epic Reply.    No genuine dispute**.  Essociate's response does not place any portion of proposed fact No. 85 in dispute.  Essociate cites no evidence to show that the destination landing page URL is part of SpeedDate.com's existing affiliate network.  *See* Epic Reply Br. at Section III.B.3.

**Epic Fact No. 86.**      The Epic affiliate ID number 48192 belongs to an Epic affiliate in Denver, Colorado.  Appiah Decl. ¶ 8.

> **Essociate Resp.     Undisputed.**

**F.      Facts concerning the prior art and the invalidity of the '660 patent**

**Epic Fact No. 87.**      Internet affiliate systems began in the middle 1990s.  Dkt. No. 81, Expert Report of Peter Kent on the Validity of the Patent-in-Suit ("Kent Invalidity Report") ¶ 30; Kent Decl. ¶2.

Redacted Public Version

        **Essociate Resp.**    Undisputed.

**Epic Fact No. 88.**    Among the most well known early affiliate systems are those run by Amazon and Linkshare, both beginning in 1996.  Kent Invalidity Report ¶ 32-34; Kent Decl. ¶2.

        **Essociate Resp.**    Undisputed.

**Epic Fact No. 89.**    Both Amazon and Linkshare are acknowledged as prior art affiliate networks in the '660 patent.  Peterson Decl. ¶ 7, Ex. 5 (the '660 patent).

        **Essociate Resp.**    Undisputed.

**Epic Fact No. 90.**    XPays, LLC operated an affiliate network prior to May 1,1999.  Oct. 8, 2012 Landau Deposition, 82: 17 – 83:22; see also Kent Invalidity Report ¶ 64; Kent Decl. ¶2.  The affiliate network operated by XPays before May 1, 1999 is referred to as "Old XPays."  The affiliate system operated by XPays after May 1, 1999 is referred to as "New XPays."

        **Essociate Resp.**    **Disputed.** "Old XPays" was used after May 1, 1999 and "New XPays" was not used prior to May 5, 1999. Landau Decl. ¶ 32.

        **Epic Reply.**    **No genuine material dispute**.  The parties agree that New XPays was first used on May 5, 1999.  Epic does not challenge Essociate's position that it also continued to use the Old XPays system for some time after May 1, 1999.

**Epic Fact No. 91.**    Old XPays was not disclosed during the prosecution of the '660 patent.  Peterson Decl. ¶ 7, Ex. 5 (the '660 patent); Peterson Decl. ¶ 8; Ex. 6 ('660 file history).

        **Essociate Resp.**    **Disputed.** The structure of Old XPays was disclosed both during the prosecution of the '660 Patent and in the discussion of prior art of the '660 Patent as it was substantially identical to Linkshare. Landau Decl. ¶ 33, Ex. A ('660 Patent).

Redacted Public Version

**Epic Reply.    No genuine dispute**.  In response to defendants' requests for

admission nos. 35 and 36, Essociate admitted that Landau and Horowitz did not

disclose Old XPays to the USPTO.  Peterson Decl. ¶ 11, Ex. 9.

**Epic Fact No. 92.**      In November 1998, the Old XPays system was used to manage the

affiliate system for a company called Netfill.  Dkt. No. 80, Jan 6, Dkt. No. 80, 2010 Deposition

of Michael Landau ("2010 Landau Deposition"), 73:2 – 73:17; Kent Invalidity Report ¶ 107;

Kent Decl. ¶2.

**Essociate Resp.**    Undisputed.

**Epic Fact No. 93.**      Before May 1, 1999, both iGallery and Python operated affiliate

networks.  Oct. 8, 2012 Landau Dep. 82:17-83:8; 84:20-87:16; 98:15-19; Kent Invalidity Report

¶ 111; Kent Decl. ¶2.

**Essociate Resp.**    Undisputed.

**Epic Fact No. 94.**      Before May 1, 1999, affiliates enrolled in the Old XPays system

provided traffic to iGallery and/or Python. 2012 Landau Dep. 87:1 – 87:16, 92:18 – 93:8; Kent

Invalidity Report ¶ 111; Kent Decl. ¶2.

**Essociate Resp.    Disputed.** The deposition portions cited do not support this

factual assertion. And because of the use of intermediate pages Old XPays

affiliates could not provide traffic to Python or iGallery, they could only provide

it to XPays. Landau Decl. ¶ 34.

**Epic Reply.    No genuine dispute**.  The cited declaration statement by Landau is

contradicted by his prior sworn testimony.  The declaration statement is therefore

a sham affidavit that cannot create a genuine dispute of fact.  *See* Epic Reply Br.

at Section I.B.   In particular, and in addition to the deposition citations above,

Redacted Public Version

Landau testified that Old XPays "provide[d] virtual affiliates to an existing
affiliate system in the case of Python and iGallery."  2010 Landau Dep. 46:17-19.

**Epic Fact No. 95.**     Before May 1, 1999, Old XPays had affiliates signed-up, was
associating webmasters with merchants, and was used to track referral identifying the referring
webmaster.  Peterson Decl. ¶ 11, Ex. 9 (Essociate's response to Requests for Admission Nos. 17-
19, 21, 25, 28, 46,47, 49, and 50).

> **Essociate Resp.     Disputed.** Old XPays did not associate webmasters with
> merchants and was not "used to track referral identifying the referring
> webmaster." Landau Decl. ¶ 35.

> **Epic Reply.    No genuine dispute**.  Essociate appears to take issue with a
> typographical error in this fact:  "track referral" should be "track referrals."
> Otherwise, this fact is summarized directly from Essociate's responses to
> defendants' requests for admission.  The cited declaration statement by Landau is
> contradicted by his prior sworn testimony.  The declaration statement is therefore
> a sham affidavit that cannot create a genuine dispute of fact.  *See* Epic Reply Br.
> at Section I.B.

**Epic Fact No. 96.**     By April of 1999, Old XPays was used by "about a thousand"
affiliates."  Oct. 8, 2012 Landau Dep. 97:6-11.

> **Essociate Resp.     Undisputed.**

**Epic Fact No. 97.**     Website pages from the 1998-1999 timeframe show that Old
XPays was a commercialized, fully operational system.  2010 Landau Dep., Exs. 7, 10.

> **Essociate Resp.     Disputed.** The web pages do not show "that Old XPays was a
> commercialized, fully operational system." Landau Decl. ¶ 36

Redacted Public Version

**Epic Reply.    No genuine dispute**.  The cited declaration statement by Landau is contradicted by his prior sworn testimony.  The declaration statement is therefore a sham affidavit that cannot create a genuine dispute of fact.  *See* Epic Reply Br. at Section I.B.  In addition to the deposition testimony cited in proposed fact No. 96 above, *see also* 2010 Landau Dep. 46:17-19.

**Epic Fact No. 98.**      Python and iGallery were configured to receive referrals from affiliates signed-up with Old XPays.  2010 Landau Deposition 48:20-23.

**Essociate Resp.    Disputed.** Python and iGallery were not configured to receive referrals from affiliates signed up with Old XPays. Landau Decl. ¶ 37.

**Epic Reply.    No genuine dispute**.  The cited declaration statement by Landau is contradicted by his prior sworn testimony.  The declaration statement is therefore a sham affidavit that cannot create a genuine dispute of fact.  *See* Epic Reply Br. at Section I.B.

**Epic Fact No. 99.**          `REDACTED`

2010 Landau Deposition 43:13-18.

**Essociate Resp.    Disputed.**


`REDACTED`

Landau Decl. ¶ 38.

**Epic Reply.    No genuine dispute**.  Essociate's response admits that

`REDACTED`

The cited declaration statement by Landau is contradicted by his prior sworn testimony.

42

Redacted Public Version

The declaration statement is therefore a sham affidavit that cannot create a genuine dispute of fact.  *See* Epic Reply Br. at Section I.B.  In addition to the testimony cited, *see* 27:10-29:25; 34:12-23; 43:13-20; 42:4-12.

**Epic Fact No. 100.**     In Old XPays, if a transaction occurred after an affiliate referred traffic to a target merchant, the target merchant would pay XPays a commission, and XPays in turn would pay the affiliate a commission.  Oct. 8, 2012 Landau Deposition 86:20-87:16.

> **Essociate Resp.     Disputed.** Old XPays was unable to allow its affiliates to refer traffic to a target merchant. Landau Decl. ¶ 39.

> **Epic Reply.    No genuine dispute**.  Essociate does not dispute that in Old XPays, the target merchant would pay XPays a commission, and XPays in turn would pay the affiliate a commission.  The conclusory denial contradicts Landau's cited prior deposition testimony.  The cited declaration statement by Landau is contradicted by his prior sworn testimony.  The declaration statement is therefore a sham affidavit that cannot create a genuine dispute of fact.  *See* Epic Reply Br. at Section I.B.

**Epic Fact No. 101.**     Old XPays assigned a source webmaster unique identifier to each of its affiliates.  Oct. 8, 2012 Landau Deposition, 105:2-11; 2010 Landau Deposition 41:2-7.

