**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

---

| | | |
|---|---|---|
| ESSOCIATE, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-cv-727-bbc |
| | ) | |
| EPIC MEDIA GROUP, INC., ET AL, | ) | **[FILED UNDER SEAL]** |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**DEFENDANTS' RESPONSES TO ESSOCIATE'S
SUPPLEMENTAL PROPOSED FINDINGS OF FACT**

---

The defendants respond as follows to Plaintiff Essociate, Inc.'s ("Essociate") Supplemental Proposed Findings of Fact.

**1.** Essociate is the proper assignee of the '660 Patent and all claims for damages at issue in this suit. February 22, 2012 Declaration of Michael Landau ("Landau Decl."). ¶ 3, Ex. B (Assignment of '660 Patent).

**Response No. 1:**    **Undisputed**.

**2.** Essociate first learned of the infringing nature of the Accused Epic Network in 2011. Landau Decl. ¶ 6.

**Response No. 2:**    **Disputed**.  Essociate accused the Epic system of infringement in 2004, when Epic was named Azoogle.com, Inc.  *See* DPF 26.[1]  Azoogle.com, Inc. changed its name to Epic Media, and the affiliate networks was renamed Epic Direct.  *See* DPF 10.  The

---

[1] Citations to the defendants' proposed findings of fact refer to the document including Essociate's responses and the defendants' replies, namely, Defendant Epic Media Group Inc.'s Reply to Plaintiff Essociate, Inc.'s Response to Defendants' Statement of Proposed Findings of Fact in Support of Motion for Summary Judgment, filed March 4, 2013.

Redacted Public Version

conclusory statement in the Landau Declaration contradicts Essociate's original infringement contentions, which identify the "[a]ccused device" as "[t]he online affiliate marketing network operated by Defendants at <<http://www.epicdirectnetwork.com>> and previously at <<http://www.azoogleads.com>>."  Second Peterson Declaration (Dkt. 110) ("Second Peterson Decl.") ¶ 2, Ex. 23; *see also* February 22, 2013 Declaration of Michael Landau (Dkt. 108) ("Landau Decl.").

    **3.**    At that time, Essociate discovered offer Click URLs and Destination Landing Page URLs associated with the Accused Epic Network and was enabled thereby to conduct a satisfactory Rule 11 investigation of the Accused Epic Network—which is the only accused infringing device in this case. Landau Decl. ¶ 7.

    **Response No. 3:**    **Disputed**.  The Click URLs and the Destination Landing Pages relied on by Essociate for its infringement contentions were at all times publicly visible.  The exhibits to Essociate's Infringement Contentions (Dkt. 89-11) rely entirely on publicly accessible materials.  Declaration of James D. Peterson  (Dkt. 89) ("Peterson Decl."), ¶ 13, Ex. 11, Essociate's Infringement Contentions, (Essociate's Supplemental Response to interrogatory number 1), (Dkt. 89-11) ("Essociate's Infringement Contentions Dkt. 89-11"); *see also* Essociate Response to DPF 69 (contending that the re-direction sequence is visible to the user).  Essociate could have made its infringement allegation against Azoogle.com at any time, and there has never been any impediment to an investigation that would satisfy Rule 11.

    **4.**    Essociate does not accuse the Old Azoogle Network of infringement in this case although the Accused Epic Network was operated by Azoogle.com, Inc. apparently under the new d/b/a "Epic", from 2008 to 2010. Landau Decl. ¶ 8.

Redacted Public Version

**Response No. 4:** **Disputed**.  The Azoogle network and the Epic Direct Network are the same network.  DPF 10, SPF 74, Essociate's Infringement Contentions, 89-11.  There is no such thing as the "Old Azoogle Network."  Unlike "Old XPays" which is a term carefully defined during Landau's deposition (October 8, 2012 Deposition of Michael Landau (Dkt. 76) ("Oct. 8, 2012 Landau Dep.")), "Old Azoogle Network" is not a term used in any of the admissible evidence in this case.  Essociate's original infringement contentions accuse one device, "[t]he online affiliate marketing network operated by Defendants at <<http://www.epicdirectnetwork.com>> and previously at <<http://www.azoogleads.com>>." Second Peterson Decl. (Dkt. 110), ¶ 2, Ex. 23.

5.     Essociate was never able to conduct a Rule 11 investigation into the issue of whether the Old Azoogle Network infringed. Landau Decl. ¶ 9.

**Response No. 5:** **Disputed**.  *See* Epic Response to SPF 3.

6.     Rather, its previous counsel sent correspondence in late 2004 and early 2005 expressing Essociate's suspicion that the Old Azoogle Network did infringe. Landau Decl. ¶ 10.

**Response No. 6:** **Disputed**.  The undisputed evidence is that Essociate accused Azoogle of infringement in 2004.  *See* DPF 26-30.  The conclusory statement in the Landau declaration does not supply evidence to refute Essociate's evidence.

7.     Azoogle's counsel responded with representations that the Old Azoogle Network did not utilize any tracking methods other than cookie or pixel tracking. Landau Decl. ¶ 11.

**Response No. 7:** **Disputed**.  Azoogle's counsel indicated that the Azoogle system "utilizes a conventional 'cookie and pixel' tracking mechanism," but did not state that the network "did not utilize any tracking methods other than cookie or pixel tracking."  Peterson Decl., ¶ 19, Ex. 17, (Dkt. 89-17), (Raskin Letter, Nov. 30, 2004).

Redacted Public Version

8.      Although that appears to have been a misrepresentation, Essociate did not initiate suit because it lacked the technological evidence to satisfy its Rule 11 obligations with respect to the Old Azoogle Network. Landau Decl. ¶ 12.

**Response No. 8:      Disputed**. *See* Epic Responses to SPF 3 and 7.

9.      Essociate did not know until the time this suit was filed that Epic had any relationship with Azoogle.com, Inc. or that the Accused Epic Network was the replacement device for the Old Azoogle Network. Landau Decl. ¶ 13.

**Response No. 9:      Disputed and immaterial**.  Azoogle publicly changed its name to Epic Media Group in 2008.  DPF 10.  The Epic Network is not a "replacement" device.  DPF 45, SPF74.  But Essociate's actual awareness is immaterial because constructive knowledge of openly infringing activities are imputed to patent owners.  *See* Epic Reply Br. at 9.

10.      In Spring 2010, Epic Advertising merged with Connexus Corporation. October 5, 2012 Deposition of Young Kim ("Kim Dep.") 52:24-53:8; October 4, 2012 Deposition of Charles Nowaczek ("Nowaczek Dep.") 31:19-32:2.

**Response No. 10:      Undisputed**.

11.      As a result of that merger, Epic added three new business lines to its already existing network affiliate business. January 21, 2013 Deposition of Don Mathis ("Mathis Dep.") 70:12-71:6; 91:9-93:2; Nowaczek Dep. 31:14-18.

**Response No. 11:      Undisputed**.

12.      Those new business lines included an online advertisement placement division, a domain name division, and a social media marketing division. Mathis Dep., 70:12-21, 93:20-94: Nowaczek Dep. 96:20-97:3, 98:5-16; Kim Dep. 18:5-19:7; October 2, 2012 Deposition of Rick

4

Okin ("October 2 Okin Dep.") 59:24-62:17. (This is also conceded in Defendants' Proposed Undisputed Facts at Fact No. 152.)

**Response No. 12:**      **Undisputed**.

13.      The purpose of this merger was to allow Epic to diversify and expand into areas of digital marketing that were becoming more lucrative—such as ad placement and social media marketing. Kim Dep. 18:5-9, 90:5-92:5, 95:8-100:16; February 11, 2013 Deposition of Alex Zhardonovsky ("Zhardonovsky Dep.") 23:16-26:18.

**Response No. 13:**      **No material dispute**.  However, the cited evidence contains no support for the proposed fact that the areas of Connexus's business "were becoming more lucrative."

14.      Simultaneously, Epic's domain name business and affiliate marketing business activities were becoming less desirable. Zhardanovsky Dep. 24:19-25:26:18; Nowaczek Dep. 86:2-7; Mathis Dep. 126:12-127:12; Kim Dep. 45:5-9

**Response No. 14:**      **No dispute**.

15.      Cybersquatting litigation had made the domain name business risky and volatile while spam litigation had done the same to the affiliate marketing business. Kim Dep. 90:5-13, 91:14-16; Mathis Dep. 100:22-102:20, 156:2-14.

**Response No. 15:**      **No material dispute**.  However, the cited evidence does not support the contention that cybersquatting litigation and spam litigation specifically were the reason that the domain name business and affiliate marketing business were becoming less desirable.

Redacted Public Version

16.     So in the Spring of 2011, Epic's board sold Epic's domain name business for $8 million in payments under a promissory note. Mathis Dep. 100:17-21, 121:15-21; Nowaczek 120:2-6.

**Response No. 16:** **No material dispute**. However, the cited evidence does not support the proposition that the domain name business was sold as a consequence of the risk and volatility referred to in proposed fact No. 15. The cited evidence provides no support for such a proposition.

17.     And in the Fall of 2011, Epic shut down its affiliate marketing business. October 3, 2012 Deposition of Rick Okin ("October 3 Okin Dep.") 50:9-12; Mathis Dep. 126:12-16.

**Response No. 17:** **Disputed**. The affiliate marketing business was shut down in the middle of 2012, not the fall of 2011. October 3, 2012 Deposition of Rick Okin (Dkt. 69) ("Okin Dep.") 50:9-12; January 21, 2013 Deposition of Don Mathis (Dkt. 75) ("Mathis Dep.") 126:12-16.

18.     Epic's two remaining divisions—ad placement and social media marketing—were transferred to Social Assets, LLC, d/b/a Kinetics Social along with all of their pertinent assets (such as intellectual property, customers and vendor relationships). Kim Dep. 22:5–10, 25:9–17, 45:10–14, 46:20–23, 92:6-24; Mathis Dep. 103:20–104:4, 130:17-133:2; 140:6-12.

**Response No. 18:** **Disputed**. Because the affiliate marketing business was still operating at Epic, ad placement and social media marketing were not "Epic's two remaining divisions." The asset transfer was governed by the Contribution and Assignment Agreement effective November 18, 2011, and the document speaks for itself.

19.     Epic transferred its entire cash holdings—$3 million—to Social Assets. Mathis Dep. 13124-133-2,140:6-12; Kim Dep. 31:2-4; Nowaczek Dep. 59:1-14.

6

**Response No. 19:**      **Disputed**.  Epic Media did not transfer its entire cash holdings to Social Assets.  Rather, Epic Media provided early day-to-day funding in the form of an intercompany loan which, over time, amounted to approximately three million dollars.  October 5, 2012 Deposition of Young Kim (Dkt. 74) ("Kim Dep.") 31:2-21; October 4, 2012 Deposition of Charles Nowaczek (Dkt. 73) ("Nowaczek Dep.") 58:9-59:14; Kim Decl. ¶ 18, Ex. 14.

20.      And thereafter, Epic forwarded all of its receivables, which were $600,000 to $800,000 per month, to Social Assets. *See* Nowaczek Dep. 122:9–13; Kim Dep. 85:15–86:18, 101:14-103:7, 112:10-19.

