**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| ESSOCIATE, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-cv-727-bbc |
| | ) | |
| EPIC MEDIA GROUP, INC., ET AL, | ) | **[FILED UNDER SEAL]** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

James D. Peterson
Jennifer L. Gregor
Dustin B. Brown
Kerry L. Gabrielson
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Post Office Box 2719
Madison, WI  53701-2719
Phone: 608-257-3911
Fax:    608-257-0609

*Attorneys for Defendants, Epic Media
Group, Inc.,(f/k/a Azoogle.com, Inc.), and
Social Assets LLC d/b/a Kinetic Social.*

REDACTED PUBLIC VERSION

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

ARGUMENT .....................................................................................................1

I. Much of Essociate's summary judgment evidence must be excluded................1

    A. Essociate's invalidity expert reports should be stricken. ........................2

    B. The Landau Declaration is an improper sham affidavit.........................2

    C. The DuWors declaration lacks foundation and provides inappropriate fact testimony from Essociate's lead attorney. ................................5

II. Essociate's suit is untimely and its claims against the defendants are barred. ...................6

    A. Essociate has no justification for its seven-year delay............................6

        1. The Epic Direct Network is not a new and different network from the one Essociate accused in 2004. ............................................6

        2. Essociate could have effectively investigated the affiliate network of Azoogle or Epic Media at any time. ........................................7

        3. Essociate cannot blame Epic for its long inaction. ........................9

        4. Other enforcement actions do not justify Essociate's delay in asserting its rights against Epic. ................................................9

        5. Essociate cannot justify its delay by claiming poverty. ...........................10

    B. Essociate's evidence of economic and evidentiary prejudice stands unrebutted. ....................................................................11

III. Epic Media does not infringe the '660 patent. ................................................13

    A. Essociate's new infringement theories should be rejected as untimely. ................14

    B. The SpeedDate.com transaction does not meet the limitations of the independent claims of the '660 patent. ................................................15

        1. Based on Essociate' summary judgment response, there is no material dispute concerning the term "SID."............................................15

        2. Essociate has no admissible evidence that Epic provides "virtual affiliates" to an existing affiliate system.................................................15

i

a.   Essociate's construction of "virtual affiliates" is contradicted by the specification and the claim language. ............15

b.   Essociate has no evidence that any SpeedDate.com transaction involves "virtual affiliates." ........................................18

3.   SpeedDate is not "configured" by Epic. ....................................................19

4.   The Epic system passes the unmodified affiliate ID as an independent variable; there is no TWID and no correlation operation in the Epic system. ...................................................................20

C.   Click-hash transactions do not infringe the '660 patent. .......................................22

IV.   No reasonable jury could conclude that the '660 patent is a valid patent..........................24

A.   The '660 patent is invalid as anticipated because the "hybrid string" embodiment of the invention is a description of Old XPays. ...............................24

1.   Old XPays "configured an existing target affiliate system." ....................26

2.   Old XPays performed the "receiving a user request" operation. ...............27

3.   Old XPays performed the "correlating" operation....................................28

4.   Old XPays performed the "generating a URL" operation. .........................31

5.   The dependent claims were practiced by Old XPays.................................33

B.   The invention in the '660 patent would have been obvious to one of ordinary skill in the art at the time of the invention.................................................34

C.   Claims 15 and 28 are also invalid because they are indefinite. .............................37

V.   Social Assets is not liable for Epic's obligations under any theory...................................38

A.   Essociate's successor liability argument contorts the case law and the evidence. ........................................................................................................40

B.   The alter ego liability and fraudulent transfer theories both fail for absence of evidence..........................................................................................................42

CONCLUSION..................................................................................................44

REDACTED PUBLIC VERSION

## INTRODUCTION

Essociate's summary judgment opposition has two fundamental problems.

First, instead of basing its response on the evidence of record in this case, Essociate relies heavily on two substantial new declarations, one by its lead counsel, John DuWors, and a 163-paragraph declaration by the inventor, Michael Landau, who also serves as Essociate's invalidity expert. These two declarations are improper for multiple reasons: they lack foundation; they constitute untimely expert testimony; and they contradict Landau's prior sworn testimony. Essociate cannot escape summary judgment by means of sham declarations like these.

Second, Essociate reads the claims terms of '660 patent broadly for infringement, but unreasonably narrowly for invalidity. Properly viewed, the '660 patent does not claim a system like Epic's. The Old XPays system (the inventors' own prior affiliate network) is an embodiment specifically described in the specification of the '660 patent. And, certainly, if Essociate can stretch the '660 patent to cover the Epic affiliate network, then the patent is invalid view of Old XPays.

Epic's summary judgment evidence stands almost entirely unrebutted by any admissible evidence, and Epic is therefore entitled to judgment as a matter of law.

## ARGUMENT

### I.      Much of Essociate's summary judgment evidence must be excluded.

Before turning to the merits, we address the admissibility of Essociate's summary judgment evidence. Essociate cannot create a genuine dispute of material fact unless it has evidence that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)(B). But much of the evidence Essociate adduces in its opposition would not be admissible at trial because it was disclosed too late, contradicts prior testimony, or lacks proper foundation.

REDACTED PUBLIC VERSION

### A.    Essociate's invalidity expert reports should be stricken.

Essociate's expert reports from Michael Landau (Dkt. 85) and David Stern (Dkt. 86) are admittedly untimely.  The Court should exclude them because Essociate has not met its burden to show that its tardiness was either justified or harmless.  *See Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 741-42 (7th Cir. 1998). The delay was not "harmless," particularly in this Court where the time between expert disclosures and summary judgment is already tight. Because Essociate served the reports on Christmas Eve, when Epic's attorneys and witnesses were entitled to spend time with their families, Essociate's delay effectively reduced the working time between the disclosure of Essociate's expert reports and the summary judgment deadline to less than a month.  Essociate also insisted on deposing Don Mathis during this time.  Dkt. 103. Epic managed to (substantially) make the summary judgment deadline, but not without pushing other professional and personal matters to the margin.

Essociate offers no real justification for the delay, saying only that it was caused by the holiday travel of its counsel and witnesses.  *See* Essociate's Brief in Opposition to Defendants' Motion (Dkt. 109) ("Essociate Br.") at 61.  Pre-planned travel should not justify a unilateral and unconsented extension of an expert disclosure deadline. The late disclosure of the Landau and Stern reports was not justified or harmless, and the Court should exclude them.

### B.    The Landau Declaration is an improper sham affidavit.

Michael Landau's February 22, 2013 declaration is the quintessential sham affidavit. *See* Dkt. 108 ("Landau Decl.").  It also comprises an improper supplemental expert report, and it should be disregarded on both grounds. Landau wears many hats in this case: Essociate's Chief Technology Officer and its Treasurer, inventor on the '660 patent, patent invalidity expert, and the purported developer of Old XPays, the primary prior art reference at issue in this motion.

REDACTED PUBLIC VERSION

Apparently, he wears each of these hats in making his February 22 declaration, but none of them make the declaration proper.

The "sham affidavit" rule prohibits litigants from creating issues of fact with affidavits that contradict their prior sworn testimony and that fail to give a credible explanation for the discrepancies. *See Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1169 (7th Cir. 1996) (listing statements deemed by courts to be "sworn testimony" subject to the rule, such as answers to interrogatories); *see also Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998). "'If such contradictions were permitted . . . the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut.'" *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005) (quoting *Bank of Illinois*, 75 F.3d at 1168–69). Landau's declaration repeatedly directly contradicts his prior deposition testimony, and Landau provides no explanation for these discrepancies. For example, in his 2012 deposition, Landau testified that he could not recall whether he took steps to preserve certain documentation, but in his February 22 declaration, he apparently knew certain dates by which the documentation was lost or discarded. *Compare* Oct. 8, 2012 Landau Dep. 171:11-176:4 *with* Landau Decl. ¶ 120. Another example is that in 2010, Landau testified that affiliate systems Python and iGallery used a five-digit XPays ID for transaction tracking, but Landau now summarily denies this in his declaration. *Compare* 2010 Landau Dep. 27:10-29:25; 42:4-12; 43:13-20 *with* Landau Decl. ¶¶ 58-59. Other examples of Landau's contradictions are noted throughout this brief, Epic's response to Essociate's Supplemental Proposed Facts, and in Epic's reply concerning its proposed findings of fact.

Many of the statements in Landau's declaration should also be disregarded because they are mere conclusory assertions, unsupported by specific facts. Conclusory statements in

REDACTED PUBLIC VERSION

affidavits opposing a motion for summary judgment are insufficient to raise a genuine issue of material fact.  *See First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir. 1985); *see also Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998); *Adusumilli v. City of Chicago*, 164 F.3d at 360.  This Court has previously disregarded these types of conclusory statements, explaining that summary judgment is the "put up or shut up" moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.  *Williams v. Berge,* No. 02-283-bbc, 2003 WL 23204305, at *6 (W.D. Wis. Jan. 28, 2003) (citation omitted).  Landau's declaration is full of conclusory denials of facts established by other evidence in this case.  In particular, paragraphs 34-42; 45-73, 75, 129, 134-39, 141-42, 156, and 163, constitute conclusions or denials that are uncorroborated by any other evidence, and in many cases contradicted by Landau's own prior deposition testimony.