> **Essociate Resp.**     Undisputed.

**Epic Fact No. 102.**     In Old XPays, the source webmaster unique identifier was the XPays five-digit ID.  Oct. 8, 2012 Landau Deposition, 105:2-11; 2010 Landau Deposition 41:2-7.

> **Essociate Resp.**     Undisputed.

Redacted Public Version

**Epic Fact No. 103.**    In Old XPays, the 5-digit XPays ID number was used to ensure proper credit for sign-ups, and affiliates were asked to enter this number into the online "XPays EZ Installation" form. 2010 Landau Deposition, Exs. 7 and 10.

      **Essociate Resp.**    Undisputed.

**Epic Fact No. 104.**    Old XPays affiliates displayed banner ads (including Python and iGallery ads) on their websites.  2010 Landau Deposition, 29:1-17;  Oct. 8, 2012 Landau Deposition 99:23-101:16.

      **Essociate Resp.**    Undisputed.

**Epic Fact No. 105.**    In the Old XPays system, when an internet user clicked on a banner ad, the Old XPays system received the request, which included the affiliate's 5 digit unique ID.  2010 Landau Deposition 29:1-17; 2010 Landau Deposition 99:23-101:16.

      **Essociate Resp.**    Undisputed.

**Epic Fact No. 106.**    Prior to May 1, 1999, Python and iGallery each had a unique identification system, apart from the Old XPays identification system, for their own affiliates. 2010 Landau Dep. 31:4-7; 32:2-12.

      **Essociate Resp.**    **Disputed.** There is no evidence that Python or iGallery had a unique identification system, apart from the Old XPays identification system for their own affiliats. Landau Decl. ¶ 40.

      **Epic Reply.**    **No genuine dispute**.  The Landau deposition show that Python and iGallery had an identification system which assigned to XPays "the XPays specific identifier."  The cited declaration statement by Landau is contradicted by his prior sworn testimony.  The declaration statement is therefore a sham affidavit that cannot create a genuine dispute of fact.  *See* Epic Reply Br. at Section I.B.

44

Redacted Public Version

**Epic Fact No. 107.**
                        REDACTED
                                                      2010 Landau

Deposition, 31:4-7; 32:3-12.

       **Essociate Resp.**    **Disputed.** There is no evidence that

                        REDACTED                 Landau Decl. ¶ 41.

       **Epic Reply.**    **No genuine dispute**.  The Landau deposition show that

                        REDACTED

       The cited declaration statement by Landau is contradicted by

his prior sworn testimony.  The declaration statement is therefore a sham affidavit

that cannot create a genuine dispute of fact.  *See* Epic Reply Br. at Section I.B.

**Epic Fact No. 108.**      REDACTED                                    .

2010 Landau Deposition, 67:10-13; 2010 Landau Deposition, Exhibit 5 at 1:10; *see also* Oct. 8,

2012 Landau Deposition at 117:17-19; 64:10-67:13.

       **Essociate Resp.**    **Disputed.**

                        REDACTED                 Landau Decl. ¶ 42.

       **Epic Reply.**    **No genuine dispute**.  The cited declaration statement by Landau is

contradicted by his prior sworn testimony.  The declaration statement is therefore

a sham affidavit that cannot create a genuine dispute of fact.  *See* Epic Reply Br.

at Section I.B.

**Epic Fact No. 109.**    The USPTO's Notice of Allowability for the '660 patent states that

the patent was allowed because it "contains the patentable distinct feature of uniquely identifying

the referring Webmaster by receiving and correlating the referring Webmaster's unique identifier

to the unique identifier of the target Merchant affiliate system's Webmaster and then generating

Redacted Public Version

a 'combined' URL for the requested Merchant affiliate system which includes the target

Webmaster Merchant unique identifier and the referring Webmaster unique identifier."  Peterson

Decl. ¶ 8, Ex. 6 (File History of '660 Patent at p. 4-5).

> **Essociate Resp.    Disputed.** The '660 Patent was allowed for multiple reasons.
>
> Landau Decl. ¶ 43, Ex. A ('660 Patent).
>
> **Epic Reply.    No genuine dispute**.  Essociate does not dispute the proposed fact.
>
> The assertion that there were "multiple reasons" for allowance is a conclusory
>
> allegation in the untimely Landau declaration which does not identify any other
>
> reason for allowance.

**Epic Fact No. 110.**    Michael Landau testified that the "crucial difference" between Old

XPays and New XPays was the "correlation" step in the '660 patent claims.  Oct. 8, 2012 Landau

Deposition, 157:19-158:2, 176:16-23.

> **Essociate Resp.    Disputed.** Landau testified that "generally speaking" the
>
> correlation step was the crucial difference. But many other important differences
>
> exist. And the issue of the legal significance associated with Old XPays and the
>
> '660 Patent is a question of law, not fact. Accordingly, Essociate's counsel
>
> properly objected that the question called for a legal conclusion. Landau Decl. ¶
>
> 44; Du Wors Decl. ¶ 14.
>
> **Epic Reply.    No genuine dispute**.  Essociate's response does not dispute
>
> proposed fact No. 110.

**Epic Fact No. 111.**    In the "hybrid string" embodiment described at Col. 11:17-21 in

the '660 patent, the target merchant assigns a single affiliate ID to the virtual-affiliate system,

which then adds an individual affiliate's ID to the end of a single target-merchant ID to create a

Redacted Public Version

unique ID that can be passed through to the target merchant when a visitor arrives at the merchant's site.  Kent Invalidity Report, ¶ 133; Kent Decl. ¶2; Peterson Decl. ¶ 7, Ex. 5 '660 patent.

> **Essociate Resp.    Disputed.** The hybrid string embodiment described at Col. 11:17-22 in the '660 Patent does not provide for the addition of "an individual affiliate's ID to the end of a single targetmerchant ID" or the creation of "a unique ID that can be passed through to the target merchant". Landau Decl. ¶ 45, Ex. A ('660 Patent).

> **Epic Reply.    No genuine dispute.**  Essociate's response is essentially a claim construction argument.  Its only support is a conclusory denial from Landau's Feb. 22, 2013 declaration, which is contradicted by the '660 patent itself.

**Epic Fact No. 112.**    One of ordinary skill in the art would recognize that scripting platforms (such as CGI, PHP, Apache, Perl, etc.) would allow the virtual affiliate system to create a template that could, in response to a user request originating from a particular source webmaster, incorporate the source webmaster ID into a URL for the target affiliate system.  Kent Invalidity Report, ¶ 131; Kent Decl. ¶2.

> **Essociate Resp.    Disputed.** One of ordinary skill in the art would not recognize this. Landau Decl. ¶ 46.

> **Epic Reply.    No genuine dispute**.  The only support cited by Essociate is a conclusory denial from Landau's Feb. 22, 2013 declaration, which should be disregarded as untimely expert opinion.  Notably, Landau's own expert report does not dispute this fact, which was asserted in the opening Kent Invalidity Report.

Redacted Public Version

**Epic Fact No. 113.**     Old XPays used the "hybrid string" method of correlation described at Col. 11:17-21 in the '660 patent, and it used a custom interface to do so.  Kent Invalidity Report, ¶ 132; Kent Decl. ¶2.

> **Essociate Resp.**     **Disputed.** Old Xpays did not use the hybrid string method of correlation described at Col. 11:17-21 in the '660 Patent. Landau Decl. ¶ 47.
>
> **Epic Reply.**     **No genuine dispute**.  The only support cited by Essociate for its position is a conclusory denial from Landau's Feb. 22, 2013 declaration, which should be disregarded as untimely expert opinion.

**Epic Fact No. 114.**

REDACTED                            Oct. 8, 2012 Landau Dep.

118:14-126:14; Kent Invalidity Report ¶143-159; Kent Decl. ¶2.

> **Essociate Resp.**     **Disputed.** The correlation step did not occur with Old XPays. Landau Decl. ¶ 48.
>
> **Epic Reply.**     **No genuine dispute**.  The only support cited by Essociate for its position is a conclusory denial from Landau's Feb. 22, 2013 declaration, which should be disregarded as untimely expert opinion.  The only portion of this fact that is allegedly disputed is based on Essociate's contention that Old XPays performed "substitution" instead of "correlation," which is a claim construction argument.  *See also* Oct. 8, 2012 Landau Dep. 118:14-126:14; 114:8-117:22.

**Epic Fact No. 115.**

REDACTED                            Kent

Invalidity Report, ¶ 148; Kent Decl. ¶2.

Redacted Public Version

**Essociate Resp.     Disputed.** This is not an example of a link used in association with Old XPays. Landau Decl. ¶ 49.

**Epic Reply.     No genuine dispute.**  The only support cited by Essociate for its position is a conclusory denial from Landau's Feb. 22, 2013 declaration.  Epic's expert, Peter Kent, discussed in his expert report at paragraphs 146-48 example lines taken from the index.html file provided by Essociate.  *See* 2010 Landau Dep. 12:2-10; 27:10-14; 64:3-9 (discussing the index.html file provided by Essociate); *see also* Kent Invalidity Report, Ex. 9.