**Response No. 20:**      **Disputed**.  The cited evidence contains no support for the proposed fact.

21.      Epic's Markham, Ontario office became Social Assets new Canada headquarters. Kim Dep. 106:18-107:9; Mathis Dep. 137:14-19; Nowaczek Dep. 66:6-13.

**Response No. 21:**      **No material dispute**.  Epic Media and Social Assets occupy different floors of the same office space in Markham, Ontario.  The lease for the space is split between the two companies.  Mathis Dep., 78:13-79:2.

22.      And Epic's Manhattan office became Social Assets' New York headquarters. October 3 Okin Dep. 13:12:24-14:23; Mathis Dep. 136:17-22. February 22, 2013 Declaration of John DuWors ("DuWors Decl.") ¶ ¶ 2-3, Exs. B (Social Assets' January 4, 2012 press release), C (Social Assets' website's "About Us" page).

**Response No. 22:**      **No material dispute**.  Kinetic Social subleased office space from Epic Media Group in New York City from October 1, 2011 through mid-August 2012.  The sublease was documented in the Intercompany Service Agreement, and payments were captured

Redacted Public Version

as part of the ongoing intercompany balance.  Nowaczek Dep., 64:11-21; Mathis Dep., 136:17-137:5, 138:16-139:11; Kim Decl., ¶ 19, Ex. 15.

     23.     Until September 2012, Epic paid Social Assets' rent at both offices as well as Social Assets' other expenses. *See* Mathis Dep. 138:20-140:2; October 3 Okin Dep. 14:11-15:7.

     **Response No. 23:**     **Disputed**.  Social Asset's lease of office space, as well as all other expenses, were reflected in the ongoing intercompany balance, which Social Assets paid off. Nowaczek Dep., 64:11-21; Mathis Dep., 78:13-79:2, 136:17-137:5, 138:16-139:11; Kim Decl., ¶ 19, Ex. 15.

     24.     About half of Epic's employees lost their jobs, and the other half went to work for Social Assets. *See* Mathis Dep. 80:9-13, 136:9-16; Nowaczek Dep. 63:14-10; October 3 Okin Dep. 15:8-18.

     **Response No. 24:**     **No material dispute**.

     25.     Everyone got to keep their computers, and all the Epic office equipment was gifted to Social Assets. Nowaczek Dep. 63:14-10; October 3 Okin Dep. 14-24-1, 16:2-17:6.

     **Response No. 25:**     **Disputed**.  No assets were "gifted," and nothing in the cited deposition testimony supports this fact.  Desktops, laptops, and chairs for approximately thirty employees were transferred from Epic Media Group to Kinetic Social.  A detailed list of those assets was prepared for the purpose of valuing the assets at market rate and rolling them into consideration.  Nowaczek Dep., 63:14-64:10.

     26.     All payments made by the purchaser of Epic's domain business were made to Social Assets. Kim Dep. 101:24-103:1.

     **Response No. 26:**     **Disputed**.  The cited evidence contains no support for the proposed fact.

Redacted Public Version

27.     The entire Epic executive team—Don Mathis (CEO), Charlie Nowaczek (COO), and Rick Okin (CTO)—took the same jobs at Social Assets. Mathis Dep. 71:22–23, 103:14–19, 180:1–5; Oct. 2 Okin Dep. 25:2–26:13; Nowaczek Dep. 13:2-14:2; DuWors Decl. 4-6, Exs. C-E (LinkedIn profiles of Mathis, Nowaczek, and Okin).

**Response No. 27:**     **No material dispute**.  Rick Okin's position is chief information officer, not chief technology officer.  Oct. 2 Okin Dep. 25:2-26:13.

28.     Epic's Rule 30(b)(6) designee, Mr. Nowaczek, testified that the reason for transferring the social media and ad placement divisions was that Epic's investors would not invest any more money in Epic's social media marketing and ad placement divisions unless they were transferred to a new entity free of Epic's creditor's claims. Nowaczek Dep. 49:7-52:7.

**Response No. 28:**     **Disputed**.  Mr. Nowaczek testified that Kinetic Social was spun off because its business model "is very different than any of the other assets that previously existed under the Epic Media Group umbrella," it is "much more of a venture oriented endeavor as opposed to a strictly profitmaking going concern," and the legacy investors "wanted to retain their investment in Epic Media Group and . . . separately have Kinetic possibly have different alternate funding arrangements or be purchased outright separately."  Nowaczek Dep. 49:7-52:7.

29.     Social Assets gave nothing in return to Epic for the transfer. Kim Dep. 22:5–10, 25:9–17, 45:10–14, 46:20–23; Mathis Dep. 103:20–104:4.

**Response No. 29:**     **Disputed**.  The cited evidence contains no support for the proposed fact.  As consideration for the assets assigned to Social Assets LLC, the shareholders of Epic Media Group—i.e. FAS Labs, Inc.—received 100 percent of the stock of Social Assets LLC.  In addition, a "carve-out" structure was informally agreed with the controlling shareholder of the preferred shareholder class. In this informal carve-out agreement, management could earn

9

as much as 32% of the proceeds of Emerald Social and Social Assets, provided that certain economic milestones are achieved.  Kim Decl., ¶ 13.

30.    Instead, weeks after Essociate filed this lawsuit, Epic's board formed a new entity—FAS Labs, Inc.—which became the 100% parent of both Epic and Social Assets. *Compare* October 21, 2011 Complaint (Dkt. 1) *with* August 20, 2012 Declaration of David Graff (Dkt. 55) at ¶ 7, and Ex. A thereto (corporate restructuring occurred in November 2011); Mathis Dep. 88:14-90:24.

**Response No. 30:    Disputed**.  The certificate of incorporation for FAS Labs, Inc. was filed in Delaware on October 11, 2011, ten days before the filing of this lawsuit.  Kim Decl., (Dkt. 92-8) ¶ 9(c), Ex. 8 (Certificate of Incorporation of FAS Labs, Inc.).

31.    Epic's shareholders exchanged their Epic shares for shares in FAS Labs in percentages equal to their previous percentage of ownership interest in Epic. Mathis Dep. 88:24–89:4, 90:17–22.

**Response No. 31:    Undisputed**.

32.    Epic's lender, Royal Bank of Canada ("RBC"), recognized that Epic's transfer of its remaining viable assets to Social Assets was a clear violation of law, as well as RBC's rights under the agreements governing the secured line of credit it had extended to Social Assets. Mathis Dep. 130:17-133:2; Kim Dep. 78:17-80:6.

**Response No. 32:    Disputed**.  The cited evidence contains no support for the proposed fact.

33.    So RBC required Social Assets to guarantee Epic's obligation to RBC in exchange for RBC's consent to Epic's transfer of assets to Social Assets. Kim Dep. 78:6-82:23; Mathis 141:12-142:5; Nowaczek Dep. 56:4-59:14.

Redacted Public Version

**Response No. 33:**     **Disputed**.  The cited evidence does not support the proposed fact. Epic does not dispute that RBC consented to the transfer of assets, or that Social Assets was a party to the financing.

34.     Epic's other creditors were left out in the cold. Epic appointed a debt workouts company to negotiate discounted settlements with all of its creditors. DuWors Decl. ¶ ¶ 7-8, Ex. H (Correspondence from Epic's debt workout company).

**Response No. 34:**     **Disputed**.  Epic Media does  not dispute that months after the corporate restructuring, it appointed a debt workout specialist firm.  However, the cited evidence does not support the assertion that "Epic's other creditors were left out in the cold."  Declaration of John DuWors in Support of Essociate's Motion for Summary Judgment (Dkt. 105) ("DuWors Decl."), ¶¶ 7-8 Ex. H (Dkt 105-10) (Correspondence from Epic's debt workout company).

35.     In online affiliate marketing, a merchant promotes goods or services by paying website operators ("webmasters" or "affiliates") to send consumers to the merchant's website. Landau Decl. ¶ 76.

**Response No. 35:**     **Undisputed**.

36.     The basic components of online affiliate marketing are: (1) an online merchant; (2) webmasters who operate websites visited by consumers; (3) advertisements, including text ads or images ("banner ads"), provided by the merchant to be placed on an affiliate's website which, when clicked on by a visitor to one of the webmasters' websites, send the visitor's web browser to the merchant's website; and (4) a financial incentive for webmasters to send visitors to the merchant's website. Landau Decl. ¶ 77.

**Response No. 36:**     **No material dispute**.  However, at this level of generality, this description would not distinguish online affiliate marketing from other forms of online

11

advertising.  *See* Expert Report of Peter Kent on the Invalidity of the Patent-in-suit, (Dkt. 81) ("Kent Invalidity Report") on "General Background of Internet Affiliate Networks" at ¶¶ 30-43.

**37.**    Essociate operates an online affiliate network at essociate.com in which Essociate's affiliated webmasters may obtain ads for online merchants—usually in the form of banner ads—to display on the webmaster's websites. Landau Decl. ¶ 78.

**Response No. 37:**    **Disputed as immaterial**.  The operation of Essociate's current affiliate network is irrelevant to any issue in this case.

**38.**    Each banner ad Essociate provides to an affiliate functions as a hyperlink so that when the banner is clicked by a visitor to the affiliate's website (a website visitor may also be referred to as a "user" or "traffic"), the visitor's web browser is redirected from the webmaster's page to the URL associated with that hyperlink. Landau Decl. ¶ 79.

**Response No. 38:**    **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**39.**    Essociate needs to identify the affiliate responsible for each visitor in order to pay a commission, so each time Essociate provides a banner ad to an affiliate, the URL associated with the hyperlink (a "Click URL") includes a unique code identifying that Essociate affiliate. Landau Decl. ¶ 80.

**Response No. 39:**    **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**40.**    Then Essociate automatically redirects that traffic to the merchant (also referred to as a "hand-off") advertised on the banner ad by sending the traffic to a URL provided by the merchant to Essociate (a "Destination Landing Page URL"). Landau Decl. ¶ 81.

**Response No. 40:**    **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**41.**    To the visitor, the hand-off occurs smoothly, and the next webpage displayed following their click is the merchant's webpage. Landau Decl. ¶ 82.

Redacted Public Version

**Response No. 41:**     **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**42.**     The Click URLs Essociate provides to its webmaster affiliates for use on their websites use the following structure: http://go.essociate.com/[affiliate ID].[sub-id].[offer-ID]. Landau Decl. ¶ 83.

**Response No. 42:**     **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**43.**     When an Essociate affiliate obtains a banner ad from Essociate to display on its website, the Click URL will be completed as follows: the [affiliate ID] value field will include the unique ID for that Essociate affiliate; the [sub-id] value field will include the Sub-ID specified by the affiliate (see following paragraph); the [offer-ID] value field will include a unique identifier for the particular advertisement. Landau Decl. ¶ 84.

**Response No. 43:**     **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**44.**     Essociate also permits its affiliates to designate a Sub-ID value which they may elect to include in a Click URL for a banner placed on their website. Landau Decl. ¶ 85.

**Response No. 44:**     **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**45.**     This permits a deeper level of tracking—for example, the affiliate may have multiple webpages for which it would like to identify as the source of traffic. Landau Decl. ¶ 86.