The Court should also exclude any expert testimony in Landau's declaration as improper supplementation.  Supplemental expert opinion is only permissible to correct mistakes and oversights, not to include new material and opinions that should have been included in the original report.  *Baratto v. Brushstrokes Fine Art, Inc*., 701 F. Supp. 2d 1068, 1071 (W.D. Wis. 2010); *see also, e.g*., *Innogenetics N.V. v. Abbott Laboratories*, No. 05-575, 2006 WL 6000791, at *1 (W.D. Wis. Aug. 3, 2006).  This is precisely what Essociate is trying to do, providing new examples, illustrations, and even additional opinions through Landau's conclusory sham declaration.  The Court's original scheduling order in this case makes clear that the expert disclosure requirements of Rule 26 apply with full force to any employee of a party who intends to offer expert testimony.  Dkt. 11.  Expert testimony related to Essociate's infringement case had to be disclosed by November 13, and for Essociate's invalidity case, the expert deadline was

4

December 17.  Landau's declaration includes extensive expert evidence on both infringement

and invalidity that should have been disclosed by December 17 at the latest.  This includes any

evidence pertaining to the operation of the Epic system, as the only means of access to that

information is as Essociate's expert.  It also includes any opinion testimony concerning the scope

of the '660 patent, the meaning of the terms of the '660 patent, and the validity of the '660

patent. All these are topics for expert testimony, not the province of a fact witness. It must also

include opinion evidence concerning Old XPays, because none of the provisions for lay opinion

evidence would be applicable to Landau's evidence regarding Old XPays. *See* Landau Decl. ¶¶

5, 7-9, 12, 15, 22-24, 26-43, 45-59, 61-73, 75, 121-142, 145-150, 155, and 157-163.  Essociate

cannot create a genuine dispute of fact with a sham declaration like this one.  The Court should

reject this transparent attempt to avoid summary judgment.

> **C.    The DuWors declaration lacks foundation and provides inappropriate fact testimony from Essociate's lead attorney.**

The declaration of Essociate's lead litigation counsel, John DuWors, should be mostly

disregarded as well.  *See* Dkt. 105 ("DuWors Decl.").  An attorney declaration can be used to

submit copies of documents that can be authenticated by counsel (as in paragraphs 2-6, 12, and

25-28).  But the DuWors declaration inexplicably provides factual evidence concerning several

matters of which DuWors has no personal knowledge.  In particular, the DuWors declaration

provides factual evidence concerning: Epic's creditors, Essociate's "belief" regarding when a

document was executed, and the operation of the Epic Network.  *See* DuWors Decl. ¶¶ 7, 16-24.

DuWors' declaration violates the requirement in Federal Rule of Civil Procedure 56(c)(1) that

declarations must be made based on personal knowledge.   DuWors also should not be serving as

both a counsel and a witness in this case.  *See* ABA Model Rule 3.7. The Court should disregard

Paragraphs 7-11, 13-24, and 29-36 in the DuWors declaration.

REDACTED PUBLIC VERSION

## II.     Essociate's suit is untimely and its claims against the defendants are barred.

These facts are undisputed: Essociate accused one of the defendants in this case, Azoogle.com, Inc., of infringing the '660 patent in 2004. Essociate then remained silent for nearly seven years, until it filed this suit in October 2011.

In response to Epic's motion for summary judgment, Essociate contends that its seven years of silence was reasonable and justified and that Epic Media suffered no material prejudice anyway. The Court must reject Essociate's excuses because they are not supported by the law or the evidence in this case.

### A.     Essociate has no justification for its seven-year delay.

Essociate offers five excuses for its delay in filing suit. None of them can rebut Epic's evidence that Essociate's delay was unreasonable, unjustified, and highly misleading.

### 1.     The Epic Direct Network is not a new and different network from the one Essociate accused in 2004.

Essociate's first excuse is that it is now accusing only the Epic Direct Network, which started in 2008, not the so-called "Old Azoogle Network," which it accused in 2004. This would be a convenient trick to evade laches and estoppel, but it does not work.[1]

Essociate's excuse is not factually supportable. Azoogle.com, Inc. is the same entity as Epic Media Group, Inc.; the name changed. DPF[2] 10. The Azoogle Ads network is the same network as Epic Direct Network; it was rebranded and rewritten in a different programming language. DPF 10, 45. None of Essociate's infringement allegations depend in any way on the

---

[1] This theory was cooked up in response to Epic's motion for summary judgment. In its first infringement contentions served on February 24, 2012, Essociate recognizes that the Azoogle network and the Epic Media network are the same network. Those contentions identify the "[a]ccused device" as "[t]he online affiliate marketing network operated by Defendants at <<http://www.epicdirectnetwork.com>> and previously at <<http://www.azoogleads.com>>." Second Declaration of James D. Peterson dated March 4, 2013, ¶ 2, Ex. 23.

[2] Citations to the defendants' proposed findings of fact ("DPF __") refer now to the Defendants' Reply to Plaintiff's Response to Defendants' Statement of Proposed Findings of Fact, filed March 4, 2013.

REDACTED PUBLIC VERSION

programming language used by Epic.  Peterson Decl., Dkt No. 89, ¶ 13, Ex. 11, Dkt. No. 89-11, Essociate's Infringement Contentions (Essociate's Supplemental Response to Epic Media's interrogatory number 1), at 2.  Epic's evidence that the Epic Direct Network functioned just like the Azoogle Ads network stands unrebutted.  DPF 10, 45; Mathis Dep., 64:11 – 65:18; Oct. 2 Okin Dep. 84:2-13; *see also* SPF[3] 74.

Essociate's excuse is also legally unsupportable.  Essociate cites no authority suggesting that a party's name change or that an immaterial modification of the accused instrumentality somehow starts a fresh clock on laches or estoppel.  Despite the changes in the entity name and the programming language, Essociate's long inaction was still unreasonable, and its long silence was still misleading.

None of the evidence or witnesses in this case identified "Old Azoogle Network" as a separate network or even used that term (except for the new Landau declaration).  A patentee cannot evade laches and estoppel by restarting the presumption period simply by claiming that it is no longer accusing the defendants' device as used before some specified date.

> **2.     Essociate could have effectively investigated the affiliate network of Azoogle or Epic Media at any time.**

Essociate's second excuse is that it was "never able to conduct a Rule 11 investigation into the issue of whether the Old Azoogle Network infringed."  SPF 5; Landau Decl. ¶ 9.  The Court must reject this excuse as merely conclusory.  Essociate gives no reason why it could not conduct a full investigation before 2011.  Why could Essociate not investigate in 2008, when Essociate contends the Epic Direct Network began, or even in 2004 when it first accused Azoogle?

---

[3] Citations to the plaintiffs' supplemental proposed findings of fact ("SPF __") refer now to the Defendants' Responses to Essociate's Supplemental Proposed Findings of Fact, filed March 4, 2013.

REDACTED PUBLIC VERSION

The excuse is baseless, because there has never been any impediment to Essociate's investigation.  This is demonstrated conclusively by Essociate's final infringement contentions (Dkt. 89-11) served on October 23, 2012, after the parties had conducted extensive discovery.  Peterson Decl., Dkt. 89, ¶ 13, Ex. 11, Dkt. 89-11, Essociate's Infringement Contentions (Essociate's Supplemental Response to Epic Media's interrogatory number 1).  The contentions were based on a redirection sequence that Essociate claims to have discovered by tracing a transaction through the Epic network.  *Id.*  Essociate's infringement theory is based entirely on the URL redirection sequence, which is publicly observable without discovery.  *See* Attachments 1-6 to Dkt. 89-11 (screen shots showing redirection sequence).  In fact, Essociate disputed a part of an Epic proposed fact because the redirection sequence is publicly visible.  *See* Essociate Resp. to DPF 69.  Essociate could have conducted its "Rule 11 investigation" at any time using only publicly visible information.

It does not matter whether Essociate had *actual* knowledge of the relationship between Azoogle and Epic, because that is not the legal standard.  In evaluating laches, the period of delay begins when the patentee has actual *or constructive* knowledge of the potentially infringing activities.  *Wanless v. General Elec. Co*., 148 F.3d 1334, 1337-38 (Fed. Cir. 1998).  The patentee is charged with "such knowledge as he might have obtained upon inquiry."  *Id.* (citing *Johnston v. Standard Mining Co*., 148 U.S. 360, 370 (1893)).  Therefore, even if Essociate was not actually aware that Azoogle had changed its name to Epic in 2008 and rewritten its network software into a new language, Essociate is charged with all the knowledge of the defendants' activities that it could have found, had it investigated.  Essociate was particularly obligated to monitor the defendants' activities once Essociate charged Azoogle with infringement and bragged to potential investors in 2005 that Azoogle was its "[b]iggest target."  Peterson Decl. ¶

REDACTED PUBLIC VERSION

20, Ex. 18 (Landau email to Hopf, May 25, 2005); *see Wanless*, 148 F.3d at 1340 (upholding

summary judgment of laches, and holding that the patentee's delay was particularly egregious in

light of its past dealings with the defendant).

> 3.      **Essociate cannot blame Epic for its long inaction.**

Essociate's third excuse is that its long silence was Azoogle's fault.  Essociate contends

now that it was lulled into inaction by misrepresentations in Azoogle's denial of infringement.

This excuse is contradicted by the record.

Just a few months after Azoogle denied Essociate's 2004 charge of infringement, Landau

wrote to potential investors (in the "hit list" email) that Essociate's counsel had had

correspondence with Azoogle and that Azoogle had denied infringement.  Landau's response

was blunt: "We do not believe them."  Peterson Decl., Dkt. No. 89, ¶ 20, Ex. 18, Dkt. No. 89-18

(Landau email to Hopf, May 25, 2005), 3.  Landau also indicated that he had a chart analyzing

Azoogle's response, which he described as "weak and unconvincing."  *Id.* at 4.  Essociate was

not induced to do anything by Azoogle's response to the 2004 accusation of infringement.[4]

Landau's email demonstrates conclusively that Essociate was on notice of a potential on-going

claim against Azoogle.

> 4.      **Other enforcement actions do not justify Essociate's delay in**
> **asserting its rights against Epic.**

Essociate's fourth excuse is that its other enforcement actions "tolled" the laches period.

This excuse fails as a mater of law and fact.

Essociate's suggestion that filing other enforcement suits in 2009 "tolled" the laches

period is wrong on the law.  Essociate cites a district court case, *Giese v. Pierce Chem. Co.*, 29 F.