**Epic Fact No. 116.**          REDACTED                                            Kent

Invalidity Report ¶ 148; Kent Decl. ¶2.

**Essociate Resp.     Disputed.** This is not an example of a link used in association with Old XPays. Landau Decl. ¶ 50.

**Epic Reply.     No genuine dispute.**  The only support cited by Essociate for its position is a conclusory denial from Landau's Feb. 22, 2013 declaration.  As explained in connection with proposed fact No. 115 above, the example lines were provided by Essociate.

**Epic Fact No. 117.**

REDACTED

Kent Invalidity Report ¶143 ;

Kent Decl. ¶2.

**Essociate Resp.     Disputed.**

REDACTED

Redacted Public Version

REDACTED

Landau Decl.

¶ 51.

**Epic Reply.**    **No genuine dispute of material fact**.

REDACTED

The only support cited by Essociate for its position is from Landau's Feb. 22, 2013 declaration, which is contradicted by Landau's prior deposition testimony, and thus should be disregarded.  In Landau's Oct. 8, 2012 deposition, he admitted the xmake.cgi was used with Old XPays. Oct. 8, 2012 Landau Dep. 111:11-114:23.  Landau also previously testified that

REDACTED

2010

Landau Dep 36:8-38:1.  Moreover, the Jan. 3, 2010 letter from Essociate's counsel explaining the operation of XPays' affiliate system "prior to May 1, 1999" explained    REDACTED

Kent Report, Ex. 9; *see also* Oct. 8, 2012 Landau Dep. 130:2-131:1.

**Epic Fact No. 118.**

REDACTED

Kent Invalidity Report, ¶ 143-45; Kent Decl. ¶2.

Redacted Public Version

**Essociate Resp.    Disputed.**

REDACTED

Landau Decl. ¶ 52.

**Epic Reply.    No genuine dispute**.  Essociate does not dispute the operation of xmake.cgi described here.  Rather, Essociate disputes that        REDACTED

based on a conclusory statement from Landau's Feb. 22, 2013 declaration, which is contradicted by his prior deposition testimony.  In particular, in Landau's October 8, 2012 deposition, he testified that        REDACTED

*See* Oct. 8, 2012 Landau Dep. 111:11-114:23; *see also* DPF 117.

**Epic Fact No. 119.**

REDACTED                                                Kent

Invalidity Report, ¶ 146; Kent Decl. ¶2.

**Essociate Resp.    Disputed.** This link does not relate to the invention disclosed by the '660 Patent. Landau Decl. ¶ 53.

**Epic Reply.    No genuine dispute**.  The only support cited by Essociate for its position is a conclusory denial from Landau's Feb. 22, 2013 declaration.  Essociate does not dispute that this link came from a file produced by Essociate or that this link relates to Old XPays.

**Epic Fact No. 120.**

REDACTED                                                Kent

Invalidity Report, ¶ 146; Kent Decl. ¶2.

51

Redacted Public Version

**Essociate Resp.    Disputed.**

`REDACTED`

Landau Decl. ¶ 54.

**Epic Reply.    No genuine dispute**.  Essociate does not dispute the operation of xmake.cgi described here.  Rather, Essociate disputes that    `REDACTED` based on a conclusory statement from Landau's Feb. 22, 2013 declaration, which is contradicted by his prior deposition testimony.  In particular, in Landau's Oct. 8, 2012 deposition, he testified that   `REDACTED`   *See* Oct. 8, 2012 Landau Dep. 111:11-114:23; *see also* DPF 117.

**Epic Fact No. 121.**

`REDACTED`                     Kent Invalidity

Report, ¶ 146; Kent Decl. ¶2.

**Essociate Resp.    Disputed.**

`REDACTED`

Landau Decl. ¶ 55.

**Epic Reply.    No genuine dispute**.  Essociate does not dispute the defendants' expert's analysis here.  Rather, Essociate only disputes   `REDACTED` based on a conclusory statement from Landau's Feb. 22, 2013 declaration, which is contradicted by his prior deposition testimony, in particular at Oct. 8, 2012 Landau Dep. 111:11-114:23; *see also* DPF 117.

**Epic Fact No. 122.**

`REDACTED`

Kent Invalidity Report, ¶ 152; Kent Decl. ¶2.

Redacted Public Version

**Essociate Resp.    Disputed.**

> REDACTED

No correlation occurred with respect to Old XPays. In Old XPays, the merchant did not use the supposed hybrid string values for tracking nor was there a hybrid string of values. Landau Decl. ¶ 56.

**Epic Reply.    No genuine dispute**.  Essociate does not dispute Peter Kent's analysis here, or that       REDACTED

Rather, Essociate disputes that       REDACTED

But Landau's conclusory statement to this effect in his Feb. 22, 2013 declaration is contradicted by his own prior deposition testimony.  *See* Oct. 8, 2012 Landau Dep 111:11-114:23; *see also* DPF 117.  The remainder of Essociate's response is a claim construction argument.

**Epic Fact No. 123.**    The Old XPays system generated a URL including the correlated target Webmaster unique identifier when it generated URLs for Python and iGallery that contained the correlated hybrid string.  2010 Landau Deposition, 34:15-23.

**Essociate Resp.    Disputed.** The Old XPays system did not generate a URL, did not correlate anything to a "target webmaster unique identifier", did not provide either service for Python or iGallery and never involved a correlated hybrid string. Landau Decl. ¶ 57.

**Epic Reply.    No genuine dispute**.  Essociate's only support for disputing this fact is a conclusory denial from Landau's Feb. 22, 2013 declaration, which is contradicted by his own prior deposition testimony, in particular at 2010 Landau Dep. 34:12-23.

53

**Epic Fact No. 124.**    The URL generated by Old XPays could also be used to access Python and iGallery and also provide identification of the Old XPays affiliate system for requisite tracking.  2010 Landau Deposition, 43:13-18.

>  **Essociate Resp.    Disputed.** No URL was generated with Old XPays and Python and iGallery were never able to recognize the referring source webmasters associated with Old XPays. Landau Decl. ¶ 58.

>  **Epic Reply.    No genuine dispute**.  Essociate's only support for disputing this fact is a conclusory denial from Landau's Feb. 22, 2013 declaration, which is contradicted by his own prior deposition testimony, in particular at 2010 Landau Dep. 27:10-29:25; 42:4-43:20; *see also* 2010 Landau Dep. 34:12-23.

**Epic Fact No. 125.**

>  REDACTED

>  2010 Landau Deposition, 42:4-12.

>  **Essociate Resp.    Disputed.** No URL was generated in the Old XPays system and no webmaster identifier was used by the target system for requisite tracking. Landau Decl. ¶ 59.

>  **Epic Reply.    No genuine dispute**.  Essociate's only support for disputing this fact is a conclusory denial from Landau's Feb. 22, 2013 declaration, which is contradicted by his own prior deposition testimony, in particular at 2010 Landau Dep. 27:10-29:25; 42:4-12; 43:13-20.

**Epic Fact No. 126.**    A person of ordinary skill in the art of the '660 patent would be a web developer experienced with web-development technologies and scripting languages, but would not necessarily need to be a skilled programmer or have a degree in computer science as

Redacted Public Version

long as he or she is familiar with the functions and capabilities of scripting languages used in web-based e-commerce.  Kent Invalidity Report, ¶ 28; Kent Decl. ¶2; *see also* Dkt No. 85 Expert Report of Michael Landau at 2.

> **Essociate Resp.     Disputed.** This is not the proper definition of a "person of ordinary skill in the art".  A person having ordinary skill in the art at the time of the invention of the '660 Patent would have been a web developer experienced with web-development technologies such as HTML, Apache, CGI, Cold Fusion, and scripting languages such as Javascript, Perl, and other similar languages commonly used in web development. Kent Invalidity Report, ¶ 28; Kent Decl. ¶ 2; see also Dkt No. 85 Expert Report of Michael Landau at 2.
>
> **Epic Reply.     No genuine dispute**.  The dispute as to the level of skill is immaterial to the defendants' motion for summary judgment.  Insofar as Essociate posits a higher level of skill than does Epic, the higher level of skill makes Epic's obviousness case stronger.  Thus, for the purpose of this motion, the Court can apply Essociate's proposed level of skill.

**Epic Fact No. 127.**     Michael Landau had a minor in computer science and did not have extensive computer programming experience at the time he invented the '660 patent. Oct. 8, 2012 Landau Deposition, 6: 4-7, 62:1-3; 66: 2-8.

> **Essociate Resp.     Disputed.** Michael Landau had extensive programming experience. Landau Decl. ¶ 60.
>
> **Epic Reply.     No genuine dispute**.  The conclusory statement cited from Landau's Feb. 22, 2013 declaration does not put this fact in genuine dispute: it

Redacted Public Version

states that Landau *has* extensive programming experience, not that he *had* such experience at the time of the invention.