**Response No. 45:**     **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**46.**     It may do so by inserting a different Sub-ID into the Click URL to indicate a specific webpage. Landau Decl. ¶ 87.

**Response No. 46:**     **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**47.**     Essociate's affiliate system tracks these Sub-IDs for its affiliates. Landau Decl. ¶88.

**Response No. 47:**     **Disputed as immaterial**.  *See* Epic's response to SPF 37.

Redacted Public Version

**48.**    So an Essociate affiliate might use the following Essociate Click URL:

http://go.essociate.com/12345.12.1234. Landau Decl. ¶ 89.

> **Response No. 48:**    **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**49.**    That URL identifies the Essociate affiliate (12345), the Sub-ID specified by that affiliate (12), and the offer the Click URL is for (1234). Landau Decl. ¶ 90.

> **Response No. 49:**    **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**50.**    Essociate's affiliate network operates in several ways in order to accommodate the operations of each merchant. Landau Decl. ¶ 91.

> **Response No. 50:**    **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**51.**    For some merchants, Essociate acts as an affiliate hub meaning that Essociate acts as an intermediary between affiliates and the merchants and supplies all of the back-end tracking functionalities for those merchants. Landau Decl. ¶ 92.

> **Response No. 51:**    **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**52.**    This is necessary where an online merchant lacks the infrastructure to operate its own affiliate network. Landau Decl. ¶ 93.

> **Response No. 52:**    **Disputed as immaterial**.  *See* Epic's response to SPF 37.

**53.**    But other online merchants operate their own affiliate systems in which webmasters may enroll as affiliates. Landau Decl. ¶ 94.

> **Response No. 53:**    **No dispute**.

**54.**    Without the invention disclosed in the '660 Patent, neither Essociate nor any other affiliate network can participate as a hub in a merchant affiliate system because the merchant already has tracking functionality. Landau Decl. ¶ 95.

Redacted Public Version

**Response No. 54:** **Disputed**.  The conclusory statement in the Landau declaration is argument about the scope of the '660 patent.  It also contradicts Landau's admission in his expert report that the '660 patent does not claim all virtual affiliate systems. Landau Report (Dkt. 85) at 32. Moreover, this fact is incoherent because this is not what the '660 patent claims.

55.     Essociate's founders, Evan Horowitz and Michael Landau, invented the technology disclosed in the '660 Patent in order to permit a stand-alone affiliate network to participate in an existing merchant affiliate network in order to permit the stand-alone network's affiliates to participate in the merchant's offers. Landau Decl. ¶ 96.

**Response No. 55:** **Disputed**.  The conclusory statement in the Landau declaration is argument about the scope of the '660 patent.  Moreover, it contradicts Landau's admission in his expert report that the '660 patent does not claim all virtual affiliate systems. Landau Report (Dkt. 85) at 32.

56.     The primary challenge that had to be met was in reconciling the affiliate hub's system for affiliate tracking with the merchant affiliate system's method for tracking affiliate ID's and Sub-ID's. Landau Decl. ¶ 97.

**Response No. 56:** **Disputed**.  Old XPays had already solved this problem.  Kent Invalidity Report, ¶¶ 115-165.

57.     The invention disclosed in the '660 Patent enables this by permitting a stand-alone affiliate network to configure a merchant affiliate system to receive referrals from the network's own affiliates such that the merchant's existing tracking system can recognize the source of the traffic as originating from the stand-alone network. Landau Decl. ¶ 98.

Redacted Public Version

**Response No. 57:** **Disputed**. This proposed fact is merely argument about the scope of the '660 patent. The only cited evidence is the Landau Declaration, which should be excluded as untimely expert opinion.

58.     For example, Essociate has participated in merchant affiliate systems for SpeedDate.com, AsSeenOnPC.com, and iBallers.com in order to provide Essociate's own affiliates with the ability to participate in those offers through Essociate's affiliate network. Landau Decl. ¶ 99.

**Response No. 58:** **Disputed as immaterial**. The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network. *See* Epic's response to SPF 37.

59.     In those examples, and all others where Essociate participated in a merchant's existing affiliate network, the merchant provides Essociate specific instructions about how to configure the URLs the merchant's system in order that it will recognize and credit traffic originating from Essociate's webmasters. Landau Decl. ¶ 100.

**Response No. 59:** **Disputed as immaterial**. The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network. *See* Epic's response to SPF 37.

60.     Specifically, in order to participate in an existing merchant affiliate system, the merchant affiliate system assigns Essociate a unique affiliate ID and provides Essociate with a particular URL structure which Essociate is required to use in order to be able to refer its webmaster's traffic to that merchant. Landau Decl. ¶ 101.

Redacted Public Version

**Response No. 60:**     **Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

61.     This is true for each the three examples noted above—SpeedDate.com, AsSeenOnPC.com, and iballers.com—as well as all of the other merchant affiliate systems Essociate has participated in in order to make that merchant's offers available to Essociate's own affiliates. Landau Decl. ¶ 102.

**Response No. 61:**     **Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

62.

     REDACTED

Landau Decl. ¶103, Ex. H.

**Response No. 62:**     **Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

63.

     REDACTED

Landau Decl. ¶ 104.

17

**Response No. 63:**     **Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

64.     Essociate used these instructions and was successfully able to direct traffic from its affiliated webmasters to the SpeedDate.com merchant affiliate system. Landau Decl. ¶ 105.

**Response No. 64:**     **Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

65.

                    REDACTED

                                        Landau Decl. ¶ 106, Ex. I.

**Response No. 65:**     **Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

66.

                    REDACTED

                                        Landau Decl. ¶ 107.

**Response No. 66:**     **Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

67.     REDACTED

            Landau Decl. ¶ 108.

18

**Response No. 67:      Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

**68.**
        REDACTED

Landau Decl. ¶ 109.

**Response No. 68:      Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

**69.**      Essociate used these instructions, including filling the {aff_sub} value field with the originating Essociate affiliate ID. Landau Decl. ¶ 110.

**Response No. 69:      Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

**70.**
        REDACTED

Landau Decl. ¶ 110, Ex. J.

**Response No. 70:      Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

**71.**      REDACTED

Landau Decl. ¶ 112.

Redacted Public Version

**Response No. 71:**     **Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

**72.**     REDACTED

Landau Decl. ¶ 113.

**Response No. 72:**     **Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  *See* Epic's response to SPF 37.

**73.**     Essociate used these instructions,     REDACTED

REDACTED     and was successfully able to direct traffic from its affiliated webmasters to the iballers merchant affiliate system. Landau Decl. ¶ 114.

**Response No. 73:**     **Disputed as immaterial**.  The operation of Essociate's affiliate network is not evidence of the scope of the '660 patent or the operation of Epic's network.  See Epic's response to SPF 37.

**74.**     Epic's witnesses testified that the Old Azoogle Network operated in the same way as the Accused Epic Network. Mathis Dep. 64:11-65:18; October 2 Okin 84:2-13.

**Response No. 74:**     **Disputed**.  Epic's witnesses offered no testimony concerning anything called "Old Azoogle Network."  The cited testimony shows that Epic operated one affiliate network, first under the name "Azoogle" and then under the name "Epic" and the operation of that network did not change in any way that is material to this case.  DPF 45, SPF 74, Essociates's Infringement Contentions, (Dkt. 89-11).

Redacted Public Version

**75.**     Essociate filed this lawsuit within three years of the Accused Epic Network's creation and within months of learning about Epic's infringement. Landau Decl. ¶ 115.

**Response No. 75:**     **Disputed**.  The accused network has been in existence since 2000.  DPF 9, 45.  It was renamed as "Epic Direct" and rewritten in the Erlang programming language in 2008 but its essential functions did not change.  DPF 45.  Essociate had actual belief that Azoogle network infringed since at least fall 2004.  DPF 26.

**76.**     Without any revenue to fund litigation, there was no reasonable way for Essociate to file suit against Epic—a company that paid $3 million per month in commissions alone.  Landau Decl. ¶ 116.

**Response No. 76:**     **Disputed and immaterial**.  Essociate's enforcement litigation has been conducted entirely on a contingent fee basis.  The proposed fact is immaterial, as neither Essociate's income nor the patent owner's poverty is a justification for delay in enforcement.

**77.**     As predicted, this suit has been costly and complicated. Landau Decl. ¶ 117.

**Response No. 77:**     **Disputed and immaterial**.  This suit has been costly for Epic, but Essociate's prosecution of this case, like all its litigation, has been conducted on a contingent fee basis.  DPF 52.  Landau's declaration statement is merely conclusory and it provides no supporting factual detail or evidence.

**78.**     The evidence Defendants allege was lost would have been gone by 2001, if it ever even existed. Landau Decl. ¶ 118.

**Response No. 78:**     **Disputed**.  Landau's declaration statement is merely conclusory and it provides no supporting factual detail or evidence.  Essociate does not dispute that, with the exception of two small pieces of script, the code and documentation of Old XPays has not been preserved.  Landau's declaration that all the pertinent evidence was disposed of by 2001

21

Redacted Public Version

contradicts his 2012 deposition testimony in which he testified that he did not recall whether he took steps to preserve documentation of the logic that rendered the correlation step.  2012 Landau Dep., Oct. 8, 175: 13-16.

**79.**   Essociate provided all relevant XPays records in the possession, custody, or control of Messrs. Landau and Horowitz even though XPays is not a party to this action. Landau Decl. ¶ 119.

**Response No. 79:**   **Disputed as immaterial**.  Essociate, and Messers. Landau and Horowitz, now admit that they did not preserve the code and documentation of Old XPays. Whether they have produced what records they had in their possession during this litigation, which began in 2011, is not material.

**80.**   All materials relating to the operation of XPays' affiliate system in 1998, 1999, and 2000 were lost or discarded by 2001 in the normal course of business, with the exception of the copies of certain materials—   `REDACTED`

—all of which Essociate produced. Landau Decl. ¶ 120.

**Response No. 80:**   **Disputed**.  Landau's declaration statement is merely conclusory and it provides no supporting factual detail or evidence.  Landau's declaration that all the pertinent evidence was disposed of by 2001 contradicts his 2012 deposition testimony in which he testified that he did not recall whether he took steps to preserve documentation of the logic that rendered the correlation step.  Oct. 8 2012 Landau Dep. 175: 13-16.

**81.**   Zhardanovsky testified that Azoogle disclosed the risk of Essociate's threat to those investors in 2005. Zhardanovsky Dep. 17:13-21.

**Response No. 81:**   **Undisputed**.

22

82.    In *Essociate, Inc. v. Blue Whaler Investments, Ltd. et al.*, U.S.D.C. Case No. 10-cv-2107-JVS, Essociate asserted infringement claims against several competing online affiliate networks. The defendants that participated in claim construction infringed the '660 Patent in essentially the same manner as Epic and relied primarily on Old XPays, just like Epic. Landau Decl. ¶ 121.