---

[4] Essociate has no evidence that Epic's response to the 2004 Essociate accusations were misleading.  *See* Epic Resp. to SPF 7, 8.

9

Supp. 2d 33, 39 (D. Mass. 1998), but it does not support this notion.[5]  Involvement in other

litigation is a factor a court might consider in evaluating the reasonableness of delay, but the

presumptive period is not "tolled."

Essociate also gives no response at all to Epic's other arguments that Essociate's

litigation is not an excuse for delay.  Essociate's first enforcement suits were filed in 2009,

already nearly five years after the 2004 accusation of infringement.  That delay is itself long

enough to support Epic's laches and estoppel defense.  And, when there has been contact

between the parties, the plaintiff should provide notice to the defendant of its intent to file suit in

the future.  *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1039 (Fed. Cir.

1992).  Essociate gave no such notice, nor does it explain why it did not.

### 5.    Essociate cannot justify its delay by claiming poverty.

Essociate' fifth excuse is that it could not afford litigation.  This excuse also fails under

the law and the evidence in this case.

Poverty is not a defense to laches or estoppel.  The Supreme Court long ago made clear

that a "party's poverty or pecuniary embarrassment was not a sufficient excuse for postponing

the assertion of his rights."  *Leggett v. Standard Oil Co.*, 149 U.S. 287, 294 (1893).  The Federal

Circuit has applied this principle to patent infringement cases, holding that poverty, by itself, is

not a legally cognizable excuse for delay in the enforcement of one's rights.  *Hall v. Aqua*

*Queen*, 93 F.3d 1548, 1544 (Fed. Cir. 1996).

---

[5] The district court decision in *Giese* provides poor support for Essociate's contention that other
litigation "tolls" the presumptive laches period.  *Giese* relies on a passage from *Watkins v.
Northwestern Ohio Tractor Pullers Ass'n, Inc.*, 630 F.2d 1155 (6th Cir. 1980), suggesting that
other litigation excuses delay.  But *Watkins* also holds that a plaintiff who forestalls enforcement
because of other litigation is obligated to so inform the defendant.  But in patent cases, this
principle from *Watkins* has long since been superseded by *Aukerman* which provides no support
to Essociate's "tolling" proposition.

REDACTED PUBLIC VERSION

Essociate's poverty excuse is also factually unsupportable.  All of Essociate' enforcement actions have been funded on a contingency fee basis, and thus Essociate is shielded from most of the expense of litigation.  DPF 52.  Apparently, the only financial burden on Essociate that it has paid for certain costs.  Landau Decl., Dkt. No. 108, ¶ 25.  However, Essociate provides only a conclusory declaration on this point.  Landau Decl. ¶ 25.  The Landau declaration does not identify what those costs were for, nor does it state that the costs were incurred specifically for this case.  In *Hall*, the Federal Circuit rejected as "not legally cognizable" the defendant's excuse that he could not find contingency fee counsel.  93 F.3d at 1544. Here, Essociate has contingency fee counsel and it need only advance some unspecified costs.  This modest burden cannot be a cognizable excuse for delay.

Essociate demonstrated its willingness and ability to sue multiple defendants in a single case, which is an efficient strategy that conserves resources.  DPF 51.  Indeed, Essociate contends that its non-infringement and invalidity arguments are "materially identical" to those in the *Essociate, Inc. v. Blue Whaler Investments, LLC*, (C.D. Cal. No. 10-cv-2107-JVS), filed in 2010. Essociate Br. 19.  Thus, if lack of resources was an impediment to Essociate's enforcement, there is absolutely no reason why Essociate did not simply name Epic as a defendant in that case.  Essociate is entitled to choose its own litigation strategy, as it points out, but it must pursue that strategy in a timely manner.

### B. Essociate's evidence of economic and evidentiary prejudice stands unrebutted.

Epic's evidence of both economic and evidentiary prejudice stands unrebutted.  Essociate relies this Court's decision in *Ardisam, Inc. v. Ameristep, Inc.*, 302 F. Supp. 2d 991, 998 (W.D. Wis. 2004) to argue that Epic's evidence is insufficient.  But *Ardisam* does not help Essociate. In that case, the Court rejected the defendants' claim of prejudice because they relied only on

11

REDACTED PUBLIC VERSION

conclusory allegations of prejudice. *Id.* at 999. But here, Epic has documented evidence of both economic and evidentiary prejudice, which Essociate has not rebutted. DPF 41-49.

Essociate now makes the conclusory allegation that "the evidence Defendants allege was lost would have been gone by 2001, if it ever even existed." Essociate Br. 10; Landau Decl. ¶ 118. But Landau's declaration contradicts his prior sworn testimony that he could not remember whether he had preserved documentation of XPays, the alleged first embodiment of the invention in the '660 patent. Oct. 8, 2012 Landau Dep. 171:11-176:4. Without some explanation of how he can now recall the events prior to 2001, the Court must reject the declaration as a sham.

But even if all documentation of the first embodiment of the '660 patent had been disposed of in 2001 (when, we note, the prosecution of the '660 patent was still pending), Essociate ignores the other evidence that has eroded in the years since 2004, including particularly Landau's own fading memory. DPF 42; *see also* DPF 32.

Epic's evidence of economic prejudice evidence also stands unrebutted. DPF 45-48. Essociate's response to Epic's evidence is based solely on the deposition testimony of Alex Zhardanovsky and Don Mathis, who both testified they did not base business decisions on Essociate's silence. Zhardanovsky Dep. (Dkt. 104) 28:13-29:1; 32:15-23; 33:11-17; Mathis Dep. (Dkt. 75) 157:12-17; 158:7-15. Zhardanovsky testified that believed that Azoogle did not infringe, and he pressed on in that belief. Zhardanovsky Dep. 33:11-17. According to Essociate, Zhardanovsky's testimony precludes Epic from showing the reliance element of its equitable estoppel defense. Essociate is wrong.

Epic does not have to show that it tailored every decision in response to Essociate's silence, nor does Epic have to prove precisely what alternative paths it would have taken. Epic's

REDACTED PUBLIC VERSION

Brief in Support of its Summary Judgment Motion (Dkt. 93) ("Epic Br.") at 14 (citing *Aspex*, 605 F.3d at 1312).  Reliance is shown when the alleged infringer has communication with the plaintiff that lulls the infringer into a sense of security.  Epic Br. 14 (citing *Aukerman*, 960 F.2d at 1043).  That is precisely what has happened here.  And Epic has adduced evidence to show the investment it made in the network software that is now accused of infringement and to show that it would have taken steps to avoid even the suspicion of infringement if Essociate had pressed its claims earlier.  DPF 45-48.  Epic's evidence of reliance and prejudice exceeds what is required under *Ardisam*, and that evidence has not been controverted by Essociate.

### III.    Epic Media does not infringe the '660 patent.

The '660 patent does not describe or claim an affiliate network like the one used by Epic. Essociate's infringement case is directed only at Epic's optional use of pre-set variables.  Epic Br. 29-30.  In its fundamental operation, Epic uses the prior art technique of cookie and pixel tracking.  But even when Epic uses these pre-set variables, the Epic system is not like the system described or claimed in the '660 patent.  The Epic system simply passes along the Epic affiliate ID as an unmodified, independent variable.  This is not at all an arrangement described or claimed in the '660 patent, as Essociate itself insists when it is defending the validity of the patent.

But the Old XPays system does more than just pass on unmodified, independent variables.  As shown below in Section IV on invalidity, Essociate cannot genuinely dispute that Old XPays is an embodiment that is specifically described in the specification of the '660 patent. Ultimately, Essociate's case must fail because it cannot read its patent one way for infringement and another way to avoid invalidity.

13

REDACTED PUBLIC VERSION

### A.      Essociate's new infringement theories should be rejected as untimely.

In response to Epic's motion for summary judgment, Essociate rolls out new infringement theories and evidence.  These are untimely and they should be rejected on that basis alone.

Essociate was required to fully disclose its infringement theories and evidence with its opening expert report, which was due and served on November 13, 2102.  *See* Expert Report of George Edwards (Dkt. 84) ("Edwards Report").  The Edwards Report articulated Essociate's infringement theory by using a single example transaction with SpeedDate.com.  That report, and Essociate's infringement case, is deeply flawed, as demonstrated in Epic's motion for summary judgment.  Because this is not a case involving simple technology that can be understood by a lay juror, Essociate cannot sustain its burden to prove infringement without competent, admissible expert evidence.  *See* DPF 126 and Essociate's response (concerning the level of ordinary skill in the art); *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004) (in complex technology, patentee cannot sustain its burden to prove infringement without expert evidence)

Now Essociate attempts to backfill the gaps in its case with new theories and evidence. The new evidence comes in the form of improper declarations from Essociate's lead counsel and its invalidity expert.  Essociate now contends, based on Landau's declaration, that it has found at least 1,200 infringing transactions (although it still does not specifically identify them). Essociate Br. 31 (citing SPF 112).  Essociate now contends, based largely on a declaration from its lead counsel, that "click-hash" transactions infringe. Essociate Br. 28-29.  These declarations are not proper summary judgment evidence and they must be excluded for the reasons given above in Section I.  But even if Essociate were allowed to advance these late-breaking theories, it cannot survive summary judgment.

14

> **B.**   **The SpeedDate.com transaction does not meet the limitations of the independent claims of the '660 patent.**

>> **1.**   **Based on Essociate' summary judgment response, there is no material dispute concerning the term "SID."**

Essociate, and its expert, have been inconsistent in identifying the source webmaster unique identifier (the SID), but Essociate's summary judgment opposition has largely eliminated the material dispute over this term. Essociate apparently now concedes that the SID in the Epic system is the Epic affiliate ID. Essociate Br. 32 ("And Epic's affiliate network assigned a 'source Webmaster identifier (a 'SID') in the form of a unique numeric identifier to each of its affiliates."). In the accused transaction, the SID is 48192, the Epic affiliate ID for an affiliate in Denver. DPF 63, 86. Essociate has now abandoned the position taken by its infringement expert, George Edwards, that the SID is <4b4Gq?sub12268>. *See* Edwards Report at 5-7. Essociate does not dispute that code 4b4Gq is the Epic link ID (DPF 62) and that 12268 is the sub-ID selected by the affiliate (DPF 78-81).