**Epic Fact No. 128.**   Evan Horowitz did not have a degree in computer science and did not have extensive computer programming experience at the time he invented the '660 patent. Dkt. No. 79, Oct. 9, 2012 Deposition of Evan Horowitz, 21: 4-24.

> **Essociate Resp.**   Undisputed.

**Epic Fact No. 129.**   Correlation functions and lookup functions are basic computing functions that were well known in the art for decades prior to the '660 patent. Kent Invalidity Report, ¶ 191-94; Kent Decl. ¶2.

> **Essociate Resp.    Disputed.** Correlation functions—as contemplated by the '660 Patent—were novel at the time the invention disclosed by the '660 Patent was conceived. Landau Decl. ¶ 61.
>
> **Epic Reply.    No genuine dispute**.  Essociate's response to this fact does not dispute that the basic computing functions of correlation and lookup functions were well known in the art long before the '660 patent.  The cited portion of Landau's Feb. 22, 2013 declaration should be disregarded as untimely expert opinion.

**Epic Fact No. 130.**   U.S. Patent No. 6,629,135 to Ross discloses an outsourced affiliate network system, and recognized that in an affiliate network, the affiliates (which he called "hosts") have to be correlated to items offered by merchants (which he called "e-commerce objects').  Ross also shows the essential idea of correlating between the source system and the target system.  Kent Invalidity Report, ¶ 176, 193, Ex. 12; Kent Decl. ¶2.

Redacted Public Version

**Essociate Resp.     Disputed.** Ross does not make the claimed disclosures. Landau Report at p. 27–28.

**Epic Reply.    No genuine dispute**.  The Kent Invalidity Report quotes the disclosure and explains it.  The sections of Landau's expert report cited by Essociate do not raise any dispute as to this proposed fact.

**Epic Fact No. 131.**    U.S. Patent No. 6,243,750 to Verma explains that a wide variety of URL tracking techniques were known to those of skill in the art as of 1998. Kent Invalidity Report, ¶ 190-91, Ex. 19; Kent Decl. ¶2.

**Essociate Resp.     Disputed.** Verma does not make the claimed disclosures. Landau Report at p. 28–30.

**Epic Reply.    No genuine dispute**.  The Kent Invalidity Report quotes the disclosures and explains them.  The sections of Landau's expert report cited by Essociate do not raise any dispute as to this proposed fact.  Moreover, Essociate does not dispute that the basic principles of link generation, URL tracking and web page scripting were all well known in the art before May 1, 1999.  *See*  DPF 137.

**Epic Fact No. 132.**    U.S. Patent Nos. 5,712,979 and 5,717,860 to Graber disclose scripting, URL generating and URL tracking techniques that could be used by an affiliate system to perform the correlating step; the Graber patents disclose the assignment of unique IDs to co-marketers (i.e. affiliates), and it employs a correlation operation to credit those co-marketers with successful transactions.  Kent Invalidity Report ¶ 192, Exs. 20 and 21; Kent Decl. ¶2.

**Essociate Resp.     Disputed.** Neither Graber patent makes the claimed disclosures. Landau Report at p. 30–32.

Redacted Public Version

**Epic Reply.    No genuine dispute**.  The Kent Invalidity Report quotes the disclosures and explains them.  The sections of Landau's expert report cited by Essociate do not raise any dispute as to this proposed fact.

**Epic Fact No. 133.**    Deleted.

**Essociate Resp.**    No Response.

**Epic Fact No. 134.**    A person of ordinary skill in the art would have been able to combine Old XPays with correlation functions known in the art and achieve predictable results. Kent Invalidity Report, ¶ 179-194; Kent Decl. ¶2.

**Essociate Resp.    Disputed.** A person of ordinary skill in the art would not have been able to combine Old XPays with correlation functions known in the art and achieve predictable results. Landau Decl. ¶ 75.

**Epic Reply.    No genuine dispute**.  Essociate's only support for disputing this fact is one conclusory statement from Landau's Feb. 22, 2013 declaration, which should be disregarded as untimely expert opinion.

**Epic Fact No. 135.**    A person of ordinary skill in the art would have known that assigning a block of IDs for the target system and correlating them to source IDs for affiliates via a basic lookup function would have worked to accomplish the invention claimed in the '660 patent.  Kent Invalidity Report, ¶ 175; Kent Decl. ¶2.

**Essociate Resp.    Disputed.** The correlation contemplated by the '660 Patent would not have been obvious to a person of ordinary skill in the art. Landau Decl. ¶ 63.

Redacted Public Version

**Epic Reply.    No genuine dispute.** Essociate's only support for disputing this fact is one conclusory statement from Landau's Feb. 22, 2013 declaration, which should be disregarded as untimely expert opinion.

**Epic Fact No. 136.**    Internet affiliate networks, including multi-tier and virtual affiliate networks, were known in the art by May 1, 1999.  Kent Invalidity Report, ¶ 180; Kent Decl. ¶2.

**Essociate Resp.    Disputed.** The virtual affiliate networking technique disclosed by the claims of the '660 Patent were not known in the art by May 1, 1999. Landau Decl. ¶ 64.

**Epic Reply.    No genuine dispute.**  Essociate's response to this fact does not dispute that affiliate networks, including multi-tier and virtual affiliate networks, were known in the art before May 1, 1999.  Additionally, the cited portion of Landau's Feb. 22, 2013 declaration should be disregarded as untimely expert opinion.

**Epic Fact No. 137.**    The basic principles of link generation, URL tracking, and web page scripting were all known in the art before May 1, 1999.  Kent Invalidity Report, ¶ 187; Kent Decl. ¶2.

**Essociate Resp.**    Undisputed.

**Epic Fact No. 138.**    Multi-tier affiliate systems, in which affiliates were compensated to recruit additional, second-tier affiliates were well known before 1999.  Kent Invalidity Report ¶ 180; Kent Decl. ¶2.

**Essociate Resp.    Disputed.**  These techniques were not known in the art relevant to the '660 Patent.  Landau Decl. ¶ 65.

Redacted Public Version

>    **Epic Reply.    No genuine dispute**.  Essociate does not dispute that these items
>    were known in the prior art before 1999.  Rather, Essociate's basis for disputing
>    this fact appears to be that the art was not relevant to the '660 patent, but this does
>    not raise a genuine dispute as to this proposed fact.  Additionally, the cited portion
>    of Landau's Feb. 22, 2013 declaration should be disregarded as untimely expert
>    opinion.

**Epic Fact No. 139.**    An example of a multi-tier affiliate system was the Be Free system,
operated at least as early as January 13, 1999. Kent Invalidity Report ¶ 180, Ex. 13; Kent Decl.
¶2.

>    **Essociate Resp.    Disputed.** The Be Free system does not disclose the
>    techniques associated with the claims of the '660 Patent. Landau Decl. ¶ 66.
>
>    **Epic Reply.    No genuine dispute**.  Essociate's response to this fact does not
>    raise any dispute as to this fact.  Additionally, the cited portion of Landau's Feb.
>    22, 2013 declaration should be disregarded as untimely expert opinion.

**Epic Fact No. 140.**    The idea of a true virtual affiliate system, in which the second-tier
affiliates did not have to enroll in the target affiliate network was also known before May 1,
1999.  Kent Invalidity Report, ¶ 181, Ex. 14; Kent Decl. ¶2.

>    **Essociate Resp.    Disputed.** The virtual affiliate networking techniques
>    disclosed by the claims of the '660 Patent were not known in the art before May
>    1, 1999. Landau Decl. ¶ 67.
>
>    **Epic Reply.    No genuine dispute**.  Essociate's response to this fact does not
>    raise any dispute as to this fact.  Additionally, the conclusory statements in the

60

Redacted Public Version

cited portion of Landau's Feb. 22, 2013 declaration should be disregarded as untimely expert opinion.

**Epic Fact No. 141.**    One of ordinary skill in the art at the time of the '660 patent would have been able to take an existing affiliate system, such as the Linkshare system and combine it with other well known principles of e-commerce and website development to create the invention claimed in the '660 patent.  Kent Invalidity Report, ¶ 179-94, Ex. 15-16; Kent Decl. ¶2.

> **Essociate Resp.    Disputed.** One of ordinary skill in the art at the time of the '660 Patent would not have been able to combine those references to create the invention claimed in the '660 Patent. Landau Report at p. 2-3; Landau Decl ¶ 68.
>
> **Epic Reply.    No genuine dispute**.  The sections of Landau's expert report cited by Essociate do not raise any dispute as to this proposed fact; they consist merely of conclusory opinion without analysis of facts, and a discussion of the level of ordinary skill in the art.  Additionally, the conclusory statements in cited portion of Landau's Feb. 22, 2013 declaration should be disregarded as untimely expert opinion.