**Response No. 82:**    **Disputed and immaterial**.  The conclusory Landau declaration provides no support for Essociate's contention that the defendants in the *Blue Whaler* case infringed in essentially the same manner as Epic is alleged to infringe, and that they relied primarily on Old XPays as prior art.  The material point is that Direct ROI, the sole defendant who participated in claim construction briefing, did not take the same positions that Epic takes here.  *See Essociate, Inc. v. Blue Whaler Investments, LLC*, Case No. 2:10-CV-2107-JUS-MLG (C.D.Cal.), (Dkt. 135-36) (Claim Construction Briefing); *see also Essociate v. Epic Media Group*, (C.D. Cal.) (Feb. 6, 2012 Claim Construction Order) (Dkt. 81-4).

83.    Essociate's proposed definition for the term "Virtual Affiliates" closely tracks the language of the specification. DuWors Decl. Ex I ("Landau Report") ¶ 10 (Dkt. 105-11).

**Response No. 83:**    **Disputed**.  This is a claim construction argument, not a fact.  It is incorrect for the reasons cited in Epic's briefs at Epic's Initial Brief ("Epic's Initial Br."), (Dkt. 93), 21-22.

84.    Epic's proposed construction of "Virtual Affiliates" is too limiting insofar as it requires the referring webmaster to not be enrolled in the merchant's affiliate system. Landau Report ¶ 10.

**Response No. 84:**    **Disputed**.  This is a claim construction argument, not a fact.  It is incorrect for the reasons cited in Epic's briefs at Epic's Initial Br., (Dkt. 93), 21-22.

Redacted Public Version

85.    Anonymity is expressly identified as an optional feature in the '660 Patent specification. Landau Report ¶ 10.

**Response No. 85:    No dispute**.

86.    The '660 Patent identifies anonymity as one possible benefit of the disclosed technology, but it is not a limitation on the scope of the claims. Landau Report ¶ 10.

**Response No. 86:    No dispute**.

87.    Epic's construction of the term "source Webmaster unique identifier" would require that each source webmaster be assigned only one such unique code, but that position is not supported by the specification. Landau Report ¶ 7.

**Response No. 87:    Disputed**.  This is a claim construction argument, not a fact.  It is incorrect for the reasons cited in Epic's briefs at Epic's Initial Br., 22-23.

88.    Epic assigned a unique numeric ID to each webmaster participating in the Accused Epic Network. Du Wors Decl. Ex. F ("Advertiser Implementation Guide") at 7.

**Response No. 88:    No dispute**.

89.    Each Click URL Epic provided to one of its affiliates was in the form <http://x.azjmp.com/[CODE]> where the value field [CODE] was filled by Epic with a unique id specific to that Click URL which includes "pertinent information such as the affiliate id, the offer id, and the traffic type." Advertiser Implementation Guide at 7.

**Response No. 89:    No material dispute**.  However, the Advertiser Implementation Guide does not use the term "Click URL."  Peterson Decl., ¶ 24, Ex. 22,  (Dkt. 89-22) ("Advertiser Implementation Guide").   The Advertiser Implementation Guide refers to the link as "Epic Affiliate link" and the term most commonly used at Epic was "jump link."  Expert Report of Peter Kent on Infringement (Dkt. 82) ("Kent Infringement Report"), ¶ 12.

Redacted Public Version

**90.**     The unique id included in the Click URL allowed Epic to identify the Epic affiliate id for the originating Epic affiliate when that link is clicked by a visitor to the Epic affiliate network. October 2, 2012 Deposition of Rocky Appiah ("October 2 Appiah Dep.") 18:2-18:10.

**Response No. 90:      No dispute**.

**91.**     When a visitor sees a merchant's ad on an Epic affiliate's website and clicks on it, the visitor's browser is directed to the Click URL, which causes Epic's system to immediately send the visitor to the Destination Landing Page URL for that merchant: "When a user clicks-thru an Affiliate link, the user will first hit the Epic server where our system will immediately decode the link and redirect the user to the appropriate Advertiser offer landing page." Advertiser Implementation Guidelines at 7.

**Response No. 91:      Disputed in part**.  The decoding of the jump link is immediate, but the redirection of the user is not.  The cited evidence shows that before the user's browser is redirected to the merchant, the user's browser is loaded with a cookie to provide a tracking mechanism.  *See* DPF 69.

**92.**     Like Essociate, Epic provided offers from merchants with existing affiliate systems. Landau Decl. ¶ 122.

**Response No. 92:      Disputed**.  Essociate's network is irrelevant to the question of infringement and there is no evidence in the record that the Epic network operated like the Essociate network.  Although some Epic merchants may have their own affiliate system, there is no evidence in the record that Epic promoted offers by means of any merchant's existing affiliate system.  Epic's Initial Br., 34-35.  The conclusory statement in the Landau declaration lacks foundation and should be excluded as untimely.

25

Redacted Public Version

93.     When a merchant with an affiliate system contracted with Epic to make a campaign available to Epic's affiliates, the merchant would provide Epic a format for a Destination Landing Page URL to which Epic should redirect traffic from Epic's affiliates. Advertiser Implementation Guidelines at 4-7; October 2 Okin Dep. 142:1-144:4.

**Response No. 93:**     **No material dispute**.  All Epic merchants provided Epic a format for the advertiser landing page, regardless of whether the merchant had its own an affiliate system.

94.     A Destination Landing Page URL is part of the merchant's affiliate system. Landau Decl. ¶ 123.

**Response No. 94:**     **Disputed**.  The advertiser's landing page is part of the merchant's affiliate system.  The URL for the advertiser's landing page was used in the Epic network.  As the Advertiser Implementation Guide states: "the offer landing page is generally hosted by the advertiser and the URL provided to our Epic managers." Page 4, section 2.1.

95.     A Destination Landing Page URL would contain a value field containing a static value composed of a code identifying Epic as the affiliate pool referring traffic to the merchant's affiliate network. Advertiser Implementation Guidelines at 8; October 2 Okin Dep. 142:1-144:4, 144:11-147:3.

**Response No. 95:**     **Disputed**.  The cited evidence contains no support for the proposed fact.  The Advertiser Implementation Guide contradicts the proposed fact as shown by the sample URLs in Section 2.1 and 2.2 of the Advertiser Implementation Guide at pages 4-6.

96.     Epic's customer service manager would then ask the merchant what additional identifying information should be included in the Destination Landing Page URL reached by

26

Redacted Public Version

traffic referred from Epic affiliates. Advertiser Implementation Guidelines at 8; October 2 Okin Dep. 142:1-144:4, 144:11-147:3.

**Response No. 96:** **Disputed**. The cited evidence provides no support for the proposed fact. When an offer is set up on the Epic system, the merchant may request that certain preset variables be passed through to the merchant. Advertiser Implementation Guide, Section 2.2 at pages 5-6.

**97.** A merchant could request that Epic include particular value fields in the Destination Landing Page URL associated with a particular offer. Advertiser Implementation Guide at 7.

**Response No. 97:** **No dispute**. The pertinent passages of the Advertiser Implementation Guide is section 2.2, at pages 5-6.

**98.** An Epic advertising manager can configure the Destination Landing Page URL associated with an advertiser's offer by including one of several value fields which could include one of several possible different preset variables, or "macros", in the Destination Landing Page URL. Advertiser Implementation Guidelines at 8; October 2 Okin Dep. 142:1-144:4, 144:11-147:3.

**Response No. 98:** **Disputed**. The Epic system allowed *merchants* to request preset variables. Advertiser Implementation Guide, section 2.2 at pages 5-6. Neither the Advertiser Implementation Guide nor Mr. Okin referred any "macros."

**99.** Those macros included: "affiliate_id", "affiliate_id-sub_id", and "click_hash". Advertiser Implementation Guidelines at 8.

27

Redacted Public Version

**Response No. 99:** **Disputed**. Proposed fact No. 99 identifies three preset variables available in the Epic system. Advertiser Implementation Guide, section 2.2 at pages 5-6. These are not referred to as "macros."

100. Epic's Rule 30(b)(6) witness admitted this is so the merchant could perform tracking. October 2 Okin Dep. 142:1-144:4, 144:11-147:3.

**Response No. 100:** **Disputed**. The cited testimony confirms the statement in the Advertiser Implementation Guide that the preset variables are passed to the advertisers for the advertisers' internal tracking or reconciliation purposes. But Mr. Okin's testimony establishes that the tracking of transactions and commissions was done using the either the pixel method or the click-hash method.

101. Epic's Advertiser Implementation Guide explains that an advertiser would make such a request "for their internal tracking or reconciliation purposes." Advertiser Implementation Guidelines at 8.

**Response No. 101:** **No dispute**. The pertinent passage of the Advertiser Implementation Guide is section 2.2 at pages 5-6.

102. In some instances, Epic did not rely on its own internal tracking mechanisms to track transactions but instead relied on the merchant to provide tracking of the transactions based on the merchant's records of the "affiliate_id", "affiliate_id-sub_id", and "click_hash" macros included in Destination Landing Page URLs. October 2 Okin Dep. 142:1-144:4, 144:11-147:3.

**Response No. 102:** **Disputed**. At no point did Mr. Okin testify that Epic did not rely on its own internal track mechanisms. Mr. Okin discussed the use of a click-hash in the delayed reporting tracking method which was one of the alternatives available in the Epic system.

Redacted Public Version

**103.** Epic's system includes a database table known as the offer_urls table which contains the Destination Landing Page URLs Epic configured in order to refer traffic to existing merchant affiliate systems. October 2 Appiah Dep. 32:7-35:13.

**Response No. 103:** **Disputed**. The Epic system includes the offer_urls table. But the cited deposition testimony does not establish that Epic configured the destination landing page URLs or that they were used to refer traffic to existing merchant affiliate systems. Mr. Appiah's testimony establishes that the advertiser configures the URL. October 2, 2012 Deposition of Sasenarine ("Rocky") Appiah ("Oct. 2 Appiah Dep."), 35:24-36:6.

**104.** The "affiliate_id" macro is included in a Destination Landing Page URL by using the string "%%AFFILIATE_ID%%" in a specific value field, which causes the Destination Landing Page URL to include the Epic affiliate id. Advertiser Implementation Guidelines at 8.

**Response No. 104:** **Not disputed**. The pertinent passage of the Advertiser Implementation Guide is section 2.2 at pages 5-6.

**105.** The "affiliate_id-sub_id" macro is included in a Destination Landing Page URL by using the string "%%AFFILIATE-SUB%%" in a specified value field which causes the Destination Landing Page URL to include "the combination of affiliate_id" and a sub-id selected by the originating Epic webmaster. Advertiser Implementation Guidelines at 8.

**Response No. 105:** **Not disputed**. The pertinent passage of the Advertiser Implementation Guide is section 2.2 at pages 5-6.

**106.** The "click_hash" macro is included in a Destination Landing Page URL by using the string "%%CLICK-HASH%%" in a specified value field which causes the Destination Landing Page URL to include the click hash, "an alpha-numeric value which when decoded identifies affiliate, click, and offer data." Advertiser Implementation Guidelines at 8.

Redacted Public Version

**Response No. 106:     Not disputed**.

107.     The click_hash discloses the affiliate id when interpreted by the Accused Epic Network. October 3, 2012 Deposition of Rocky Appiah ("October 3 Appiah Dep.") 45:22-46:1.