Given Essociate's recognition that the SID is the Epic affiliate ID, the remaining disputes over whether there can be more than one SID assigned to an affiliate are immaterial to this motion.

>> **2.**   **Essociate has no admissible evidence that Epic provides "virtual affiliates" to an existing affiliate system.**

>>> **a.**   **Essociate's construction of "virtual affiliates" is contradicted by the specification and the claim language.**

Although Essociate had not raised the issue before,[6] the primary dispute concerning the term "virtual affiliate" is whether it is part of the structure of the invention, and thus a claim limitation, or whether it is merely a statement of a purpose the invention. Essociate's contention

---

[6] *See* Landau Report at 11-12, which proffers a construction of "virtual affiliate" without making any mention of a non-limiting preamble or suggesting that the term did not need construction.

15

that the term is merely a statement of intended use is wrong.  Essociate Br. 20-21.  This is a question for the Court in its capacity as the construer of claims.

Essociate gets the law wrong.  Essociate wrongly cites the old axiom from *Kropa v. Robie*, 187 F.2d 150, 152, (C.C.P.A. 1951) as saying that the preamble is limiting *only* if it is "necessary to give life, meaning and vitality to the claims."  Rightly stated, the rule is that a claim preamble is limiting if it recites essential structure or steps, *or* if it is necessary to give "life, meaning and vitality" to the claim.  *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1572-73 (Fed. Cir. 1996).  To put it more plainly: any terminology in the preamble that limits the structure of the claimed invention must be treated as a claim limitation. *See, e.g., Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989).

The body of the claims of the '660 patent do not describe the invention "in complete and exacting structural detail" without the concept of "virtual affiliate."  *Cf. Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1295 (Fed. Cir. 2004).  The essential structure of the invention in the '660 patent involves a system that allows a pool of affiliate webmasters to send traffic to an existing target affiliate system without actually joining (or at least remaining independent of) the target system.  A system that allows a pool of webmasters to send traffic *directly* to an existing affiliate system would not have been different from the prior art Amazon or Linkshare systems discussed in the background section of the '660 patent.  Thus, in the '660 patent, the referring webmasters must be *virtual* members of the target system, not *actual* members.  The virtual relationship is a structure, not merely a statement of intended use.

Exhibit 20 to the 2012 Landau Dep. (Dkt. 81-11) provides a particularly good illustration of the structure entailed in a virtual affiliate arrangement:

REDACTED PUBLIC VERSION



*See* Dkt. 76, Oct. 8, 2012 Landau Dep. 150:17-152:10; *see also* Expert Report of Peter Kent on

the Validity of the Patent-in-Suit (Dkt. 81) ("Kent Invalidity Report") ¶ 120.

In this illustration, Affiliate A is an actual affiliate of Python.  Webmaster Affiliate 1 is

an actual affiliate of Old XPays, and a virtual affiliate of both Python and iGallery.  If the

inventors had claimed, more broadly, an affiliate tracking system that could be used not only

with virtual affiliates, but also with non-virtual affiliates, the patent would not have issued over

the Amazon patent (discussed just below).  Besides, the inventors have admitted that "the '660

patent claims a specific kind of virtual affiliate system."  Expert Report of Michael Landau (Dkt.

85) ("Landau Report") at 18.  The term "virtual affiliates" reflects a required structural feature of

the invention, and the preamble is a claim limitation.

Turning to the parties' proposed constructions of term, Essociate's proposed

construction—that a virtual affiliate need only be somehow "independent" of the target merchant

system—is wrong on three counts.  First, the passage cited for the Essociate's construction ("the

Virtual Affiliate remains independent") is from the discussion of an embodiment.  '660 patent,

17

7:5-7 (introducing the passage cited by Essociate as "an affiliate system in accordance with an embodiment of the present invention").  The portion of the specification relied on by Epic is expressly set out as a description of the invention itself.  *See* '660 patent, 4:53-56.  The passage cited by Epic is the closest thing in the '660 patent to a definition of the term "virtual affiliate."

Second, Essociate wrongly implies that Epic requires that the virtual affiliate remain anonymous.  Essociate Br. 21-22.  Anonymity is not part of Epic's proposed construction of the term "virtual affiliate," and this misguided argument provides no basis for adopting Essociate's claim construction.

Third, the inventor's statements during prosecution express their understanding that any broader notion of virtual affiliate than that proposed by Epic.  In their successful Petition to Make Special, the inventors distinguished their invention from Amazon's affiliate system patent by claiming that their invention had the important advantage that "it is not necessary that the associate register with the merchant."  Petition to Make Special at 4 (Dkt. 89-06 at page 120 of the .pdf copy of the file history).  All of the advantages the inventors claimed over the Amazon patent derive from this feature of their invention, which makes their system an "open" system rather than the "closed" system as disclosed in the Amazon patent.  *Id.*

### b. Essociate has no evidence that any SpeedDate.com transaction involves "virtual affiliates."

Essociate has no admissible evidence that any SpeedDate.com transaction with Epic involves virtual affiliates.

Essociate's infringement expert report failed to provide evidence that showed that Epic had engaged SpeedDate's affiliate system, rather than dealing with SpeedDate directly as a merchant.  *See* Epic Br. 34-35.  In its summary judgment motion, Epic adduced evidence—the SpeedDate insertion order—that showed that SpeedDate was a merchant client of the Epic

18

system.  DPF 84.  That fact is admitted by Essociate.  Thus, Essociate has no evidence that the

example SpeedDate transaction involves a virtual affiliate transaction as opposed to an actual

affiliate transaction.

To get around its failure of proof on this element, Essociate attempts to adduce evidence

of Essociate's *own* dealings with SpeedDate and other affiliate systems.  But this evidence—

Landau Decl. ¶¶ 99-114—cannot create genuine issue of material fact even if it were admissible.

*Essociate's* dealings with SpeedDate and other affiliate networks is utterly irrelevant, because it

cannot show how *Epic* dealt with them.  In any case, the Landau declaration actually confirms

Epic's evidence.  The SpeedDate domain used by Epic in the accused example transaction is

"mysdate.com."  But the SpeedDate domain used by Essociate when it engaged the SpeedDate

affiliate system is "affiliates.speeddate.com."  SPF 103.  Essociate has adduced no evidence here

to show that Epic engaged the SpeedDate affiliate network in the accused example transaction.

### 3.    SpeedDate is not "configured" by Epic.

Epic's summary judgment evidence and its opening brief showed that the Epic system

did not configure the SpeedDate affiliate system to recognize the transaction as originating from

a particular Epic affiliate.  Epic Br. 35-36. Epic supported its brief with DPF 58 (showing that

the format of the landing page URL is determined by the merchant, not Epic), and DPF 71

(explaining that the tracking pixel prompts the Epic system to read tracking information from the

cookie on the user's computer).  DPF 71 is undisputed.  Essociate's response to DPF 58 does not

place the proposed fact in genuine dispute, but merely argues that Epic configures the SpeedDate

affiliate system by formatting the landing page URL to include the affiliate ID.  Essociate's brief

cites no evidence, essentially repeating the argument made in response to DPF 58.  Essociate Br.

31-32.

REDACTED PUBLIC VERSION

There is no dispute that in the example transaction, the Epic affiliate ID is an independent variable appended unmodified to SpeedDate's landing page URL and thus the affiliate ID will be passed along to SpeedDate.  But Essociate has provided no evidence that SpeedDate has been configured by Epic such that SpeedDate will recognize this transaction as coming from an affiliate in the Epic system.  The claim requires more than just passing along the unmodified affiliate ID to the merchant.  Essociate provides no evidence that Epic configured SpeedDate.com to recognize the Epic affiliate ID.

However, if Epic's passing along of the affiliate ID is sufficient to satisfy the configuring operation, then Old Xpays certainly satisfies this limitation.  As Landau admitted,

SPF 155.          **REDACTED**

4. **The Epic system passes the unmodified affiliate ID as an independent variable; there is no TWID and no correlation operation in the Epic system.**

The parties dispute certain aspects of the definition of TWID, but in the context of this case, the parties agree that TWID would have to be defined as "a unique identifying code assigned to the Epic affiliate that is functional in the SpeedDate affiliate system."  Further, the claim language requires that the TWID "correspond to the unique identification system of the SpeedDate affiliate system."  *See* '660 patent, 21:67-22:2.

Essociate contends that, in the example transaction, the TWID is a portion of the SpeedDate landing page URL: <a=53&c=1&s1=48192&s2=12268>.  SPF 120.  This does not meet the definition of TWID and satisfy the claim limitation for at least two reasons.  First, it is not a unique code *assigned to the Epic affiliate*.  The only code assigned to the Epic affiliate is the Epic affiliate ID, 48192.  What Essociate contends is the TWID is a string of independent

20

variables that represent various aspects of the internet traffic that SpeedDate would receive. Only one of these variables is uniquely assigned to the Epic affiliate: the affiliate ID 48192.  The purported TWID is not assigned to, and does not represent, an Epic affiliate.  The same affiliate would have a different string of variables when a user requested a different SpeedDate offer, or when a user requested the offer from a different banner ad served by the same affiliate and assigned a different sub ID.  The purported TWID is thus not a unique code assigned to the affiliate.