**Epic Fact No. 142.**    Although the Linkshare system (in U.S. Patent No. 5,991,740 to Messer) was reviewed by the USPTO during prosecution of the '660 patent, the inventors of the '660 patent description of it that was inaccurate.  Kent Invalidity Report,  ¶¶ 184-85, Ex. 15,17; Kent Decl. ¶2.

> **Essociate Resp.    Disputed.** The inventors of the '660 Patent did not inaccurately describe the Linkshare system during the prosecution of the '660 Patent. Landau Decl. ¶ 69.

Redacted Public Version

**Epic Reply.    No genuine dispute**.  The Kent Invalidity Report explains the inaccurate statement.  Essociate's response does not raise any genuine dispute as to this fact.  The conclusory statement in cited portion of Landau's Feb. 22, 2013 declaration should be disregarded as untimely expert opinion.

**Epic Fact No. 143.**

REDACTED                          Oct. 8, 2012 Landau Deposition, 86:20-87:16; *see also* 2012 Landau Dep. 147:22-149:10.

**Essociate Resp.    Disputed.**

REDACTED

Landau Decl. ¶ 70.

**Epic Reply.    No genuine dispute**.  Essociate's only basis for disputing this fact are conclusory denials from Landau's Feb. 22, 2013 declaration, which is contradicted by his own prior deposition testimony cited by Epic.

**Epic Fact No. 144.**

REDACTED

Oct. 8 2012 Landau Deposition, 147:22-149:10.

**Essociate Resp.    Undisputed.**

**Epic Fact No. 145.**    Affiliates of Old XPays could select banner ads for merchants that the affiliates could display on their websites.  Oct. 8 2012 Landau Deposition, 85:4-10; 86:20-24; 99:23-100:3.

**Essociate Resp.    Undisputed.**

**Epic Fact No. 146.**    iGallery was one of the merchant affiliate systems for which Old XPays affiliates could select and display banner ads on their websites.  Oct. 8 2012 Landau

Redacted Public Version

Deposition 85:4-10; 86:20-24; 99:23-100:3; and 2010 Landau Deposition Exs. 4, 5, and 10; 2010 Landau Deposition 64:6-65:6; 80:4-81:1.

> **Essociate Resp.**    Undisputed.

**Epic Fact No. 147.**    The '660 patent does not disclose the algorithm or code that performed the "correlating" step in claims 15 and 28.  Kent Invalidity Report ¶ 97; Kent Decl. ¶2.

> **Essociate Resp.**    **Disputed.**  The '660 Patent discloses the algorithm or code or other structure necessary for performing the correlating step in claims 15 and 28—one example is the hybrid string method.  Landau Decl. ¶ 71
>
> **Epic Reply.**    **No genuine dispute**.  Despite Essociate's conclusory denial of this fact, Essociate does not identify any such algorithm or code in the '660 patent.

**Epic Fact No. 148.**    The '660 patent discloses much less structure than other patents in the same field.  Kent Invalidity Report ¶ 98; Kent Decl. ¶2.

> **Essociate Resp.**    **Disputed.** The '660 Patent discloses structure both qualitatively and quantitatively comparable to that of other patents in the same field. Landau Decl. ¶ 72.
>
> **Epic Reply.**    **No genuine dispute**.  The Kent Invalidity Report gives examples of the disclosures in other patents in the field.  Essociate's only support for its position is one conclusory sentence from Landau's Feb. 22, 2013 declaration, which should be disregarded as late expert opinion and as a self-serving and unsupported conclusion.

**Epic Fact No. 149.**    A person of ordinary skill in the art would not be able to determine the scope of claims 15 and 28 of the '660 patent.  Kent Invalidity Report ¶¶97-98; Kent Decl. ¶2.

Redacted Public Version

**Essociate Resp.      Disputed.** A person of ordinary skill in the art would be able to determine the scope of claims 15 and 28 of the '660 Patent. Landau Report at p. 2-3; Landau Decl. ¶ 73.

**Epic Reply.      No genuine dispute**. Essociate's only support for disputing this fact is one conclusory statement from Landau's Feb. 22, 2013 declaration, which should be disregarded as untimely expert opinion.

## G.      The spin-out of the Kinetic Social business from Epic Media Group.

**Epic Fact No. 150.**      Until 2010, Epic Advertising—a predecessor entity of Epic Media Group—was engaged in the principle business line of operating an affiliate network.  Dkt. No. 74, Deposition of Young Kim ("Kim Dep."), 17:20-18:1, 53:5-7; Dkt. No. 73, Deposition of Charles Nowaczek ("Nowaczek Dep."), 31:11-18.

**Essociate Resp.**      Undisputed.

**Epic Fact No. 151.**      In May 2010, Epic Advertising merged with Connexus Corporation ("Connexus") to form the successor entity Epic Media Group.  Dkt. No. 75, Deposition of Don Mathis ("Mathis Dep."), 65:19-21, 69:17-24, 82:23-83:19; Kim Dep., 18:5-9; Nowaczek Dep., 31:19-32:2.

**Essociate Resp.      Disputed.** Connexus Corporation was the surviving entity following the merger with Epic Advertising. Connexus Corporation then changed its name to Epic Media Group. *See* Nowaczek Dep.31:19-33:1; Mathis Dep. 70:12-21; October 2 Okin Dep. 61:15-62:17.

**Epic Reply.      No genuine dispute**.  None of the evidence cited by Essociate contradicts the proposed fact.  Epic Media Group was the surviving entity following the merger of Epic Advertising with Connexus Corporation.  Mathis

Redacted Public Version

Dep. 69:17-24, 82:23-84:14.  Essociate's response merely provides details of the mechanics of the merger.

**Epic Fact No. 152.**    The newly formed Epic Media Group operated a series of business lines, including the affiliate network, a display ad network, a domain business, and a social media business.  This latter was based in part on a small company acquired by Connexus called Social Suitcase, which formed the basis of the social media marketing unit of Connexus.  Kim Dep., 18:5-19:1; Mathis Dep., 70:12-21, 93:20-94:10.

> **Essociate Resp.     Disputed.** Epic Media Group was not "newly formed" it was merely renamed from Connexus Corporation which was the surviving entity following Connexus' merger with Epic Advertising. Mathis. Dep. 28:14-19. *See* Nowaczek Dep.31:19-33:1; Mathis Dep. 70:12-21; October 2 Okin Dep. 61:15-62:17.

> **Epic Reply.    No genuine dispute of material fact**.  Essociate disputes only the characterization of Epic Media Group as "newly formed."

**Epic Fact No. 153.**    The addition of Social Suitcase exposed Epic Media Group to social media as a potential future business opportunity.  Kim Dep., 19:2-22.

> **Essociate Resp.     Disputed.** Immediately upon Epic Advertising's merger with Connexus Corporation, social media, Epic Media Group obtained a current social media business division—not a mere "future business opportunity"—with appurtenant business assets including but not limited to, customers, trade secrets and other intellectual property, source code, business opportunities, vendor relationships, and employees belonging exclusively to Epic Media Group. *See* Mathis Dep. 91:9-92:6, 94:3-12, 162:-168:1; Nowaczek Dep. 31:6-18.

Redacted Public Version

> **Epic Reply.   No genuine dispute**.  Essociate's response provides additional information that even if true would not place any portion of proposed fact No. 153 in dispute.  TMP Social and Social Suitcase provided "some raw clay to work with," exposing Epic Media Group to future business opportunities in social media.  However, the actual business they conducted "was not at all like the business that [Kinetic Social] do[es] today," and "none of it creates a foundation for Kinetic."  Mathis Dep. 162:22-165:16.

**Epic Fact No. 154.**    In late 2010, Epic Media Group's principals began working on a project they named "Epic Social," which arose from ideas and discussions about opportunities in the social media sphere.  Nowaczek Dep., 97:13-21.

> **Essociate Resp.    Disputed.** Epic Social was merely the Social Suitcase technology and business division renamed and further developed by the Epic Media Group team. *See* Nowaczek Dep. 98:5-99:14; Mathis Dep. 163:20-166:6.
>
> **Epic Reply.    No genuine dispute**.  The cited testimony provides no support for Essociate's contention, and even if true would not place any portion of proposed fact No. 154 in dispute.  Social Suitcase "provided the concept for" Epic Social but was not "the genesis of" the business and "has nothing to do with Kinetic today."  Kim Dep. 18:5-19:22; Mathis Dep. 163:15-165:16.

**Epic Fact No. 155.**    The Social Suitcase division, including the former leader of Epic Media Group's social business, left Epic Media Group in the spring or summer of 2011 due to differences of opinion about the direction of the social media business.  Nowaczek Dep., 100:9-103:2.

Redacted Public Version

**Essociate Resp.     Disputed.** The Social Suitcase division remained with Epic Media Group although Art Shaw—the former CEO of Connexus Corporation—purchased the Social Suitcase entity. All business assets appurtenant to the Social Suitcase enterprise remained with Epic Media Group following the renaming of the project to Epic Social. Mathis Dep. 163:15-166:6.