**Response No. 107:     Not disputed**.

108.     The offer_urls table includes thousands of Destination Landing Page URLs which include the affiliate_id macro. Du Wors Decl. ¶ 30.

**Response No. 108:     Disputed**.  The cited evidence is a conclusory attorney affidavit, which is not admissible evidence of the operation of the Epic system.  Epic does not dispute that many advertiser landing page URLs include the affiliate ID variable.

109.     One Destination Landing Page URL in the offer_urls table which includes the affiliate_id macro and which is associated with a merchant affiliate system is: http://affiliates.speeddate.com/z/4/CD35/&subid1=%%AFFILIATE_ID%%&subid2=%%SUB_I D%%&subid3=%%CLICK_HASH%%. Du Wors Decl. ¶ 31; Landau Decl. ¶ 99.

**Response No. 109:     Disputed**.  Essociate has no admissible evidence that connects the quoted URL with a merchant *affiliate system*.  SpeedDate is an Epic client, a merchant who uses the Epic system.  DPF 84.  The Du Wors declaration is a conclusory attorney affidavit, which is not admissible evidence of the operation of the Epic system.  The cited paragraph of the Landau declaration does not support this proposed fact.

110.     The offer_urls table includes thousands of Destination Landing Page URLs which include the affiliate_id-sub_id macro. One such Destination Landing Page URL associated with a merchant affiliate system is:

http://asseenonpc.directtrack.com/z/3451/CD1923/&subid1=<http://asseenonpc.directtrack.com/

Redacted Public Version

z/3451/CD1923/%26subid1=> %%AFFILIATE-SUB%%. Du Wors Decl. ¶ 32; Landau Decl. ¶ 99.

**Response No. 110:**   **Disputed**.  Essociate has no admissible evidence that connects the quoted URL with a merchant *affiliate system*.  The Du Wors declaration is a conclusory attorney affidavit, which is not admissible evidence of the operation of the Epic system.  The cited paragraph of the Landau declaration does not support this proposed fact.

111.    There are thousands of Destination Landing Page URLs in the offer_urls table which include the click_hash variable. One example Destination Landing Page URL which is associated with a existing merchant affiliate system is: http://iballers.com/cgi-bin/ib.cgi/141/40685:%%CLICK_HASH%%?page=land/v1/r1. Du Wors Decl. ¶ 33; Landau Decl. ¶ 99.

**Response No. 111:**   **Disputed**.  Essociate has no admissible evidence that connects the quoted URL with a merchant *affiliate system*.  The Du Wors declaration is a conclusory attorney affidavit, which is not admissible evidence of the operation of the Epic system.  The cited paragraph of the Landau declaration does not support this proposed fact.

112.    Based on Michael Landau's dealings on behalf of Essociate with many of the same merchant affiliate systems Epic provided services to, Essociate is able to confirm that at least approximately 1200 of the configured Destination Landing Page URL's in Epic's offer_urls table are infringing offers. Landau Decl. ¶ 124.

**Response No. 112:**   **Disputed**.  The conclusory statement in the Landau declaration does not identify which 1,200 URLs he regards as infringing or why, and this statement should be excluded as an untimely expert opinion.  Pursuant to the Court's scheduling order, Essociate's

Redacted Public Version

infringement theory needed to be fully disclosed in the report of its infringement expert, George Edwards, which was due and disclosed on November 13, 2012.

113.    Epic received a user request for a target Merchant affiliate system URL from a web site operated by an Epic webmaster each time a visitor to that webmaster's web site clicked on the banner ad, thereby activating the Click URL embedded in that banner ad: "When a user clicks-thru an Affiliate link, the user will first hit the Epic server where our system will immediately decode the link and redirect the user to the appropriate Advertiser offer landing page." Advertiser Implementation Guidelines at 7.

Response No. 113:   **Disputed**.  Epic does not dispute the description of the process as quoted in the Advertiser Implementation Guide.  Epic disputes that it received requests for a "target merchant affiliate system" because Essociate has no admissible evidence that Epic directed traffic to other merchant affiliate systems rather than to merchants.  The claim term "target merchant affiliate system" implies that Epic has provided "virtual" affiliates, for which Essociate has shown no admissible evidence.

114.    According to Epic, each Click URL it provided to an Epic affiliate includes "pertinent information such as the affiliate id [the SID], the offer id, and the traffic type." Advertiser Implementation Guidelines at 7.

Response No. 114:   **Not materially disputed**.  Epic does not dispute that the jump link includes a link ID code that includes "pertinent information such as the affiliate ID, the offer ID, and the traffic tag."

115.    The unique id specific to each Click URL allows Epic to identify information including the affiliate id assigned to that webmaster. October 2 Appiah Dep. 18:2-18:10.

Response No. 115:   **Undisputed**.

32

**116.** In the SpeedDate.com example, a Click URL Epic provided to an Epic affiliate for a SpeedDate.com offer was <http://x.azjmp.com/4b4Gq?sub=12268>. Du Wors Ex. J ("Edwards Report") at 5.

**Response No. 116:   Undisputed**.

**117.** That user request included the unique id specific to each Click URL which includes: "pertinent information such as the affiliate id [the SID], the offer id, and the traffic type." Advertiser Implementation Guidelines at 7; Edwards Report at 6.

**Response No. 117:   Undisputed**.

**118.** A click on that link is a request for the SpeedDate.com target affiliate system, which operated a merchant affiliate system for its own affiliated webmasters. Landau Decl. ¶ 99.

**Response No. 118:   Disputed**. If a user clicked on the URL identified in fact No. 116, that click would constitute a request for the Epic jump link that would lead to speeddate.com. But the cited evidence provides no support for the contention that the request was for the "speeddate.com target affiliate system."  Indeed, that contention is contradicted by the evidence which shows that the SpeedDate.com affiliate system had its own domain.  The SpeedDate.com affiliate system domain identified by Mr. Landau is "affiliates.speeddate.com."  Landau Decl, ¶ 103.  The SpeedDate.com domain connected with the jump link in fact No. 116 is "speeddate.com."  *See* Edwards Report at 10.

**119.** For any offer in the offer_urls table for a merchant affiliate system which required Epic to use a Destination Landing Page URL with a unique identifier for Epic and a value field filled with one or more of the macros "%%AFFILIATE_ID%%", "%%AFFILIATE-ID_SUBID%%", or "%%CLICK_HASH%%", Epic created or recognized a relationship

33

Redacted Public Version

between the SID and the hybrid string combining the unique identifier for Epic and that variable (the "TWUID"). Advertiser Implementation Guidelines at 8; Edwards Report at 7.

**Response No. 119:    Disputed**.  This proposed fact is a legal conclusion as to a claim element.  It is not supported by the Advertiser Implementation Guide, and it is not an opinion provided in the Edwards Report.

120.    In the SpeedDate.com example, Epic creates or recognizes a relationship between a SID for the originating Epic affiliate (<48192>)—which is included in <4b4Gq?sub=12268> in the unique click id <4b4Gq> (See Advertiser Implementation Guide at 7 (Each Click URL includes "pertinent information such as the affiliate id.") and the TWUID, <a=53&c=1&s1=48192&s2=12268>, a hybrid-string of characters including both the unique identifier SpeedDate.com assigned to Epic and the SID. Advertiser Implementation Guidelines at 7; Edwards Report at 7.

**Response No. 120:    Disputed**.  This proposed fact is a legal conclusion as to a claim element.  It is not supported by the Advertiser Implementation Guide.

121.    In the example SpeedDate.com TWUID: a=53 is the value field containing the unique ID assigned to Epic; c=1 is the value field containing an identifier for a particular SpeedDate.com advertising offer; s1=48192 is the value field containing the SID of the originating Epic affiliate; and s2=12268 is the value field containing the Sub-ID selected by the Epic affiliate. Landau Decl. ¶ 125.

**Response No. 121:    Disputed and immaterial**.  The value 48192 is the Epic affiliate ID, the SID in terms of the patent.  DPF 86.  12268 is the sub-ID selected by the Epic affiliate. Mr. Landau's declaration does not establish any foundation for his contention that in the Epic

34

transaction with SpeedDate.com, "53" is the ID assigned to Epic or that "1" is the identifier for the SpeedDate.com advertising offer.

122.     Epic's claim that Landau testified that passing the SID is not correlation is incorrect. Rather, Landau's testimony was that Old XPays did not use correlation because the SID (the XPays affiliate ID) was not correlated to a "target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system". Landau Decl. ¶ 126.

Response No. 122:    Disputed.  Landau's declaration directly contradicts his sworn deposition testimony.  Oct. 8, 2012 Landau Dep., (Dkt. 76), 118:14-126:14; 114:8-117:22; 2010 Deposition of Michael Landau ("2010 Landau Dep."), (Dkt. 80), 36:8-38:1.

123.     When a visitor to an Epic affiliate's website requested a merchant affiliate system by clicking on a banner ad for that merchant, the Click URL was activated and Epic's system "immediately decode[d] the link and redirect[ed] the user to the appropriate" Destination Landing URL. Advertiser Implementation Guidelines at 10.

Response No. 123:    Not materially disputed.  The cited portions of the Advertiser Implementation Guide also explain that the Epic system will place cookies on the user's computer for use in tracking.

124.     Where the Destination Landing Page includes a hybrid string of characters including a unique identifier for Epic and a value field filled with one or more of the macros "%%AFFILIATE_ID%%", "%%AFFILIATE-ID_SUB-ID%%", or "%%CLICK_HASH%%", the generated URL includes a correlated TWUID and can be used to access the requested Merchant affiliate system. Advertiser Implementation Guidelines at 8; Edwards Report at 10.

Redacted Public Version

**Response No. 124:**   **Disputed**.  This proposed fact is a legal conclusion as to a claim element.  It is not supported by the Advertiser Implementation Guide, and it is not an opinion provided in the Edwards Report.

125.   The macros "%%AFFILIATE_ID%%", "%%AFFILIATE-ID_SUB-ID%%", or "%%CLICK_HASH%%" each can be used to identify the originating Epic webmaster and those macros are included when a merchant requests them "for their internal tracking or reconciliation purposes." Advertiser Implementation Guidelines at 8.

**Response No. 125:**   **Disputed**.  Only the preset variable "%%AFFILIATE_ID%%" can be used by the merchant to identify the Epic affiliate.  The preset variables are included whenever a merchant requests them for whatever reason.  The variables can be used for the merchant's internal tracking or reconciliation purposes, but only Epic can use them to identify the affiliate.

126.   In the SpeedDate.com example, the Destination Landing Page URL included in Epic's offer_urls table is
<http://mysdate.com/?a=53&c=1&s1=%%AFFILIATE_ID%%&s2=%%SUB_ID%%>.
Du Wors Decl. ¶ 34.

**Response No. 126:**   **Not disputed**.

127.   The URL generated is <http://mysdate.com/?a=53&c=1&s1=48192&s2=12268>, which could be used to access the SpeedDate.com merchant affiliate system, and which includes the SID for the Epic affiliate, 48192. Edwards Report at 10.

**Response No. 127:**   **Disputed**.  The cited evidence does not establish that the URL accesses the speeddate.com merchant affiliate system.  Indeed, the evidence contradicts this.  *See* Epic's response to SPF 118.