Second, Essociate provides no admissible evidence that the purported TWID corresponds to the unique identification system of the SpeedDate affiliate system or even that SpeedDate has a unique identification system.  Essociate's SPF 121, citing Landau Decl. ¶ 125, provides no foundation for Landau's purported knowledge of the SpeedDate.com transaction through the Epic system.  Landau's knowledge of Essociate's interactions with affiliate networks is irrelevant.

Epic's passing along of the unmodified affiliate ID as an independent variable does not constitute "correlation" within the meaning of the '660 patent.  Essociate contends that Epic practices the "hybrid string embodiment" of the correlation function. Essociate Br. 35.  But the passage Essociate quotes does not describe the hybrid string as a set of independent variables. *See* '660 patent, 11: 15-26.  Rather, it describes the hybrid string as a single "code" in which the "first portion of the code may be an acronym for the source system" while "the next portion may consist of numbers that represent the particular source Webmaster ID."  And, notably, in the description of this embodiment, tracking is accomplished by the *merchant's* system using the TWID; in the Epic system, Epic does the tracking, not the merchant.  This embodiment contemplates creating a new "hybrid" code that is uniquely assigned to the affiliate, it does not

21

REDACTED PUBLIC VERSION

describe simply passing along the unmodified affiliate ID as one of group of independent variables.  Epic's use of the affiliate ID and sub ID variables is a basic URL tracking technique known in the art before the '660 patent.  DPF 130-32; 137.

The SpeedDate example transaction in the Epic system does not match the description of the hybrid string embodiment, but the Old XPays system certainly does.

**REDACTED**                                   SPF 155.

### C.      Click-hash transactions do not infringe the '660 patent.

In its summary judgment opposition, Essociate contends for the first time that transactions using the "click hash" variable infringe the '660 patent.  Essociate Br. 30 (and SPF 102, 106-07, 111).  This theory was not disclosed in Essociate's infringement expert report, and thus it is untimely.  Epic was deprived of the opportunity to address the theory in its opening brief, and the Court should reject it on that basis alone.  Essociate supports the new theory primarily with the declaration testimony from its lead litigation counsel (SPF 11; DuWors Decl. ¶¶ 16-23) which provides a second basis for the Court's to dismiss this theory summarily, without considering its merits.

But even if the Court were to allow it, Essociate cannot prove infringement on the basis of transactions involving the click hash variable.  The click hash is one of the preset variables available in the Epic system.  However, it has a special, limited function and it is incomprehensible to the merchant, thus it cannot provide a basis for infringement.

The click hash, as explained in the Advertiser Implementation Guide, is "an alpha-numeric value which when decoded identifies the affiliate, click, and other data."  SPF 106.  But

22

the click hash variable is only used in the case of "direct reporting," which is a variations use in the Epic system for merchants who cannot or will not place the pixel on a lead conversion page. *See* Responsive Expert Report of Peter Kent on Infringement (Dkt. 82) ("Kent Infringement Report") ¶¶ 18-24.  The click hash variable is only enabled when the "direct reporting" option is enabled.  *See* Advertiser Implementation Guidelines (Dkt. 89-22) at 5 (at note ***).  If the click hash variable is enabled, when a user clicks on the jump link, the Epic system generates a click hash code, which is unique to that particular user's click.  If another user clicks on that same jump like, on the same affiliate's website, a new and different click hash will be generated.  The click hash can be decoded, but only by Epic, to determine the information needed for tracking that particular transaction.  Kent Infringement Report ¶ 21-22.

Critically, the click hash is meaningless to the merchant.  DPF 72. The merchant simply stores the click hash until the transaction is complete, and then it sends the click hash code back to Epic.  Epic then decodes the click hash, records a successful transaction, and pays a commission to the affiliate. *See* DPF 77.  The merchant knows nothing about the transaction, other than that it came from Epic.

In a click hash transaction, the merchant landing page URL would be formatted like this:

www.creditcard.com/affiliates/signup.html?click_hash=789XyZ00

Kent Infringement Report ¶ 21.  Following the logic of Essociate's infringement theory, the TWID would be: click_hash=789XyZ00.  But this infringement theory would fail for multiple reasons.  First, click_hash=789XyZ00 is not a code assigned to the Epic affiliate; it is assigned to a particular user request for the merchant system.  Second, it is not a code functional in the target merchant's system.  Third, the click hash value does it correspond to the merchant's own unique identification system; it can be decoded only by Epic.

23

REDACTED PUBLIC VERSION

In sum, the click hash theory must be rejected as untimely and not supported with proper summary judgment evidence, but even if it had been timely, it cannot not survive summary judgment.

### IV.   No reasonable jury could conclude that the '660 patent is a valid patent.

The '660 patent cannot survive this motion.  The patent is invalid because it is anticipated under 35 U.S.C § 102(a) and (b) and obvious under § 103.  Means plus function claims 15 and 28 are also invalid under § 112 because they are indefinite.

Essociate does not dispute that the Old XPays affiliate system is prior art or that it was used commercially more than one year before the '660 patent application was filed. Rather, Essociate attempts to survive the anticipation challenge by disingenuously arguing that there "is no evidence" that Old XPays performed the '660 patent claims. But the evidence clearly and convincingly demonstrates that the Old XPays system embodied the invention claimed in the '660 patent—and this evidence is not <u>genuinely</u> in dispute.  Essociate attempts to survive the obviousness challenge by cataloging differences between the prior art and the '660 patent.  This misses the point.  The problem solved by the '660 patent was known in the prior art, and it would have been obvious to one of ordinary skill in the art to modify an existing affiliate system using known techniques with predictable results to make the invention claimed in the '660 patent.  No reasonable jury could conclude that the '660 patent is valid based on the evidence in this case.

### A.   The '660 patent is invalid as anticipated because the "hybrid string" embodiment of the invention is a description of Old XPays.

Each element in the asserted claims of the '660 patent was present in the Old XPays affiliate system, which is an example of the "hybrid string" embodiment of the invention.  The '660 patent claims at least two embodiments of a virtual affiliate system:  (1) the "hybrid string" embodiment in which correlating the SID and the TWID results in a hybrid string of codes (*see*

24

'660 patent, 11:14-25); and (2) the "block of IDs" embodiment in which a SID from a block of previously assigned IDs is correlated to a TWID using a lookup table (*see* '660 patent, 11:1-13).

Old XPays was the "hybrid string" embodiment, which was in commercial use before the critical date of May 1, 1999. XPays' campaign with SexToy.com, (also known as "New XPays"), beginning in early May 1999, embodied the block of IDs method, though there is also evidence indicating that Old XPays practiced this embodiment as well. But it is not necessary that Old XPays practice both methods. It will anticipate the '660 patent if it practices either one, or otherwise falls within the scope of the claims.

Essociate attempts to muddy the water through its description of Old XPays in its brief, but Essociate's description is unsupported and the Court should disregard it. For example, Essociate argues that Peter Kent (the defendants' expert) erred by identifying as a "virtual affiliate system" the XPays system that worked with Netfill. Essociate Br. 39. Essociate's argument is based on one sentence of Kent's invalidity report, in which there was a typographical error: "1998" should have been "1999." When read in context, clearly Kent is discussing the Old XPays system that worked with iGallery and Python. No genuine factual dispute is caused by this typo.

Another example is that in Essociate's description, it argues that the five-digit XPays affiliate ID did not have any functionality within iGallery or Python's affiliate system, and that iGallery did not track transactions using the webmaster (affiliate) ID. *See* Essociate Br. 40-41 (citing SPF 149-150). But the only "evidentiary" support for Essociate's argument is the conclusory and self-serving February 22, 2013 Landau Declaration. Landau's declaration is directly contradicted by his prior deposition testimony. *See* 2010 Landau Dep. 27:10-29:25; 34:12-23; 42:4-43:20; *see also* DPF 122-125; SPF 149-150. Other examples of Essociate's mis-

REDACTED PUBLIC VERSION

descriptions are discussed below in the context of the '660 patent claims, and they do not create a genuine issue of material fact.

But even if fully credited, Essociate's description of Old XPays does not rebut that it was an embodiment of the '660 patent.

**REDACTED**

Similarly, it does not matter whether internet users needed to click one or whether they needed to click twice to be transferred to the merchant affiliate system. The '660 patent claims do not have a requirement for the number of clicks needed.  As explained element-by-element below, Essociate cannot rebut that Old XPays was the inventors' commercial embodiment of the "hybrid string" virtual affiliate system.

### 1.  Old XPays "configured an existing target affiliate system."

The configuring operation requires that the "target Merchant affiliate system recognizes a transaction as originating from a source Webmaster in an affiliate pooling system."  Essociate Br. 43.  The evidence shows that Old XPays performed this operation; Essociate is incorrect when it argues that "[t]here is no evidence that Old XPays performed the 'configuring' step" of the '660 patent.  Essociate Br. 43.   When used with Old XPays, Python and iGallery (target merchant affiliate systems), recognized transactions as originating from XPays affiliate webmasters.

**REDACTED**

REDACTED PUBLIC VERSION

REDACTED

2010 Landau Dep. 29:17-25 (Dkt. 80); DPF 98-100.  Essociate ignores this testimony, now

arguing that there is "no evidence" that Old XPays performed this operation.  SPF 157-60.

Essociate's only support for denying the evidence from Landau's deposition is a series of

conclusory denials from Landau's February 2013 declaration, which should be disregarded.  The

undisputable evidence actually shows that Old XPays "configured an existing target affiliate

system" to receive referrals from Old XPays.  Even if there is some ambiguity as to what Python

and iGallery knew about the information associated with the XPays five-digit identifier, if this

element of the '660 patent reads on Epic's network as Essociate contends, it necessarily reads on

Old XPays as well.

> **2.      Old XPays performed the "receiving a user request" operation.**

Old XPays also performed the "receiving a user request" operation in the '660 patent

claims.  This operation has two aspects.  First, this operation requires that an internet user clicks

on a URL to "request" the target merchant affiliate system (e.g. Python or iGallery).  Essociate

does not dispute that this occurred in Old XPays.  Essociate only argues that the defendants'

expert failed to appreciate that in Old XPays it takes two clicks to make the request, not just one.