**Epic Reply.     No genuine dispute**.  The evidence cited by Essociate does not support Essociate's response.

**Epic Fact No. 156.**     Epic Social, which remained with Epic Media Group following the departure of Social Suitcase, was eventually re-branded as Kinetic Social to appropriately market the initiative's "venture" nature.  Kim Dep., 27:4-8.

**Essociate Resp.     Disputed.** Epic Social was not rebranded as Kinetic Social until November of 2011—several weeks after Essociate filed this lawsuit. Kinetic Social is the d/b/a for Social Assets LLC, which was formed as a receptacle for the two remaining Epic Media Group Divisions—social media and ad placement—to be transferred into. *See* Nowaczek Dep. 125:4-22, 126:10-15; Kim Dep. 22:5–10, 25:9–17, 45:10–14, 46:20–23, 92:6-24; Mathis Dep. 103:20–104:4, 130:17-133:2; 140:6-12; October 2 Okin Dep. 39:23-41:10.

**Epic Reply.     No genuine dispute**.  None of the evidence cited by Essociate contradicts the proposed fact.  Furthermore, Essociate mischaracterizes the purpose underlying the creation of Kinetic Social, which was formed to foster the development of a new social media business.  *See* DPF 157-162.

**Epic Fact No. 157.**     The founding concept behind Kinetic Social was to assist brand advertisers and advertising agencies with "audience engagement," i.e. promoting discussions and

Redacted Public Version

interaction between brands and potential customers through social media platforms such as Facebook and Twitter.  Declaration of Young Kim, ¶ 5.

> **Essociate Resp.     Disputed.** This supposed "founding concept" was not the founding concept behind Kinetic Social. It was the founding concept behind Epic Social. And the component of Epic Social involving the promotion of brands through social network platforms such as Facebook and Twitter was fully operational before this business division was fraudulently transferred from Epic to Social Assets, LLC. Nowaczek Dep. 98:5-99:19, 126:16-23, 128:1-129:2; Mathis Dep. 162:22-166:6.

> **Epic Reply.     No genuine dispute**.  Essociate's response is argument that does not create a genuine dispute concerning proposed fact No. 157.  None of the evidence cited by Essociate contradicts the proposed fact.  Essociate's characterization of the business division as having been "fraudulently transferred" is a legal conclusion unsupported by the evidence cited in Essociate's response.

**Epic Fact No. 158.**     The Kinetic Social concept did not emerge at a specific moment. Rather, it resulted from an evolution of understanding about opportunities in the social media space.  Nowaczek Dep., 97:4-21, 103:19-104:14.

> **Essociate Resp.     Disputed.** Kinetic Social is nothing more than Epic Social. The fact that the Social Assets, LLC employees have somehow further developed Epic's social media platform since its fraudulent transfer to Social Assets, LLC does not somehow legitimize that transfer. Nowaczek Dep. 98:5-99:19; Mathis Dep. 162:22-166:6.

Redacted Public Version

> **Epic Reply.    No genuine dispute**.  Essociate's response is argument that does not create a genuine dispute concerning proposed fact No. 158.  None of the evidence cited by Essociate contradicts the proposed fact.  Essociate's reference to the "fraudulent transfer" of Epic Media's social media platform to Social Assets is a legal conclusion unsupported by the evidence cited in Essociate's response.

**Epic Fact No. 159.**    Because it engaged the rapidly evolving social media marketplace, Kinetic Social had to be a more venture-oriented enterprise than the profit-focused affiliate network and other business lines of Epic Media Group.  Nowaczek Dep., 49:7-24.

> **Essociate Resp.    Disputed.** Epic Media Group's shareholders would not invest more money in the social media and ad placement divisions of Epic Media Group unless they were transferred to a new entity free of Epic Media Group's creditor's claims. Nowaczek Dep. 49:7-52:7. Similarly, Don Mathis told Epic's board that he would only remain CEO following the liquidation of Epic Media Group's affiliate networking and domain name divisions if the remaining divisions—ad placement and social media—could be transferred to a new entity that he could be part owner of Nowaczek Dep.
>
> 146:6-149:5.
>
> **Epic Reply.    No genuine dispute**.  The deposition testimony cited by Essociate does not refer to or allude to "Epic Media Group's creditor's [sic] claims." Rather, Nowaczek explains that Kinetic Social needed to be spun out because its "business model is, in its value proposition to its clients, . . . very different than any of the other assets that previously existed under the Epic Media Group

Redacted Public Version

umbrella," as it is "much more of a venture oriented endeavor as opposed to a strictly profitmaking going concern."  Nowaczek Dep. 49:7-52:7.  Essociate's characterization of the testimony of Don Mathis concerning his move to Kinetic Social is completely inaccurate.  Mathis Dep. 146:6-149:5.

**Epic Fact No. 160.**    Affiliate networks rely on a pure broker model that has no application in social media.  Therefore, having operated an affiliate network did not make Epic Media Group more qualified to enter the social media space. Nowaczek Dep., 86:8-87:7.

**Essociate Resp.    Disputed.** Social media marketing and affiliate networking have significant overlap with respect to both business and technology. They often share the same software platforms, merchant customer bases, vendor relationships, proprietary data, and distribution channels. Social media marketing is an obvious and natural area of expansion for any affiliate networking company. Both fall under the general rubric of digital media marketing. And a multitude of digital media marketing companies do both affiliate networking as well as social media marketing, and even ad placement, because of the natural synergy between those three fields. Landau Decl. ¶ 74.

**Epic Reply.    No genuine dispute**.  The Landau declaration provides no foundation for any knowledge of social media marketing, and paragraph 74 points out similarities between affiliate networks and social media, but it does not put proposed fact No. 74 in genuine dispute.

**Epic Fact No. 161.**    Epic Media Group's largest institutional investor, TA Associates, is a private equity firm rather than a venture capital firm.  As such, TA Associates sought to

Redacted Public Version

retain its investment in Epic Media Group and to have Kinetic Social—which was more of a venture opportunity—be part of a separate entity.  Nowaczek Dep., 51:9-24.

> **Essociate Resp.     Disputed.** Epic Media Group's investors and Don Mathis transferred Epic's ad placement and social media divisions to avoid Epic's creditor's claims. Nowaczek Dep. 49:7-52:7; *see* Kim Dep. 90:5-13, 91:14-16; Mathis Dep. 100:22-102:20, 156:2-14.

> **Epic Reply.     No genuine dispute.**  Essociate's response is argument and it has no support in the cited evidence.  Essociate cites no evidence that the spinoff was intended "to avoid Epic's creditor's claims," and indeed, no threat of litigation by Essociate was even recognized, Mathis Dep. 155:21-156:14.

**Epic Fact No. 162.**     That Kinetic Social's business model was so different made raising capital from within Epic Media Group difficult.  The social media business was a noncore competency that did not add but consumed value because it required a substantial amount of investment.  Due in large part to those difficulties, Kinetic Social was spun off into a separate entity in late 2011.  Nowaczek Dep., 49:7-24, 50:11-51:24; Mathis Dep., 100:22-102:4.

> **Essociate Resp.     Disputed.** Nothing about Kinetic Social has made it more advantageous to raise money through a different entity than Epic Media Group other than that Epic's creditor's claims could be avoided. Nowaczek Dep. 49:7-52:7.In fact, Kinetic Social has raised no money whatsoever since the time it was formed in November 2011. All of Kinetic Social's growth was funded by the cash and other business assets of Epic Media Group. Kim Dep. 141:10-142:5. For example, and without limitation, every month Epic Media Group gives its rolling cash receipts—totaling on average $600,000 to $800,000 each month—to Kinetic

Redacted Public Version

Social to fund its operations. *See* Nowaczek Dep. 122:9–13; Kim Dep. 85:15–86:18, 101:14-103:7, 112:10-19.

**Epic Reply.    No genuine dispute.**  None of the evidence cited by Essociate contradicts the proposed fact.  The deposition testimony cited by Essociate does not reference or allude to the possibility that "Epic's creditor's [sic] claims could be avoided," nor does the testimony show that "without limitation, every month Epic Media Group gives its rolling cash receipts . . . to Kinetic Social to fund its operations."  *See* DPF 175-178 for evidence concerning the intercompany balance and the early day-to-day funding provided by Epic Media Group.  Essociate also cites to pages from the deposition testimony of Young Kim that do not exist (Kim Dep. 141:10-142:5; the deposition concludes at page 118).

**Epic Fact No. 163.**    In mid-2011, Epic Media Group, Inc. engaged the law firm of Dechert LLP to structure a spinoff of Kinetic Social.  Kim Decl., ¶ 6, Ex. 2 (PowerPoint presentation illustrating reorganization), Ex. 3 (narrative summary of reorganization).

    **Essociate Resp.**    Undisputed.

**Epic Fact No. 164.**    Before the reorganization, Epic Media Group, Inc. was a Delaware corporation governed by a Board of Directors.  Kim Decl., ¶ 7.