Redacted Public Version

**128.** Claim 3 of the '660 Patent reads on the Accused Epic Network because the Accused Epic Network obtains transaction information from the target Merchant affiliate system for specified transactions. Edwards Report at 11.

**Response No. 128:**   **Disputed**.  This proposed fact is a legal conclusion.

**129.** This occurs via the Accused Epic Network's tracking pixel and delay reporting functions. Advertiser Implementation Guidelines; Edwards Report at 11.

**Response No. 129:**   **Disputed**.  The tracking pixel prompts the Epic system to acquire transaction information from the cookie on the user's computer, not from the merchant.  Epic does not dispute that it can acquire transaction information during the delay reporting process under some conditions, although none of those conditions have been accused of infringement. When the click-hash method is used, Epic does not acquire transaction information from the merchant.  *See* Epic Reply Br. at Section III.C.

**130.** Under the tracking pixel functionality, the Accused Epic Network obtained transaction information from the target Merchant affiliate system upon completion of a transaction, referred to as a "lead." Advertiser Implementation Guidelines at 12; Edwards Report at 11.

**Response No. 130:**   **Disputed**.  When the tracking pixel is used, Epic acquires transaction information from the cookies on the user's computer.  Kent Infringement Report, ¶¶ 16-17; *see also* DPF 71.

**131.** It did this by displaying a "transparent 1×1 pixel graphic" which "triggers verification activities to check if the lead was from an Epic Affiliate referral" and if so "return[s] data to Epic for reporting." Advertiser Implementation Guidelines at 12; Edwards Report at 11.

Redacted Public Version

**Response No. 131:** **No material dispute**.  The Advertiser Implementation Guide makes clear that the information is drawn from the cookies on the user's computer.  *See also* DPF 71.

**132.**     And under the delay reporting functionality, the Accused Epic Network obtained transaction information from the target Merchant affiliate system about "lead conversions" occurring over a period of time by either sending a summary of those transactions to Epic via email or making that summary available for Epic to access from the target Merchant affiliate system's FTP site. Advertiser Implementation Guidelines at 14; Edwards Report at 11; October 3 Appiah Dep. 42:23–43:3.

**Response No. 132:** **Disputed in part**.  When using delay reporting, Epic could also obtain transaction information from the click-hash code. Advertiser Implementation Guide, 5; Oct. 2 Appiah Dep., 45:15-22.

**133.**     Claim 6 of the '660 Patent reads on the Accused Epic Network because Epic obtains transaction information by granting the target Merchant affiliate system access to the Accused Epic Network via the tracking pixel functionality, which causes transaction information to be provided to the Accused Epic Network when an image is placed on a website associated with the target Merchant affiliate system, or by the delay reporting functionality under which Epic obtains a report containing lead information by accessing the target Merchant affiliate system's FTP ("file-transfer protocol") site. Advertiser Implementation Guidelines at 12-13; Edwards Report at 11-12.

**Response No. 133:** **Disputed**.  This is a legal conclusion.  Moreover, claim 6 is a dependent claim, and thus it does not read on the Epic system unless claim 1 reads on it.

Redacted Public Version

**134.**    Claim 10 of the '660 Patent reads on the Accused Epic Network because at least one of the Webmasters in the Accused Epic Network operates a website with a banner ad for a related Merchant affiliate system. Edwards Report at 12; October 3 Appiah Dep. 52:13-17.

**Response No. 134:    Disputed**.  This is a legal conclusion.  Moreover, claim 7 is a dependent claim, and thus it does not read on the Epic system unless claim 1 reads on it.

**135.**    Claim 13 of the '660 Patent reads on the Accused Epic Network because the Accused Epic Network selects at least one transfer mode by which transaction information is transferred from the target Merchant affiliate system to the Epic Service by implementing Epic's tracking pixel or delayed reporting functions with respect to that target Merchant affiliate system. Advertiser Implementation Guidelines at 12-14; Edwards Report at 12; October 3 Appiah Dep. 51:12-52:12.

**Response No. 135:    Disputed**.  This is a legal conclusion.  Moreover, claim 13 is a dependent claim, and thus it does not read on the Epic system unless claim 1 reads on it.

**136.**    Claim 14 of the '660 Patent reads on the Accused Epic Network because at least one of the transfer modes referred to in claim 13 is selected from the group consisting of electronic mail, file transfer protocol, script call, and manual entry. Specifically, the delay reporting functionality transfers transaction information by FTP (file transfer protocol) or by electronic mail. Advertiser Implementation Guidelines at 14; Edwards Report at 12; October 3 Appiah Dep. 51:12-52:12.

**Response No. 136:    Disputed**.  This is a legal conclusion.  Moreover, claim 14 is a dependent claim, and thus it does not read on the Epic system unless claim 1 reads on it.

**137.**    Claim 15 is a computer program claim which describes the use of code segments to execute the method described in claim 1. Edwards Report at 12.

Redacted Public Version

**Response No. 137:**   **No material dispute.**  The wording is imprecise, because the purpose of the claim language is not to "describe," but to define the scope of the claimed invention.

138.    Claim 28 describes a means plus function for executing the method described in claim 1. Edwards Report at 13.

**Response No. 138:**   **No material dispute.**  The wording is imprecise, because the purpose of the claim language is not to "describe," but to define the scope of the claimed invention.

139.    XPays practiced several forms of the prior art affiliate services. For example, in 1998 XPays provided affiliate services to a company called Netfill. XPays operated as an "Internet affiliate service bureau" in connection with Netfill which Epic's expert defines as a service provided to "e-commerce merchants that did not want to build their own affiliate networks." (Kent Report at ¶ 34.) Landau Decl. ¶ 127.

**Response No. 139:**   **Disputed and immaterial.**  Essociate does not cite any evidence, other than the conclusory Landau Declaration, demonstrating that XPays practiced several different forms of prior art affiliate services.  The material issue in this case is not how XPays operated with Netfill, but how XPays operated as it provided services to Python and iGallery.

140.    Epic's expert is incorrect when he says about Netfill: "the system that XPays operated in 1998 also worked as a virtual affiliate system...it contained a mechanism by which it could interface with other affiliate systems, allowing XPays affiliates to send visitors to merchants outside the XPays affiliate network; that is, to merchants that ran their own affiliate programs" (Kent Report at ¶ 110.) This is false. Landau Decl. ¶ 128.

Redacted Public Version

**Response No. 140:    Disputed and immaterial.**  Essociate's proposed fact mischaracterizes the statement at issue in the Kent Invalidity Report, which is not referring to XPays as used with Netfill, but to the XPays system as used with iGallery and Python.  Kent Invalidity Report ¶¶ 106-114.  There is a typographical error in Paragraph 110 of Kent's Invalidity Report: "1998" should have been "1999."  When read in context, Kent is clearly discussing  the Old XPays system that worked with iGallery and Python.

Essociate has admitted that iGallery and Python operated affiliate networks.  DPF 93.  And there is no genuine dispute that traffic from affiliates enrolled in the Old XPays system was directed to iGallery and Python.  DPF 94.  Thus, it is already established through other facts that XPays operated a virtual affiliate system before May 1, 1999, and it is not material whether it did so with Netfill.

**141.**
    **REDACTED**
                                        Landau Decl. ¶ 129.

**Response No. 141:    Disputed and immaterial.**  The evidence cited by Essociate in support of this proposed fact is a paragraph in the Landau declaration, which should be disregarded because contradicts his prior sworn testimony.  2010 Landau Dep. 27:10-29:25; 42:4-12; 43:13-20.  The proposed fact is immaterial because the '660 patent does not require that the merchant affiliate system provide codes to the virtual affiliate system, particularly if practicing the "hybrid string" embodiment of the invention.

**142.**    **REDACTED**

Landau Decl. ¶ 130.

Redacted Public Version

**Response No. 142:    Disputed and immaterial.**  There is no evidence in this case to support this proposed fact, other than the conclusory statement in the Landau Declaration.  The fact is immaterial because the '660 patent does not require that the merchant landing page URLs be generated "on the fly."

**143.**

> REDACTED

Landau Decl. ¶ 131.

**Response No. 143:    Disputed and immaterial.**  There is no evidence in this case to support this proposed fact, other than the conclusory statement in the Landau Declaration.  The fact is immaterial because the '660 patent does not require that the merchant landing page URLs be generated "on the fly."

**144.**

> REDACTED

Landau Decl. ¶ 132.

**Response No. 144:    Disputed.**  There is no evidence in this case to support this proposed fact, other than the conclusory and uncorroborated statement in the Landau Declaration.

**145.**     REDACTED

Landau Decl. ¶ 133.

**Response No. 145:    Undisputed.**

**146.**     No URL was generated, as required for the fourth step of claim 1 of the patent. Landau Decl. ¶ 134.

42

**Response No. 146:    Disputed.**  The only evidence Essociate cites in support of this proposed fact is the conclusory statement in the Landau declaration: "No URL was generated, as required for the *second step* of claim 1 of the patent."  Landau Decl. ¶ 134 (emphasis added). The declaration statement must be disregarded as a sham affidavit because it contradicts Landau's own prior deposition testimony that the outgoing URL generated by Old XPays included the merchant ID and the Webmaster five-digit identifier.  *See* 2010 Landau Dep. 34:12-23.

**147.**    No Destination Landing Page URL was displayed or contained in the browser or any part of the user interface. Landau Decl. ¶ 135.

**Response No. 147:    Disputed and immaterial.**  Essociate has not provided any evidentiary support for this fact.  Essociate cites only the same conclusory sentence (but no other facts or support) from the Landau Declaration.  This proposed fact is immaterial because the display of the URL is not required by the claims of the '660 patent.  *See* Defendants' Brief in support of MSJ at 23-24.

**148.**    And the user was not automatically forwarded to the website of the target merchant affiliate system as required both by Defendant Epic's proposed construction of "generating a URL" and the construction of "generating a URL" adopted by Judge Selna in the *Blue Whaler* case. Landau Decl. ¶ 136.

**Response No. 148:    Disputed and immaterial.**  Essociate has not provided any evidentiary support for this fact.  Essociate cites only the same conclusory sentence (but no other facts or support) from the Landau Declaration.  This proposed fact is immaterial because automatic forwarding is not required by the claims of the '660 patent.  *See* Defendants' Brief in support of MSJ at 23-24; *see also* Defendants' Reply Brief at Section IV.B.4.

Redacted Public Version

149.       REDACTED

Landau Decl. ¶ 137.

**Response No. 149:**    **Disputed.**  Essociate has not provided any evidentiary support for this fact.  Essociate cites only the same conclusory statement (but no other facts or support) from the Landau Declaration.

REDACTED

*See* DPF 122-125; *see also* 2010 Landau Dep. 27:10-29:25; 34:12-23; 42:4-43:20.

150.     Epic's expert incorrectly states that "Old XPays affiliates could use the Old XPays system to send their site visitors to an iGallery web site, and be tracked by the iGallery affiliate system." (Kent Report at ¶ 118.) iGallery performed no such tracking or had the ability to do so.

REDACTED

Landau Decl. ¶ 138.