Essociate Br. 44. Whether it took two clicks versus one click does not make any difference,

however, because the '660 patent claims do not specify how many clicks are needed for a

"request."

Second, this operation requires that the target merchant affiliate system (e.g. Python or

iGallery) has a unique identification system for its own affiliates.  Essociate falsely states that

"there is no evidence that either Python or iGallery has a 'unique' identification system for their

27

affiliates." Essociate Br. 44. But there is clear evidence of this, which Essociate cannot place in genuine dispute. Specifically, it is undisputed that Python and iGallery were affiliate systems. DPF 93.

2010 Landau Dep. 31:4-7; 32:2-12.

**REDACTED**


2010 Landau Dep. 67:10-13. Landau now tries to back track from these statements. In October 2012, Landau claimed that he was not "totally familiar" with how iGallery worked. SPF 168. And Landau's February 22, 2013 declaration contains the conclusory and self-serving denial that: "Epic's claim that I previously admitted that either Python or iGallery had a 'unique' identification system for their affiliates is false." SPF 168. Landau's 2010 testimony is crystal clear and the Court should reject Essociate's attempts to create an issue of fact by disavowing it.

### 3.  Old XPays performed the "correlating" operation.

The alleged "crucial difference"—if there is one—between Old XPays and the invention in the '660 patent is the "correlating" operation. DPF 110. Essociate's arguments that Old XPays did not perform "correlation" are unsupported by the evidence in this case, and Essociate does not raise any genuine dispute to the evidence submitted by Epic.

Notably, Essociate does not dispute any material aspects of the analysis of Peter Kent (the defendants' expert) concerning


**REDACTED**


28

REDACTED

Essociate disputes none of this.

Essociate disputes only immaterial aspects of the operation of xmake.cgi.  In particular,

REDACTED

Essociate Br. 47

(citing SPF 174-75).  Essociate's only evidence to support these facts is the conclusory Feb. 22, 2013 declaration of Michael Landau, which should be disregarded as explained above. But even if these proposed facts are fully credited, they are immaterial because they do not demonstrate that Old XPays did not perform the correlation operation.  The correlation operation of the '660 patent can be performed before an internet user visits the source webmaster's website.  The '660 patent specifically explains that it would be within the scope of the claimed invention if the "correlation operation described in detail below has already happened when a user visits the Webmaster's site." *See* '660 patent, 10:37-44. And the '660 patent does not require correlation to be performed automatically. Rather in discussing the "block of IDs" method of correlation, the '660 patent explains that it could be performed "on the fly, or having been assigned previously." Essociate fails to raise a genuine dispute or material fact concerning the operation of xmake.cgi in the Old XPays system.

29

Essociate's remaining arguments as to the correlation operation are factual in nature, and there are three of them.  In each, Essociate misrepresents the relevant evidence and denies it only with conclusory statements from Michael Landau's sham declaration:

First, Essociate claims—in direct contradiction to extensive deposition testimony—that the xmake.cgi script "was never used with Python and iGallery." Essociate Br. 46; *see also* SPF 161. This is false. Landau specifically testified in 2010

**REDACTED**

2010 Landau Dep. 36:8-38:1.

Second, Essociate argues that there is "no evidence" that Python and iGallery had unique identification systems. Essociate Br. 44.  But as explained above, there is clear evidence from Landau's 2010 deposition testimony that

**REDACTED**                                      *See* SPF 168.

Third, Essociate argues that there's "no evidence" that Old XPays had a TWID such that the Merchant's existing tracking system could take over.  However, there is clear evidence from 2010 deposition testimony of Michael Landau that

**REDACTED**

*See* DPF ¶ 122-125; SPF ¶ 149 *see also* 2010 Landau Dep. 27:10-29:25; 34:12-23; 42:4-43:18.

Although the defendants' motion focuses on demonstrating that Old XPays performed the correlation operation using the "hybrid string" method, there is also evidence that Old XPays practiced the "block of IDs" method of correlation.  Epic Br. 50. This argument is far from "absurd" as Essociate labels it.  Peter Kent's expert report explains how Old XPays practiced the

REDACTED PUBLIC VERSION

"block of IDs" method,                    **REDACTED**

See Jan. 2, 2010 Letter from John DuWors (Dkt. 81-9); *see also* Oct. 8, 2012 Landau Dep. 130:2-131:1. Essociate argues that this letter should be disregarded because Essociate's attorney was mistaken in his description of Old XPays in the letter.  However, when Landau was deposed,

                    **REDACTED**                    SPF 176 (citing Oct. 8, 2012 Landau Dep. 130:2-131:1).  This letter is admissible evidence; the letter and its contents are not being used for any prohibited purpose under Federal Rule of Evidence 408.

After setting aside Essociate's misrepresentations, the undisputed evidence demonstrates that Old XPays performed the correlating operation claimed in the '660 patent.

### 4.        Old XPays performed the "generating a URL" operation.

The Court must reject Essociate's proposed construction of the term "generating a URL" because it adds a limitation not present in the claim.  The passage relied on by Essociate to support the addition of the "without a further user request" limitation is a description of a specific embodiment,[7] not a generalized description of the invention.  '660 patent, 15:29-41.  It is a bedrock principle of claim construction that features of the embodiments cannot be read into the claims as limitations.  *See CollegeNet, Inc. v. ApplyYourself, Inc*., 418 F.3d 1225, 1231 (Fed. Cir. 2005) ("In examining the specification for proper context, however, this court will not at any time import limitations from the specification into the claims.").

There is simply no requirement in the patent that the generation of the URL be done automatically.  Nor is there any proscription against presenting the URL to the user and requiring

---

[7] We note that Essociate is not trying to incorporate every aspect of this embodiment as a limitation: this embodiment uses the "lookup function," an option that Essociate is certainly not proposing as a claim limitation.

REDACTED PUBLIC VERSION

the user to click on it.  In fact, the specification explicitly describes a method by which the

merchant URL can be generated in advance and then presented to and clicked by the user:

> Alternately, the request [for the merchant affiliate system] can be
> initiated by the Webmaster himself, or by the affiliate pooling
> system itself, such that the correlation operation described in detail
> below has already happened when a user visits the Webmaster's
> site, *and the user can thus directly click the returned entry
> mechanism URL for hand off to the target system*, as described in
> more detail below.

'660 patent, 10:37-44 (emphasis added).  The description of a user-initiated hand-off directly

contradicts Essociate's proposed construction of "generating a URL."  Although the Court

cannot import limitations from the specification into the claims, a claim interpretation that

excludes an embodiment, as Essociate proposes here, is rarely correct.  *Vitronics Corp. v.

Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

Essociate contends that the claim construction order in *Blue Whaler* case (Dkt. 81-04,

referred to in Epic's brief as the Direct ROI Order), is entitled to "reasoned deference" in the

interests of preserving uniformity.  Essociate Br. 20.  Despite Essociate's urging, the principle of

*stare decisis* is inapplicable here, and this Court should adopt the correct construction regardless

of the *Blue Whaler* order.  In *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323 (Fed. Cir.

2008), the Federal Circuit reviewed claim constructions from the Eastern District of Texas.  *Id.* at

1328-1334.  In doing so, it found "particularly helpful" later and different constructions of the

same terms in the same patent by the Northern District of California, which had considered but

rejected the constructions of the Eastern District of Texas.  *Id.* at 1329.  *Finisar* makes clear that

the court should get it right, not follow an earlier district court ruling in the interests of

uniformity.  The particular arguments presented here by Epic were not made in *Blue Whaler*, and

that order is of little help here.  *See Essociate, Inc. v. Blue Whaler Investments, LLC*, No. 10-cv-

2107-JVS (C.D. Cal.) Dkt. Nos.  135-36, 139 (claim construction briefing).

REDACTED PUBLIC VERSION

Essociate also misunderstands the defendants' proposal that this term be construed as: Generating a URL which may be presented to a user <u>OR</u> to which traffic may be directed automatically.  Epic Br. 23-24.  Essociate apparently mis-reads the "or" to mean "and." Essociate Br. 48.  As explained above, there is nothing in the '660 patent that precludes the hand off from being prompted by the user's clicking on a URL.

When this claim element is properly construed, Essociate has no rebuttal to the defendants' evidence that Old XPays performed the "generating a URL" operation of the '660 patent.  Essociate argues that Old XPays did not employ "correlated hybrid string" or a "correlated target Webmaster unique identifier."  Essociate is incorrect.  As demonstrated above, Old XPays performed the "hybrid string" method of correlation, and the combined or "correlated" hybrid string constituted a "correlated target Webmaster unique identifier. *See also* Epic Br. 50-51.  This element was present in Old XPays.

### 5.      The dependent claims were practiced by Old XPays.

Essociate fails to present any substantial reason that the features of dependent claims 3, 6, 10, 13, and 14 were not present in the Old XPays system.

For claim 3, Essociate argues that there is no evidence that Old XPays obtained transaction information from the merchant system for specified transactions.  But as explained above, Landau's 2010 deposition testimony makes clear

REDACTED

See Section IV.B.1.

For claim 6, Essociate argues that the merchant systems such as iGallery did not have "access" to the Old XPays affiliate pooling system to transfer transaction information.  Essociate Br. 49.  The '660 patent explains that there are two methods of transferring transaction information: "retrieving and receiving."  '660 patent, 12:3-18. Both involve the general concept

33

of "access" between the merchant affiliate system (e.g., iGallery) and the virtual affiliate system

(e.g., Old XPays).  It is undisputed that the Old XPays system

**REDACTED**                                  DPF 144.

For claims 10, 13, and 14, Essociate argues that the features claimed were already

addressed by its arguments concerning claim 1.  These claims have elements not present in claim

1, so Essociate appears to have no rebuttal whatsoever to claims 10, 13, and 14.