    **Essociate Resp.**    Undisputed.

**Epic Fact No. 165.**    The Board of Directors for Epic Media Group, Inc. approved the reorganization on November 15, 2011.  Kim Decl., ¶ 8, Ex. 4 (board resolutions).

    **Essociate Resp.**    Undisputed.

**Epic Fact No. 166.**    As a result of the reorganization, Kinetic Social currently has the following corporate structure:  Social Assets LLC, d/b/a Kinetic Social, is a limited liability

72

Redacted Public Version

company formed under Delaware law, Kim Decl., ¶ 9(a), Ex. 5 (Certificate of Formation of

Social Assets LLC); Social Assets LLC is a wholly owned subsidiary of Emerald Social LLC, a

limited liability company formed under Delaware law, Kim Decl., ¶ 9(b), Ex. 6 (Certificate of

Formation of Emerald Social LLC), Ex. 7 (LLC Agreement of Social Assets LLC); and Emerald

Social LLC is, in turn, a wholly owned subsidiary of FAS Labs Inc., a Delaware corporation,

Kim Decl., ¶ 9(c), Ex. 8 (Certificate of Incorporation of FAS Labs, Inc.), Ex. 9 (LLC Agreement

of Emerald Social LLC).

       **Essociate Resp.**    Undisputed.

    **Epic Fact No. 167.**    As a part of the same restructuring, Epic Media Group Inc. was

converted into a member-managed Delaware limited liability company having the name Epic

Media Group LLC.  Epic Media Group LLC is a wholly owned subsidiary of FAS Labs, Inc.

Kim Decl., ¶ 10, Ex. 10 (Written Consent of Series A Preferred Stockholders); ¶ 11, Ex. 11

(diagram of corporate structure).

       **Essociate Resp.**    Undisputed.

    **Epic Fact No. 168.**    Under a Contribution and Assignment Agreement effective

November 18, 2011, Epic Media Group, Inc. assigned to Social Assets LLC the assets of the

Kinetic Social business. Kim Decl., ¶ 12, Ex. 12 (Contribution and Assignment Agreement).

       **Essociate Resp.**    Undisputed.

    **Epic Fact No. 169.**    As consideration for the assets assigned to Social Assets LLC, the

shareholders of Epic Media Group—i.e. FAS Labs, Inc.—received 100 percent of the stock of

Social Assets LLC.  In addition, a "carve-out" structure was informally agreed with the

controlling shareholder of the preferred shareholder class. In this informal carve-out agreement,

Redacted Public Version

management could earn as much as 32% of the proceeds of Emerald Social and Social Assets, provided that certain economic milestones are achieved.  Kim Decl., ¶ 13.

> **Essociate Resp.     Disputed.** There was no consideration to Epic Media Group for the transfer of assets. Rather, Epic's shareholders received 100% of the shares of the newly formed parent company of Social Assets, LCC—which is FAS Labs, Inc.—thereby making an end-run around the rights of Epic Media Group's creditors. Kim Dep. 22:5–10, 25:9–17, 45:10–14, 46:20–23; Mathis Dep. 88:24– 89:4, 90:17–22, 103:20–104:4; August 20, 2012 Declaration of David Graff (Dkt. No. 55) at ¶ 7, and Ex. A.

> **Epic Reply.    No genuine dispute.**  None of the evidence cited by Essociate contradicts the proposed fact.  Essociate offers no factual support for its assertion that there was no consideration for the transfer of assets.  Essociate's characterization of the transaction as "making an end-run around the rights of Epic Media Group's creditors" is merely a conclusory argument unsupported by the deposition testimony cited.

**Epic Fact No. 170.**    Pursuant to section 1(e) of the Contribution Agreement, Social Assets LLC d/b/a Kinetic Social did not assume "any liability or obligation" of Epic Media Group with the sole exception of a Loan and Security Agreement with RBC Bank (USA) and with regards to which Social Assets LLC was added as a separate borrower with the approval of RBC Bank (USA) to facilitate the spinout transaction.  Kim Decl., ¶ 14, Ex. 12.

> **Essociate Resp.     Undisputed.**

**Epic Fact No. 171.**    Epic Media Group was solvent at the time of and following the spinoff of the Kinetic Social business.  As of December 31, 2011, Epic Media Group had

Redacted Public Version

approximately $37.0 million of net realizable asset value; this figure includes short-term and long-term assets but excludes goodwill and PP&E (property, plant, and equipment).  At the same time, Epic Media Group had $30.5 million of total liabilities, short and long-term combined.  In other words, Epic Media Group had—immediately after the Kinetic Social spinoff—just over $6.5 million of positive balance sheet value if regarded with a liquidation analysis.  Moreover, Epic Media Group had about $133 million in 2011 revenue from continuing and ongoing operations that the company expected to continue, and it maintained operations well into 2012. Kim Decl., ¶ 17.

> **Essociate Resp.     Disputed.** The transfer of all Epic Media Group's assets to Social Assets, LLC rendered Epic Media Group completely insolvent. Kim Dep. 45:45:5-14; 113:5-114:15, 84:12-85:8. For this reason, Epic Media Group hired a debt workouts company. Du Wors Decl. ¶ 8, Ex. H (Communication From Debt Workouts Company). Further, all receivables—which Epic Media Group testified it had no expectation of receiving—have been distributed to Social Assets on a rolling basis since November 2011. *See* Nowaczek Dep. 122:9–13; Kim Dep. 85:15–86:18, 101:14-103:7, 112:10-19.
>
> **Epic Reply.     No genuine dispute**.  None of the evidence cited by Essociate contradicts the proposed fact.  Essociate offers no factual support for its assertions that Epic Media Group was "rendered . . . completely insolvent" by the spinoff or that "all receivables . . . have been distributed to Social Assets on a rolling basis since November 2011."  Epic's unrebutted evidence establishes that Epic Media had over $6.5 million of positive balance sheet immediately after the spinoff.

Redacted Public Version

Essociate responds by reference to Epic Media's finances half a year later, which does not create a genuine dispute concerning proposed fact number 171.

**Epic Fact No. 172.**     The lawsuit filed by Essociate played no role in the decision to spinoff Kinetic Social.  Kim Dep., 25:18-26:15; Mathis Dep., 150:14-151:6.

> **Essociate Resp.     Disputed.** Essociate's claim, along with the claims of Epic Media Group's other creditors was the sole determinative factor influencing Epic Media Group's transfer of all of its assets to Social Media, LLC. *See* Kim Dep. 90:5-13, 91:14-16; Nowaczek Dep. 49:7-52:7.
>
> **Epic Reply.     No genuine dispute**.  None of the evidence cited by Essociate contradicts the proposed fact, and no evidence shows that Essociate's claim "was the sole determinative factor influencing" the Kinetic Social spinoff.  To the contrary, Don Mathis—who initiated and managed the Kinetic Social spinoff—testified that the threat of Essociate's lawsuit "never came up in discussions" that he "was aware of."  Mathis Dep. 151:1-24.

**Epic Fact No. 173.**     Charles Nowaczek, the chief operating officer at Kinetic Social who formerly held a similar position at Epic Media Group, never heard any internal discussions characterizing Epic Media Group's debt as a rationale for the Kinetic Social spinoff.  Nowaczek Dep., 52:20-53:1.

> **Essociate Resp.     Disputed.** Epic Media Group's Rule 30(b)(6) deponent testified that Epic had to segregate its social media and ad placement divisions because its affiliate networking and domain name divisions had become too volatile. Kim Dep. 90:5-13, 91:14-16.

Redacted Public Version

> **Epic Reply.    No genuine dispute.**  None of the evidence cited by Essociate
>
> contradicts the proposed fact.

**Epic Fact No. 174.**    When Kinetic Social was established as a legal entity in late 2011,

the Kinetic Social platform as a product did not yet exist.  The platform was launched sometime

between March and May of 2012.  In the interim, Kinetic Social relied on third-party partners to

deliver on behalf of its clients.  Nowaczek Dep., 104:16-105:18.

> **Essociate Resp.    Disputed.** The Kinetic Social platform existed and
>
> commercially deployed—both as Social Suitcase and as Social Assets, LLC—as
>
> early as May 2010. Those components of the social media project that were not
>
> commercially deployed were well into the development stages as early as the
>
> summer of 2010. Mathis Dep. 91:9-94:12, 162:24-168:1; Du Wors Decl. ¶¶ 2-3,
>
> Ex. A (Kinetic Social press release), Ex. B (Kinetic Social About Us page).
>
> **Epic Reply.    No genuine dispute.**  None of the evidence cited by Essociate
>
> contradicts the proposed fact, and no evidence shows that "the Kinetic Social
>
> platform existed and [was] commercially deployed . . . as early as May 2010."
>
> The "foundation of Kinetic" as "originally conceived in mid 2010" was "a
>
> brainstorm moment" that arose from discussions between Don Mathis and Rick
>
> Okin concerning how "a statistical approach to analyzing large pools of data[]
>
> could be used in social media in a way that it really wouldn't work for other forms
>
> of digital media."  Mathis Dep. 162:22-163:14.  As established in DPF 173,
>
> another two years went by before this platform was launched.  The cited press
>
> release does not indicate that Kinetic Social's new social media platform had been
>
> launched.