**Response No. 150:**    **Disputed.**   Essociate has not provided any evidentiary support for this proposed fact.  Essociate cites only a conclusory paragraph from the Landau declaration, whereas Kent's analysis is supported by Landau's own prior deposition testimony.  *See* 2010 Landau Dep. 27:10-29:25; 34:12-23; 42:4-43:20.

151.     Nor did Old XPays involve a correlating step. Landau Decl. ¶ 139.

**Response No. 151:**    **Disputed.**  This is a legal conclusion, and it is contradicted by the evidence.  Old XPays used the "hybrid string" method of correlation described in the '660 patent, 11:17-21. *See* Kent Invalidity Report ¶ 132; *see also* DPF 113-122.  For support for its

44

proposed fact, Essociate cites only a conclusory paragraph from the Landau Declaration, which should be disregarded as untimely expert opinion and a sham affidavit.

152.    The correlating step contemplated by the '660 patent involves an algorithmic process whereby the value in the affiliate ID field of the Click URL determines what value appears in the Sub ID value field of the Destination Landing Page URL. Landau Decl. ¶ 140.

**Response No. 152:    Disputed.**  This proposed fact is an argument about the meaning of the claims of the '660 patent, and it is not supported by the '660 patent itself.  The '660 patent describes "a number of ways" that the correlation step can occur, but this is not one of them.  '660 patent, 11:1-37.  For support for its proposed fact, Essociate cites only the same sentence (but no other facts or support) from the Landau Declaration, which should be disregarded as untimely expert opinion.

153.    REDACTED

Landau Decl. ¶ 141.

**Response No. 153:    Disputed and immaterial.**  Nothing in the '660 patent requires REDACTED and neither of Essociate's experts made any such suggestion in their reports.

REDACTED

*See also* SPF 141, *supra*.

154.    REDACTED

Landau Decl. ¶ 142.

**Response No. 154:    Disputed and immaterial.**  Nothing in the '660 patent requires REDACTED and neither of Essociate's experts made any such suggestion in their reports. REDACTED

45

Redacted Public Version

REDACTED

*See also* SPF 141, *supra*.

**155.**      REDACTED

Landau Decl. ¶ 143.

**Response No. 155:   Disputed**.  There is no evidence in this case to support this proposed fact, other than the conclusory and uncorroborated statement in the Landau Declaration.

**156.**      REDACTED

Landau Decl. ¶ 144.

**Response No. 156:   Disputed.**  Landau's own prior deposition testimony contradicts this proposed fact, and thus his declaration must be disregarded.  Landau testified that

REDACTED

Oct. 8 2012 Landau Deposition, 147:22-149:10.  *See also* DPF 144 (undisputed).

**157.**      REDACTED

which means it failed the requirements of the correlation step, which provides: "correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system." Landau Decl. ¶ 145.

46

**Response No. 157:     Disputed.**  Landau's own prior deposition testimony contradicts this proposed fact, and thus his declaration must be disregarded.  Landau's own prior deposition testimony admits that          **REDACTED**                                   *See* 2010 Landau Dep. 27:10-29:25; 34:12-23; 42:4-43:20.

**158.**     In other words, the Python and iGallery systems did not practice the invention disclosed by the '660 patent because the affiliate ID that appeared in the Click URL did not correspond to a value that "corresponded to the unique identification system of the requested Merchant affiliate system." Landau Decl. ¶ 146.

**Response No. 158:     Disputed.**  This is a conclusory statement that is essentially argument about the scope of the claims, and it is contradicted by Landau's own prior testimony.  Epic's invalidity expert shows that Old XPays practiced the '660 patent relying on Landau's own prior deposition testimony.  *See* Kent Invalidity Report ¶¶ 115-178; *see also* 2010 Landau Dep. 27:10-29:25; 34:12-23; 42:4-43:18.

**159.**          **REDACTED**


Landau Decl. ¶ 147.

**Response No. 159:     Disputed.**  Landau's own prior deposition testimony contradicts this proposed fact, and thus his declaration must be disregarded.  Landau's own prior deposition testimony admits that          **REDACTED**                                   *See* 2010 Landau Dep. 27:10-29:25; 34:12-23; 42:4-43:20.

**160.**               **REDACTED**


                                                        Landau Decl. ¶ 148.

47

**Response No. 160:**    **Disputed.**  Landau's own prior deposition testimony contradicts this proposed fact, and thus his declaration must be disregarded.  Landau's own prior deposition testimony admits that iGallery and Python used the webmaster identifier for tracking.  *See* 2010 Landau Dep. 27:10-29:25; 34:12-23; 42:4-43:20.

**161.**    REDACTED

Landau Decl. ¶ 149.

**Response No. 161:**    **Disputed.**  Landau's own prior deposition testimony contradicts this proposed fact, and thus his declaration must be disregarded.  In Landau's own prior deposition testimony,

REDACTED                              Oct 8, 2012 Landau Dep. 111:11-114:23.  Landau also specifically testified that

REDACTED                                                                 2010 Landau Dep. 36:8-38:1.

**162.**    At that time, XPays was only providing "affiliate service bureau" services to Netfill—which Epic does not claim invalidates the '660 Patent.

REDACTED

Landau Decl. ¶ 150.

**Response No. 162:**    **Disputed.**  Landau's own prior deposition testimony contradicts this proposed fact, and thus his declaration must be disregarded.  In Landau's own prior deposition testimony, he admitted that

REDACTED                              Oct 8, 2012 Landau Dep. 111:11-114:23.  Landau

Redacted Public Version

also specifically testified that        **REDACTED**

                                                                                2010

Landau Dep. 36:8-38:1.

163.    The need to correlate affiliate codes in Click URL's to unique identifying codes

recognizable by a target merchant affiliate system did not arise until Messrs. Landau and

Horowitz began referring XPays' affiliate traffic to the Sextoy.com merchant affiliate system

(which the parties agree occurred less than a year before the '660 patent application was filed).

Landau Decl. ¶ 151.

Response No. 163:    **Disputed.** Landau's own prior deposition testimony contradicts

this proposed fact, and thus his declaration must be disregarded.  Old XPays (the XPays affiliate

system prior to May 1, 1999 used with Python and iGallery) performed the correlation operation

in the '660 patent.  *See* Kent Invalidity Report ¶ 132; *see also* DPF 113-122.  iGallery and

Python used unique identifying codes for tracking.  *See* 2010 Landau Dep. 27:10-29:25; 34:12-

23; 42:4-43:20.

164.    **REDACTED**

                                                    Landau Decl. ¶ 152.

Response No. 164:    **Disputed and immaterial.**  There is no evidence in this case

concerning whether the sextoy.com affiliate system

                **REDACTED**                        other than the conclusory statement in the Landau

declaration.  The proposed fact is immaterial, because the '660 patent does not require

                **REDACTED**

165.    This meant that Landau and Horowitz had to invent the '660 patent's correlation

technology to ensure that the affiliate ID in their Click URL's resulted in a Sub ID in the

49

Destination Landing Page URL that was functional within the target merchant affiliate system. Landau Decl. ¶ 153.

      **Response No. 165:**   **Disputed and immaterial.**  The proposed fact is immaterial, because the '660 patent does not require    `REDACTED`    The '660 patent discloses several methods of correlation, at least one of which the Old XPays system practiced with iGallery and Python, prior to the sextoy.com campaign.  *See* Kent Invalidity Report ¶¶ 126-159; *see also* DPF 113-125; 2010 Landau Dep. 27:10-29:25; 34:12-23; 42:4-43:20.

      **166.**    `REDACTED`

Landau Decl. ¶ 154.

      **Response No. 166:**   **Disputed and immaterial.**  The Old XPays system had already done this in connection with iGallery and Python, prior to the Sextoy.com campaign.  *See* Kent Invalidity Report ¶¶ 126-159; *see also* DPF 113-125; 2010 Landau Dep. 27:10-29:25; 34:12-23; 42:4-43:20.  Essociate cites only the Feb. 22, 2013 Landau Declaration, which simply recites this proposed fact and should be disregarded as untimely expert opinion and a sham affidavit.

      **167.**    Thus, it was not until XPays began participating in the Sextoy.com merchant affiliate network that the invention disclosed by the '660 patent was first publicly used. Landau Decl. ¶ 155.

      **Response No. 167:**   **Disputed.**  This is a legal conclusion, and one not supported by the evidence. The Old XPays system used in connection with iGallery and Python was an embodiment of the '660 patent and was used prior to May 1, 1999.  *See* DPF 93-97; Kent Invalidity Report ¶¶ 115-159.

Redacted Public Version

**168.**   Epic's claim that Landau previously admitted that

REDACTED                                          Landau Decl. ¶ 156; 2012 Landau Dep.

at 137:19–24

   **Response No. 168:**   **Disputed.**  Landau's deposition testimony admitted that

REDACTED

*See* DPF 93 (undisputed, citing Landau deposition testimony); 2010 Landau Dep.

31:4-7; 32:2-12.  For support for this proposed fact, Essociate cites a sentence in the Feb. 22,

2013 Landau Declaration, which merely recites this proposed fact, and which should be

disregarded under the sham affidavit rule.  Essociate also cites 2012 deposition testimony from

Landau where he couldn't remember that       REDACTED

but this contradicts his 2010 testimony where he readily admitted this.  *See* 2010 Landau Dep.

67:10-13; DPF 108.

   **169.**   Additionally, Epic's expert's application of the "user request" step to Old XPays

is irreconcilably flawed because it is internally inconsistent. Kent claims that the user

request(I)occurs when "[t]he visitor's browser sends a request for the Intermediate Page [hosted

by XPays] to the Xpays server," (Kent Report at 150) and (ii) that it is something "sent to the

target merchant" (*id.* at ¶ 153).

REDACTED                                    Landau Decl. ¶ 157.

   **Response No. 169:**   **Disputed.**  This is argument.  Essociate has not provided any

evidentiary support for this proposed fact, other than one conclusory paragraph from the Landau

Declaration, which should be disregarded as untimely expert opinion.

Redacted Public Version

170.     In the '660 Patent, the request initiated with the link continuing the SID is sent to the affiliate pool and the user is "handed off" to the target Merchant affiliate system. But in Old XPays, the first "request" dead ends at the Intermediate Page, which is XPays—not the target merchant affiliate system. To get there, you have to request (by clicking) yet again. Landau Decl. ¶ 158.

**Response No. 170:    Disputed and Immaterial.**  Essociate has not provided any evidentiary support for this proposed fact other than one conclusory paragraph from the Landau Declaration, which should be disregarded.  This proposed fact is immaterial because there is no requirement in the '660 patent that the user be directed "automatically" without clicking on the generated URL.  *See* Epic's Initial Br. at 23-24.

171.     The correlation in the '660 Patent is between unique codes assigned to source webmasters and unique codes functional in the target merchant system. The Old XPays system did not include unique codes functional in the target merchant system and therefore there was nothing which could be correlated. Landau Decl. ¶ 159.

**Response No. 171:    Disputed.**  Essociate has not provided any evidentiary support for this proposed fact, other than one conclusory paragraph from the Landau Declaration.  This paragraph of the Landau Declaration should be disregarded as untimely expert opinion.  It should also be disregarded under the sham affidavit rule because it contradicts Landau's own prior deposition testimony.