> ### B.     The invention in the '660 patent would have been obvious to one of ordinary skill in the art at the time of the invention.

Even if the alleged invention in the '660 patent is not anticipated, it is invalid because it

is obvious under 35 U.S.C. § 103.  Essociate attempts to avoid obviousness by detailing

differences between the '660 patent claims and the individual prior art references cited by Epic,

but Essociate cannot avoid invalidity by doing this.  It is undisputable that each element of the

'660 patent claims was known in the prior art.  Indeed, all of the elements are present in Old

XPays.  But even if Old XPays did not practice each element of the '660 patent, the modification

of Old XPays to work with the SexToy.com campaign was "the product not of innovation but of

ordinary skill and common sense." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).  The

law requires summary judgment of obviousness in this case, where Essociate cannot genuinely

dispute the facts material to the issue and where "the obviousness of the claim[s] is apparent."

*Soverain Software LLC v. Newegg, Inc.*, __ F.3d. __, 105 U.S.P.Q.2d (BNA) 1732, 2013 WL

216406, at *2 (Fed. Cir. Jan. 22, 2013).

Essociate incorrectly claims that the '660 patent is not obvious in view of Old XPays

because the prior art did not disclose the specific type of "correlation" in the '660 patent, namely

the correlation of the SID to the TWID.  Essociate Br. 50-51. But there is no genuine dispute that

correlation functions and look up functions are basic computing functions that were well known

34

in the art for decades prior to the '660 patent.  DPF 129.  Some examples of prior art correlation functions are described in U.S. Patent No. 6,629,135 to Ross, U.S. Patent No. 6,243,750 to Verma, and U.S. Patent Nos. 5,712,979 and 5,717,860 to Graber.[8]  It does not matter that Michael Landau, Essociate's purported "expert" disagrees because an expert's opinion on the legal conclusion of obviousness is neither necessary nor controlling.  *See Soverain*, at *7. Essociate spends considerable effort attempting to detail differences between these prior art references and the '660 patent, but this is immaterial.  The point is that if the "crucial difference" between Old XPays and the invention in the '660 patent was the correlation operation, a person of ordinary skill in the art would have had many options to use.

There are also fundamental legal errors in Essociate's nonobviousness argument.  In particular, Essociate places too much reliance on having an explicit "teaching, suggestion or motivation" to combine prior art references.  Rigid application of this test has been explicitly rejected by *KSR*. 550 U.S. at 415.  The motivation to combine does not need to be explicit:

> [o]ften, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

*Id.* at 418 (emphasis added).  Thus, a motivation to combine references can be obtained from the "inferences and creative steps" that a person of ordinary skill in the art would employ.  *Id.*

Essociate also incorrectly argues that prior art such as the Linkshare affiliate system and other directly relevant prior art would not have been considered by a person of ordinary skill in the art.  However, it is well settled law that a person of ordinary skill in the art is presumed to

---

[8] Essociate argues that the defendants fail to explain the relevance of the '979 Graber patent, but the two Graber patents are discussed together both in the defendants brief (at 57) and in Peter Kent's expert report (¶ 192).

REDACTED PUBLIC VERSION

have knowledge of all pertinent prior art. *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1576 (Fed. Cir. 1984).  It is also well settled that relevant prior art includes references in the art in question and references in analogous fields that a person of ordinary skill would be expected to examine for a solution to the problem. *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1350-51 (Fed. Cir. 2010); *see also KSR*, 550 U.S. at 417.  Incredibly, Essociate argues that the Messer patent (U.S. Patent No. 5,991,740) is prior art that would not have been considered by a person of ordinary skill in the art.  The Messer '740 patent, however, is the patent on the Linkshare hub type affiliate network discussed in the background section of the '660 patent itself. '660 patent, 3:17-64; Kent Invalidity Report ¶ 183.  Essociate also argues that the BeFree affiliate system is not relevant prior art (Essociate Br. 57), but example affiliate networks are clearly pertinent prior art.

As explained by the defendants' expert, Peter Kent, the invention in the '660 patent would have been obvious to a person of ordinary skill in the art at the time of the invention.[9] Examples of multi-tier affiliate networks and the problem of providing virtual affiliates to a target affiliate network without being enrolled in it were all known in the prior art.  DPF 138-140 (no genuine dispute as to these facts).  It would have taken only "ordinary skill and common sense" not inventive innovation, to take an existing affiliate system, such as the Linkshare affiliate system (Messer '740) and combine it with known techniques for link generation, URL tracking, and web page scripting to create the invention claimed in the '660 patent.  The inventors' misdescription of the Messer '740 patent is relevant because it is a reason that the USPTO may have overlooked its significance in examining the application.

---

[9] The parties' respective definitions of the level of skill of a person of "ordinary" skill overlap significantly, and any dispute over the differences in those definitions is immaterial to this motion.  If anything, Essociate's definition of ordinary skill is a higher level of skill because it would require a person to be experienced in programming techniques.  The higher the level of skill, the more likely the alleged invention would be obvious.

REDACTED PUBLIC VERSION

As additional evidence of the obviousness of the "block of IDs" method of correlation in the '660 patent, there is expert testimony from Peter Kent that it would have been readily known that a lookup table could be used to correlate an assigned block of IDs with source IDs for affiliates.  Kent Invalidity Report ¶ 175.  Essociate does not—and cannot—dispute that lookup tables would be within the realm of alternatives considered by a person of ordinary skill, but rather it argues that lookup tables "teach away" from the claimed invention. Essociate fails to identify any prior art reference that has any teaching about look-up tables; it only provides its attorneys' argument on this point.  In any event, to "teach away" means that the prior art reference itself would discourage a person of ordinary skill from using that reference to solve the problem, or if the reference would lead the person in a direction divergent from the path that was taken by the patentee.  *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).  But a lookup table does not teach away.  In fact, <u>the '660 patent even describes the "block of IDs" method of correlating as a "lookup table that cross-references the two codes."</u>  '660 patent, 11:1-13.

Essociate has not even tried to argue evidence of secondary considerations, thus waiving any argument that secondary considerations would support the validity of the '660 patent.  At bottom, Essociate cannot rebut the apparent and prima facie showing of obviousness and the Court should hold that the '660 patent is invalid under § 103.

### C.    Claims 15 and 28 are also invalid because they are indefinite.

The '660 patent fails to disclose sufficient structure to support the means plus function claims 15 and 28, thus these claims are also invalid under 35 U.S.C. § 112(a).  Essociate's response to Epic's motion falls short of disclosing the required structure. The only "structure" Essociate identifies is a purely functional description of the three ways to accomplish the correlating operation in the '660 patent.  Essociate Br. 61.  For example, Essociate argues that the "hybrid string" method is one example of structure for performing the correlation operation.

37

But the patent does not identify or describe the script or other software for performing this operation; the inventors could have disclosed the xmake.cgi script for example.  Essociate also argues that the defendants' expert discusses their "functionality in detail," but the fact that a person of ordinary skill in the art can identify and discuss a claimed function does not mean that he would know which structures fall within the scope of these claims.  This distinction is particularly critical in means plus function claims, governed by 35 U.S.C. §112(f).

Indeed,  Essociate has not identified—and the '660 patent does not disclose—any code, scripts, or algorithms that would satisfy the definiteness requirements of 35 U.S.C. § 112(a) for software as "structure."  *See Finisar Corp.*, 523 F.3d at 1340-41.  Accordingly, the Court should hold that claims 15 and 28 of the '660 patent are invalid because they are indefinite.

### V.    Social Assets is not liable for Epic's obligations under any theory.

Essociate's various theories that Social Assets is liable for the obligations of Epic Media all suffer the same fundamental defect: they are unsupported by evidence.  These theories depend, essentially, on a single proposition—that Social Assets was spun off from Epic Media for the purpose avoiding Epic Media's debts, particularly a potential damages award to Essociate.  To provide even the appearance of factual support, Essociate blatantly mischaracterizes the deposition testimony of Epic's witnesses.

Essociate adduces no evidence to genuinely dispute the following facts.  Kinetic Social was a nascent venture that required an independent corporate structure to attract investment and develop.  DPF 156-162.  For that reason, it was spun off from Epic Media as a distinct entity.  DPF 163-170.  Following the spinoff, Social Assets strictly maintained the corporate separateness between itself and Epic Media, and in less than a year, the seed money it received from Epic Media was paid off.  DPF 175-179.

38

REDACTED PUBLIC VERSION

Essociate's response to Epic's evidence is, at best, conclusory and speculative.  But Essociate's proposed facts include many that are patently untrue.[10]  Essociate's misstatements are addressed point-by-point in response to Essociate's Supplemental Proposed Facts, but we highlight four of the most important ones here.

First, Essociate claims that Kinetic Social was not in fact a novel venture but was merely a continuation of the existing business of Epic Media's Social Suitcase business line—even though Social Suitcase and its management left Epic Media months before the Kinetic Social spinoff.  DPF 155.

Second, Essociate alleges that FAS Labs, Inc., the new parent company created as part of the spinoff, was formed weeks after this lawsuit was filed.  SPF 30.  In fact, the opposite was true:  FAS Labs was incorporated on October 11, 2011, ten days *before* Essociate filed its complaint, and planning for the Kinetic Social spinoff had been underway for months.  Epic's Response to SPF 30; DPF 163.  Epic Media had no advance warning this lawsuit would be filed; indeed, Essociate's last communications about its infringement allegations were back in 2004.  DPF 29-34.  Essociate was not even on the company's radar as a potential litigation threat.  DPF 172.  Essociate's assertions that its claim "was the sole determinative factor influencing" the spinoff is not and could not be true.  Essociate's Response to DPF 172.