Redacted Public Version

**Epic Fact No. 175.**     An Intercompany Service Agreement was entered into by and between FAS Labs, Inc. and Epic Media Group, Inc. on the one hand, and Emerald Social LLC and Social Assets LLC on the other.  This agreement governs the transactions between Epic Media Group and Social Assets, and it explicitly provides in Recital B that the parties "wish to assure that all charges for services and the use of facilities incurred hereunder are reasonable, and to the extent practicable, reflect actual costs and are arrived at in a fair and equitable manner." Kim Decl., ¶ 19, Ex. 15.

> **Essociate Resp.**     Undisputed.

**Epic Fact No. 176.**     Following the Kinetic Social spinoff in December 2011, the companies began to separate their financial reporting and otherwise delineate the two entities. Nowaczek Dep., 56:4-23; Kim Decl., ¶ 18.

> **Essociate Resp.**     **Disputed.** There is no meaningful delineation between the
> financial operations of the two companies, except that the assets remain Social
> Assets, LLC and the liabilities remain with Epic Media Group. *See* Kim Dep.
> 45:5-14, 49:13-50:3; 103:19-104:24; Mathis Dep. 138:16-140:22; Nowaczek Dep.
> 60:11-61:13, 62:18-63:13.

> **Epic Reply.**     **No genuine dispute**.  None of the evidence cited by Essociate
> contradicts the proposed fact, and no evidence establishes that there is "no
> meaningful delineation between the financial operations of the two companies" or
> that "the assets remain [with] Social Assets, LLC and the liabilities remain with
> Epic Media Group."

**Epic Fact No. 177.**     Young Kim, the executive vice president for finance and administration for Epic Media Group, and Gordon Grant, the comptroller for Kinetic Social, are

Redacted Public Version

responsible for the accounting related to the intercompany balance between Epic Media Group and Kinetic Social.  Nowaczek Dep., 64:22-65:24; Kim Dep., 6:9-14, 34:17-19, 35:23-36:5, 105:4-7; Mathis Dep., 78:9-12.

        **Essociate Resp.**   Undisputed.

    **Epic Fact No. 178.**   Epic Media Group provided early day-to-day funding for the launch of Kinetic Social in the form of an intercompany loan.  Over time, that funding amounted to approximately three million dollars. Kim Dep., Oct. 5, 2012, 31:2-21; Nowaczek Dep., Oct. 4, 2012, 58:9-59:14; Kim Decl. ¶ 18, Ex. 14.

        **Essociate Resp.**   **Disputed.** Social Assets, LLC also received all of Epic Media Group's revenue producing assets. And, as Rick Okin testified, by November of 2011, Epic had already transferred three million dollars to Social Assets, LLC. Since that time, Epic has continued to distribute all of its receivables—averaging $600,000 to $800,000 per month—to Social Assets. Kim Dep. 22:5–10, 25:9–17, 45:10–14, 46:20–23, 92:6-24; Mathis Dep. 103:20–104:4, 130:17-133:2; 140:6-12. *See* Nowaczek Dep. 122:9–13; Kim Dep. 85:15–86:18, 101:14-103:7, 112:10-19.

        **Epic Reply.**   **No genuine dispute**.  The evidence cited by Essociate does not support Essociate's response.  Essociate alludes to alleged testimony of Rick Okin but provides no citation for the testimony in question.  Essociate's assertion that Social Assets "received all of Epic Media Group's revenue producing assets" is merely a conclusory argument unsupported by the deposition testimony cited.

    **Epic Fact No. 179.**   Kinetic Social paid back the funds advanced by Epic Media Group in full by September 2012.  Kinetic Social did so by drawing on a line of credit from a third

Redacted Public Version

party, Gibraltar Capital.  Kim Dep., 31:2-21, 36:6-38:15; Nowaczek Dep., 60:11-61:13; Kim

Decl. ¶ 18, Ex. 14.

> **Essociate Resp.    Disputed.** Social Assets, LLC became a co-borrower on the
>
> Royal Bank of Canada line of credit because RBC recognized that Epic Media
>
> Group's transfer of assets to Social Assets was fraudulent and a violation of
>
> RBC's contract rights with Epic Media Group. To the extent Social Assets, LLC
>
> "paid Epic back" it did so for its own benefit as a debtor—and did so out of the
>
> revenue producing assets transferred to it by Epic which had grown to $16 million
>
> by October 2012. Mathis Dep. 130:17-133:2, 141:12-142:5; Kim Dep. 31:2-16,
>
> 36:6-37:3, 40:14-22, 45:10-14, 78:6-80:23; Nowaczek Dep. 56:4-59:14.
>
> **Epic Reply.    No genuine dispute.**  None of the evidence cited by Essociate
>
> contradicts the proposed fact.  Essociate's assertion that "RBC recognized that
>
> Epic Media Group's transfer of assets to Social Assets was fraudulent and a
>
> violation of RBC's contract rights with Epic Media Group" is merely a
>
> conclusory argument unsupported by the deposition testimony cited.

**Epic Fact No. 180.**    Desktops, laptops, and chairs for approximately thirty employees

were transferred from Epic Media Group to Kinetic Social.  A detailed list of those assets was

prepared for the purpose of valuing the assets at market rate and rolling them into consideration.

Nowaczek Dep., 63:14-64:10.

> **Essociate Resp.    Disputed.** The purpose of listing the fraudulently transferred
>
> assets was purely cosmetic. *See* Nowaczek Dep. 63:14-64:10; Kim Dep. 49:13-
>
> 50:20; Mathis Dep. 137:24-140:22.

Redacted Public Version

Epic Reply.   **No genuine dispute**.  None of the evidence cited by Essociate

contradicts the proposed fact.  Essociate's characterization of the assets as

"fraudulently transferred" and their valuation as "purely cosmetic" are conclusory

argument unsupported by the deposition testimony cited.

**Epic Fact No. 181.**   Kinetic Social subleased office space from Epic Media Group in

New York City from October 1, 2011 through mid-August 2012.  The sublease was documented

in the Intercompany Service Agreement, and payments were captured as part of the ongoing

intercompany balance.  Nowaczek Dep., 64:11-21; Mathis Dep., 136:17-137:5, 138:16-139:11;

Kim Decl., ¶ 19, Ex. 15.

Essociate Resp.   **Disputed.** Social Assets did not lease space from Epic Media

Group in New York City because Epic Media Group voluntarily paid Social

Assets' rent in that space up until September 2012 when Social Assets moved to a

different space in New York City. Mathis Dep. 136:17-137:13, 138:16-142:5;

Nowaczek Dep. 64:11-21.

Epic Reply.   **No genuine dispute**.  None of the evidence cited by Essociate

contradicts the proposed fact or supports Essociate's characterization of the lease

arrangement.

**Epic Fact No. 182.**   Epic Media Group, LLC and Kinetic Social occupy different floors

of the same office space in Markham, Ontario.  The lease for the space was split between the two

companies.  Mathis Dep., 78:13-79:2.

Essociate Resp.   **Disputed.** Epic has a single employee in the Markham,

Ontario office—Young Kim, whose job is exclusively to cosmetically paper the

fraudulent transfer of assets from Epic to Social Assets. Young Kim does not use

Redacted Public Version

up an entire floor on which he is seated. The other 30 or so former Epic

employees—who are now Social Assets employees—use substantially all of the

space on both floors. And, moreover, Epic Media Group paid the entire rent (for

both floors of the Markham office) until September 2012. Kim Decl. 106:10-

110:17; *see* Mathis Dep. 137:14-19, 138:16-142:5; Nowaczek Dep. 66:6-67:13.

**Epic Reply.    No genuine dispute**.  None of the evidence cited by Essociate

contradicts the proposed fact.  Essociate's characterization of Young Kim's job as

being "exclusively to cosmetically paper the fraudulent transfer of assets from

Epic to Social Assets" is conclusory argument unsupported by the deposition

testimony cited.

Dated March 4, 2013.

By:  *s/ James D. Peterson*
     James D. Peterson
     Jennifer L. Gregor
     Dustin B. Brown
     Kerry L. Gabrielson
     GODFREY & KAHN, S.C.
     One East Main Street, Suite 500
     Post Office Box 2719
     Madison, WI  53701-2719
     Phone: 608-257-3911
     Fax:    608-257-0609
     Email: jpeterson@gklaw.com
          jgregor@gklaw.com
          dbrown@gklaw.com
          kgabrielson@gklaw.com

     *Attorneys for Defendants, Epic Media*
     *Group, Inc.,(f/k/a Azoogle.com, Inc.), and*
     *Social Assets LLC d/b/a Kinetic Social.*

9138694_1

Redacted Public Version