REDACTED

*See* DPF 122-125; *see also* 2010

Landau Dep. 27:10-29:25; 34:12-23; 42:4-43:20.  Old XPays also performed the correlation step of the '660 patent.  Kent Invalidity Report. ¶¶ 115-159.

Redacted Public Version

**172.**     The '660 Patent discloses at least three structures capable of performing the correlation step: (1) a "lookup table" ('660 Patent at col. 11, ll. 5-12); (2) a "hybrid string" of characters (*id.* at col. 11, ll. 13-24); and (3) with "custom interfaces" (*id.* at col. 11, ll. 26-37). Landau Report at 14.

**Response No. 172:**     **Disputed.**   These are not structures and this is insufficient structure under 35 U.S.C. § 112, ¶ 6.   Kent Invalidity Report ¶¶ 96-100.

**173.**     Epic claims that Old XPays practiced the hybrid-string technique, but there is no evidence to support its position and Epic's expert report is both conclusory and mistaken. Landau Report at 14.

**Response No. 173:**     **Disputed.**   The opinion of defendants' expert, Peter Kent, is well supported by evidence, including Landau's own deposition testimony that pre-dates Landau's expert report.   Kent Invalidity Report ¶¶ 115-169.   The use of the hybrid string method by Old XPays is illustrated in SPF 155 and DPF 113-125.

**174.**     REDACTED

Landau Decl. ¶ 160.

**Response No. 174:**     **Disputed and immaterial.**   This proposed fact is not a valid reason that the Old XPays system could not have performed the correlating step.   Essociate has not provided any evidentiary support for this proposed fact, other than one conclusory paragraph from the Landau Declaration, which should be disregarded as untimely expert opinion. Additionally, this proposed fact is contradicted by Landau's prior deposition testimony and Peter Kent's expert report, both explaining that

REDACTED                                                                                   *See* 2010

Redacted Public Version

Landau Dep. 37:20-44:2; 59:22-60:14; 60:18-61:4;  Oct. 8, 2012 Landau Dep. 130:18-138:12;
*see also* Kent Invalidity Report ¶¶ 115-169.

**175.**

> REDACTED

> Landau Decl. ¶ 161.

**Response No. 175:    Disputed and immaterial.** There is no evidence in this case
concerning whether

> REDACTED

This conclusory sentence is
insufficient to establish this fact and should be disregarded under the sham affidavit rule.
Additionally, it is immaterial whether the script was executed when the visitor was at the
intermediate page or sometime prior.  *See* Epic Reply Br. at Section IV.B.3.

**176.**    In one of Essociate's first cases, Essociate's counsel attempted to explain Old
Xpays and was mistaken as to its functionality. This was not a statement by Essociate and was
made pursuant to FRE 408. Du Wors Decl. ¶ 29.

**Response No. 176:    Disputed.**  The proposed fact refers to a letter that was marked as
Exhibit 17 during the October 8, 2012 deposition of Michael Landau. *See* Kent Invalidity Report
(Dkt. 81), Ex. 9.  During this deposition, Michael Landau confirmed that

> REDACTED

Oct. 8, 2012 Landau Dep. 130:2-131:1.  In view of Landau's endorsement, this letter is
admissible evidence as an accurate description of the operation of Old XPays.  The letter and its

Redacted Public Version

contents were not disclosed to Epic in connection with settlement discussions, and it is not being offered for any prohibited purpose under Federal Rule of Evidence 408.

177.    The Old XPays system had no ability to obtain information for specified transactions,

    REDACTED

    Landau Decl. ¶ 162.

Response No. 177:    Disputed.  The only supporting evidence cited by Essociate for this proposed fact is one sentence from the Landau Declaration, which merely recites this proposed fact. This declaration should be disregarded as a sham affidavit because it contradicts Landau's own prior deposition testimony.  Landau testified that

    REDACTED

    Oct. 8, 2012 Landau Deposition, 147:22-149:10.  *See also*, DPF 144 (undisputed).  Additionally, Landau's prior deposition testimony establishes that

    REDACTED

    *See* DPF 122-125; *see also* 2010 Landau Dep. 27:10-29:25; 34:12-23; 42:4-43:20.

178.    iGallery never "had access to the Old XPays affiliate pooling system." Landau Decl. ¶ 163.

Response No. 178:    Disputed.  Prior to May 1, 1999, the Old XPays system itself was an affiliate in the iGallery system, and affiliates enrolled in the Old XPays system provided traffic to iGallery.  2010 Landau Dep. at 26:18-22; 46:17-19; Oct. 8, 2012 Landau Dep. 98:15-99:12.    REDACTED

Redacted Public Version

`REDACTED` DPF 144 (undisputed).  Additionally, this conclusory denial in Landau's Feb. 22, 2013 declaration cited for support for this proposed fact is insufficient to establish this fact and should be disregarded under the sham affidavit rule.  This conclusory denial should also be disregarded as untimely expert opinion.

179.    Epic characterizes Ross as including a "correlation function" with the "essential idea of correlating between the source system and the target system." (Defs' Brief at 57.) That is a material and misleading oversimplification—Ross does not disclose an existing target affiliate system, a source webmaster unique identifier (in the same sense as the '660 Patent), a target webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system, or a correlation of those identifiers as disclosed in the '660 Patent. Landau Report at 27.

**Response No. 179:   Disputed.**  This is argument.  The relevant fact is proposed in DPF 130, which is supported by U.S. Patent No. 6,629,135 to Ross and the Kent Invalidity Report ¶ 176, 193, Ex. 12.

180.    Ross does not even seek to address the same problem solved by the '660 Patent. Rather, Ross is directed to the perceived problem of a Host losing traffic to a Merchant when the user navigates away from the Host's site to the Merchant's. Landau Report at 28.

**Response No. 180:   Disputed in part**.  Ross (U.S. Patent No. 6,629,135) demonstrates features known in the relevant prior art at the time of the invention in the '660 patent.

181.    Like Ross, Verma does not have the same functionality, is not addressed at the same (or similar) problem as the '660 patent, and there is no reason to believe that it would have rendered the '660 Patent obvious to one of skill in the art, whether in combination with the Old XPays system or otherwise. Landau Report at 29.

56

Redacted Public Version

**Response No. 181:    Disputed.**  A person of ordinary skill in the art at the time of the invention in the '660 patent could have readily combined the basic principles of correlation functions, link generation, URL tracking, web page scripting to yield predictable results. Kent Invalidity Report ¶¶ 171-194. Ross and Verma demonstrate features known in the relevant prior art at the time of the invention in the '660 patent.  Kent Invalidity Report ¶¶ 176-177, 190-191.

**182.**    Graber '860 does not teach that co-marketers are part of a single virtual affiliate system of webmasters. Landau Report at 30.

**Response No. 182:    Undisputed.**

**183.**    Graber '860, like Ross and Verma, does not address the same problem as the '660 Patent and may not be in the same field of art. Landau Report at 31.

**Response No. 183:    Disputed.**  The Graber references (US Patent Nos. 5,712,979 and 5,717,860) demonstrate features known in the relevant prior art at the time of the invention in the '660 patent.  Kent Invalidity Report ¶ 192, Exs. 20 and 21.

**184.**    Epic's expert's report claims that using a lookup table to correlate source IDs and target IDs would be the "first method one would consider." (Kent Report at ¶ 175.) But this is incorrect, and lookup tables teach away from the claimed invention because using a lookup table is highly resource and time intensive and would generally be viewed as a suboptimal or inefficient solution to this kind of problem. Landau Report at 26.

**Response No. 184:    Disputed.**  This is argument, rather than a proposed fact.  The relevant fact is proposed as DPF 135, which is supported by the Kent Invalidity Report ¶ 175. The Landau Report at 26 provides no support whatsoever to the proposition that look-up tables "teach away" from the claimed invention.  The Landau Report provides a bare conclusion and it does not cite any art that contains any teaching regarding lookup tables.

Redacted Public Version

**185.**     Epic claims that one of skill in the art would be able to combine U.S. Patent No. 5,991,740 to Messer, the "basic idea" of a "virtual affiliate system," and generic "correlation functions" to create the invention claimed in the '660 Patent. (Defs' Brief at 59.) Epic is incorrect. Landau Report at 35.

**Response No. 185:     Disputed.**  This is argument and the ultimate conclusion of obviousness is a matter of law.  The relevant fact is proposed in DPF 141, which is supported by the Kent Invalidity Report ¶¶ 179-94.  The Landau Report at page 35 does not cite or provide any evidence to contradict DPF 141 or the argument in Epic's opening brief (at page 59).  Rather, this page of Landau's report merely attempts to recite the differences between the Messer patent and the '660 patent.

**186.**     Defendants seek to exclude two expert reports—the Landau Report and the Stern Report—because delivery of the reports was delayed by one week, from December 17 to December 24. There was no harm to the Defendants from this brief delay, which was caused by the holiday travel of the witnesses and Essociate's counsel. Du Wors Decl. ¶ 35.

**Response No. 186:     Disputed.**  Epic was harmed when its counsel received the Landau and Stern expert reports one week late, when the schedule only had a few weeks between expert disclosures and the summary judgment deadline.  Moreover, the Christmas and New Year holidays fell during this period, and if Essociate's counsel was entitled to holiday time for travel, so was counsel for Epic.  The time Epic had to respond to the late reports was cut to less than a month, which is an unfair burden especially in a case that is "costly and complicated."  *See* SPF 77.

Redacted Public Version

**187.**    The Landau and Stern reports were provided months before the discovery cutoff date and several weeks prior to Defendants' summary judgment briefing deadline and the Defendants make only a general, conclusory allegation of harm. Du Wors Decl. ¶ 36.

**Response No. 187:**    **Disputed.**  See the response to SPF 186.

**188.**    Epic shut down its failing domain name and affiliate marketing divisions, and transferred its entire remaining business divisions, including ad placement and social media marketing, to Social Assets, whose operation of those divisions already generates tens of millions of dollars in revenue per year. Kim Dep. 40:14-19.

**Response No. 188:**    Disputed.  Social Assets does not operate the "remaining business divisions" of Epic Media; rather, it developed a distinct platform that was launched in 2012 after Social Assets had already been spun off of Epic Media.  Nowaczek Dep., 104:16-105:18.


Dated:  March 4, 2013.                                            Respectfully submitted,


By: *s/ James D. Peterson*
    James D. Peterson
    Jennifer L. Gregor
    Dustin B. Brown
    Kerry L. Gabrielson
    GODFREY & KAHN, S.C.
    One East Main Street, Suite 500
    Post Office Box 2719
    Madison, WI 53701-2719
    Phone: 608-257-3911
    Fax: 608-257-0609
    Email: jpeterson@gklaw.com
          jgregor@gklaw.com
          dbrown@gklaw.com
          kgabrielson@gklaw.com

*Attorneys for Defendants, Epic Media*
*Group, Inc.,(f/k/a Azoogle.com, Inc.), and*
*Social Assets LLC d/b/a Kinetic Social.*

9134319_4

Redacted Public Version