Third, Essociate alleges that the transfer of assets to Social Assets "rendered Epic Media Group completely insolvent," when in fact Epic Media had more than $6.5 million of *positive* net worth on its balance sheet after the transfer, on December 31, 2011.  DPF 171.  Essociate also

---

[10] Many of Essociate's colorful statements of fact and responses are so clearly unsupported by the evidence cited as to cast serious doubt on the credibility of Essociate and its counsel.  Essociate asserts that Young Kim's job "is exclusively to cosmetically paper the fraudulent transfer of assets from Epic to Social Assets," Essociate's Response to DPF 182; that Royal Bank of Canada "recognized that Epic Media Group's transfer of assets to Social Assets was fraudulent," Essociate's Response to DPF 179; and that the spinoff "rendered Epic Media Group completely insolvent," Essociate's Response to DPF 171.  Needless to say, none of these assertions has any support in the evidentiary record.

REDACTED PUBLIC VERSION

mischaracterizes the intercompany loan, claiming without support that Epic Media had already transferred three million dollars to Social Assets by November 2011 and then continued to distribute between $600,000 to $800,000 a month in receivables.  SPF 19; Essociate's Response to DPF 178.  In fact, the seed money loan amounted to three million dollars *in total*, which Social Assets received over the course of months and paid back within a year.  Epic's Response to SPF 19; DPF 178-179.

Fourth, Social Assets did not occupy Epic Media's offices rent-free; rent and equipment were all accounted for in intercompany accounts and reconciled by the time Social Assets paid back its seed money, by which time Social Assets had moved into new offices of its own.  DPF 179-181.

Spinning off Kinetic Social into a separate entity was a legitimate business decision that did not render Epic Media insolvent.  No matter what theory Essociate raises—successor liability, alter ego liability, or fraudulent transfer—Social Assets is not liable for Epic Media's debts.

### A.    Essociate's successor liability argument contorts the case law and the evidence.

To support its successor liability claim, Essociate asks this court to ignore a holding of New York's highest court in favor of dicta from an intermediate appellate court.  For at least three decades, New York law—as dictated by the New York Court of Appeals—has been that the "mere continuation" exception "refers to corporate reorganization . . . where only one corporation survives the transaction; the predecessor corporation must be extinguished." *Schumacher v. Richards Shear Co.,* 451 N.E.2d 195, 198 (N.Y. 1983).  The "handful of federal district court and magistrate opinions" Epic Media cites all rely on *Schumacher*.  Essociate Br. 66.  Essociate urges this court to cast aside those opinions and follow "current New York law—

REDACTED PUBLIC VERSION

as established by New York's appellate courts." Essociate Br. 66.  Of course, the most recent

intermediate appellate decision on successor liability in New York—issued less than three

months ago—adheres to *Schumacher*'s holding that Essociate blithely encourages this court to

ignore:  "[T]he third exception, 'mere continuation,' cannot apply because it requires that the

selling/predecessor corporation be fully extinguished for there to be successor liability, and no

dispute exists that [the predecessor] continued in business after the transfer of assets to [the

successor]."  *State Farm Fire & Cas. Co. v. Main Bros. Oil Co.*, 956 N.Y.S.2d 695, 698 (App.

Div. 2012) (citing *Schumacher*, 451 N.E.2d at 198).

Even if this court were to follow *Kaur v. American Transit Ins. Co.*, 926 N.Y.S.2d 517,

520 (App. Div. 2012), as Essociate urges, the result would be no different.  In *Kaur*, as modified

on appeal, 968 N.E.2d 994 (N.Y. 2012), the court was open to applying the mere continuation

theory to a successor law firm that substituted as counsel on every case undertaken by its

predecessor, who was retiring from the practice of law.  The key fact in *Kaur* was that the

predecessor's "business was effectively ended" as soon as the substitution occurred.  *Kaur*, 926

N.Y.S.2d at 520.  Putting aside its conflict with *Schumacher*, *Kaur* is inapt because Epic Media

continued to operate its affiliate network business for six months after the Kinetic Social spinoff.

Essociate misrepresents this fact, asserting with no evidentiary support that the affiliate

marketing business was shut down in fall of 2011, SPF 17—when in fact it continued through

the middle of 2012, Epic's Response to SPF 17.  Thus Epic Media remained a going concern,

operating the same business, for more than six months after the spinoff, facts that are

incompatible with the mere continuation doctrine.

Essociate also asserts—for the first time—that Social Assets can be liable "under the de

facto merger doctrine."  Essociate Br. 66.  As Essociate never alleged "de facto merger" in its

REDACTED PUBLIC VERSION

complaint, this theory could be rejected on that basis alone.  Essociate alleged in its complaint that "Social Assets is a mere continuation of Epic, or in the alternative, the transaction in which Epic transferred assets to Social Assets was entered into fraudulently to escape Epic's liability for Epic's torts."  Dkt. 58, Amended Compl. ¶ 33.  Nowhere does Essociate claim that the Kinetic Social spinoff was a "de facto merger"—a theory that is anyhow an ill fit for a transaction that was a spinoff, not a merger.

Nevertheless, the de facto merger theory fails on the merits.  Rather than coming forward with evidence that Epic Media had an "actual intent" to defraud, Essociate presents only tautologies:  as evidence of fraud, Essociate cites "Epic's fraudulent transfer of its ad placement and social media marketing division."  Essociate Br. 66.  Calling something "fraud" does not prove it to be so.  Similarly, Essociate asserts that "Epic's post-lawsuit transfers to Social Assets were clearly designed to fraudulently escape Epic's creditors' claims."  Essociate Br. 67. Essociate only supports this theory by misconstruing evidence:  by claiming, for example, that FAS Labs was incorporated after this lawsuit was filed when in fact its incorporation preceded the complaint, *see* SPF 30, Epic's Response to SPF 30; by asserting that Social Assets used Epic Media's space rent-free when in fact the rent was paid through intercompany accounts, *see* SPF 23, Epic's Response to SPF 23; and by alleging Epic Media simply transferred three million dollars when that sum was a loan that Social Assets paid back within the year, *see* SPF 19, Epic's Response to SPF 19.  The Kinetic Social spinoff was a legitimate business decision; Essociate cannot prove otherwise by ignoring and misrepresenting evidence.

### B. The alter ego liability and fraudulent transfer theories both fail for absence of evidence.

Although Essociate also asserts separate claims for alter ego liability and fraudulent transfer, their objective is identical to the successor liability claim:  to permit recovery from

REDACTED PUBLIC VERSION

Social Assets in the event Essociate prevails on its patent infringement claim against Epic Media. These claims are defeated by the same flaws in the factual record noted above.

Alter ego liability requires Essociate to establish "an overall element of fraud, injustice, or unfairness," as well as "some combination" of factors showing the companies operated as a "single economic entity." *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 470-71 (D. Del. 2010). Fraud is also, understandably, a key element of Essociate's fraudulent transfer theory. That claim requires a showing of "actual intent to hinder, delay or defraud" a creditor, Del. Code tit. 6, § 1304(a)(1) (2013), or that the transfer was made without an exchange of "reasonably equivalent value" and the entity "was, or was rendered, insolvent thereby," *In re Plassein Int'l Corp.*, 03-11489, 2008 WL 1990315, at *5 (Bankr. D. Del. May 5, 2008).

The factors relevant to alter ego liability all point away from piercing the corporate veil: Epic Media was adequately capitalized and solvent both before and after the Kinetic Social spinoff; corporate formalities between the companies were observed; and no dominant shareholder siphoned company funds or treated Epic Media or Social Assets as a facade. *See* Essociate Br. 68 (quoting *Microstrategy Inc. v. Acacia Research Corp.*, 2010 Del. Ch. LEXIS 254 at * 46 (Del. Ch. Dec. 30, 2010) for "[s]pecific facts a court may consider when being asked to disregard the corporate form"). The evidence also shows that the Kinetic Social spinoff was motivated by legitimate business strategy and did not cause Epic Media to become insolvent— facts that preclude Essociate from succeeding on its fraudulent transfer theory.

Although Essociate has tried to cast the Kinetic Social spinoff as a fraud, that effort fails for lack of evidence. Essociate has not presented evidence sufficient to defeat summary judgment on any of its theories. Social Assets is therefore entitled to summary judgment.

43

REDACTED PUBLIC VERSION

## CONCLUSION

The defendants have demonstrated their entitlement to summary judgment on four issues: the equitable defenses; noninfringement; invalidity; and all of the successor liability theories. Although the Court could reach a case-dispositive decision on any of the first three issues, there is a strong public interest in eliminating invalid patents. *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 100 (1993).

Essociate continues to assert the '660 patent against multiple defendants, on essentially the same theories it advances in this case. *See, e.g., Essociate v. Adscend Media LLC*, Case No. 12-cv-2153 (C.D. Cal., filed Dec. 11, 2012) and E*ssociate v. Voom Media Corp.*, Case No. 12-cv-2156 (C.D. Cal., filed Dec. 11, 2012). None of Essociate's enforcement cases have yet been litigated to resolution, and this is the first to reach summary judgment. The Court should take this opportunity to end Essociate's campaign of enforcing an invalid patent with spurious infringement theories.

Dated: March 4, 2013.

By: *s/ James D. Peterson*
    James D. Peterson
    Jennifer L. Gregor
    Dustin B. Brown
    Kerry L. Gabrielson
    GODFREY & KAHN, S.C.
    One East Main Street, Suite 500
    Post Office Box 2719
    Madison, WI  53701-2719
    Phone: 608-257-3911
    Fax:    608-257-0609
    Email: jpeterson@gklaw.com
        jgregor@gklaw.com
        dbrown@gklaw.com
        kgabrielson@gklaw.com

    *Attorneys for Defendants, Epic Media*
    *Group, Inc.,(f/k/a Azoogle.com, Inc.), and*
    *Social Assets LLC d/b/a Kinetic Social.*

9154426

44

REDACTED PUBLIC VERSION