IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ESSOCIATE, INC.,

                      Plaintiff,

          v.

AZOOGLE.COM, INC., EPIC MEDIA
GROUP, INC., SOCIAL ASSETS LLC,
D/B/A KINETIC SOCIAL and
DOES 1-10,

                      Defendants.

OPINION AND ORDER

11-cv-727-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Essociate, Inc. accuses defendants Azoogle.com and Epic Media Group, Inc. of infringing plaintiff's United States Patent No. 6,804,660. The '660 patent concerns a method of operating a virtual affiliate system, which is a type of internet promotion. Plaintiff also contends that Social Assets LLC, which does business as Kinetic Social, and its officers, Does 1-10, are liable for Epic Media's infringement under the doctrines of successor liability, alter ego liability and fraudulent transfer.

Now before the court is defendants' motion for summary judgment. Dkt. #87. Defendants have moved for summary judgment on (1) noninfringement; (2) invalidity of the '660 patent; (3) their defenses of laches and equitable estoppel; and (4) successor liability. I am granting defendants' motion with respect to noninfringement because plaintiff has failed to show that defendant Epic Media's affiliate system performs all steps of the asserted

1

claims of the '660 patent.  In particular, plaintiff has not shown that Epic's system provides a method for virtual affiliates to access existing merchant affiliate systems.  Plaintiff also has not shown that Epic's system performs the "configuring" or "correlating" steps of the asserted claims.  Because non-infringement is clear and defendants have shown no reason to believe they are at risk for further infringement suits, I will exercise my discretion not to decide defendants' invalidity or unenforceability counterclaims or defenses.  It is also unnecessary to address defendants' laches and equitable estoppel defenses or to determine whether Social Assets LLC and Does 1-10 may be held liable as successors of Epic Media.

From the parties' proposed findings of fact and the evidence in the record, I set forth the material and undisputed facts below.  However, there are a few evidentiary and procedural matters related to the facts that require some discussion.  First, I disregarded several of plaintiff's proposed facts because they were not supported by admissible evidence in the record.  In particular, plaintiff proposed several facts about the operation of defendant Epic Media Group's affiliate system, Epic Direct, but cited only the conclusory declaration of John Du Wors, dkt. #105, as supporting evidence.  Du Wors is plaintiff's trial counsel. He did not explain why he would be qualified to provide expert or any other opinion testimony about the characteristics or operation of the Epic Direct system.  Second, plaintiff cites an "Advertiser Implementation Cheat Sheet and Guide" created by Epic as evidence of how the system works.  Dkt. #105-6.  However, plaintiff proposes several facts about the operation of the system that are not supported by the guide or by any expert opinion offered by plaintiff.  E.g., PPFOF, dkt. #107, ¶¶ 113, 119, 120, 124.  Finally, plaintiff cites a

declaration of Michael Landau, submitted on February 23, 2013, which includes several conclusory opinions about whether the Epic system infringed the '660 patent. Dkt. #108. I am disregarding Landau's statements as untimely expert opinion. (According to the preliminary pretrial conference order, plaintiff's expert report on infringement was due November 5, 2012. Dkt. #46. Plaintiff filed a timely expert opinion by George Edwards regarding infringement that I have considered.) Further Landau's declaration does not establish any foundation for his statements about the Epic system. (Plaintiff's expert reports on validity were also late, but because I am not reaching the issue of patent validity, I need not decide whether those reports should be stricken.)

## UNDISPUTED FACTS

### A. The Parties

Plaintiff Essociate, Inc. is the owner of the United States Patent No. 6,804,660. Michael Landau and Evan Horowitz are plaintiff's founders and the inventors of the '660 patent. Plaintiff operates a small affiliate network and has realized the majority of its revenue from settlements in suits to enforce the '660 patent.

Defendant Azoogle.com, Inc. operated an affiliate network, called Azoogle Ads, beginning in about 2000. In 2008, Azoogle.com changed its name to Epic Media Group, Inc. and the affiliate network was renamed the Epic Direct System. In a corporate restructuring in 2011, Epic Media Group, Inc. became Epic Media Group, LLC. Defendant Social Assets, LLC, doing business as Kinetic Social, was spun off from Epic Media and is

in the business of targeting social media advertising.  Social Assets does not operate an affiliate network.

## B.  The '660 Patent

The Patent and Trademark Office issued the '660 patent to Essociate, Inc. on October 12, 2004.  Michael Landau and Evan Horowitz are listed as the inventors.  The patent is titled "System Method and Article of Manufacture for Internet Based Affiliate Pooling" and relates to internet advertising.

In online affiliate marketing, a merchant promotes goods or services by paying website operators ("webmasters" or "affiliates") to send customers to the merchant's website. The basic components of online affiliate marketing are (1) an online merchant; (2) webmasters who operate websites visited by consumers; (3) advertisements provided by the merchant to be placed on an affiliate's website which, when clicked on by a visitor, send the visitor's web browser to the merchant's website; and (4) a financial incentive for webmasters to send visitors to the merchant's website.  Some merchants, such as Amazon, operate their own affiliate systems in which webmasters may enroll as affiliates.  Other merchants use affiliate "hub" systems, in which another system acts as an intermediary between affiliates and the merchants and supplies tracking functionality for the merchants.

The '660 patent identifies both stand-alone merchant-operated affiliate systems and affiliate hub systems as prior art.  '660 patent, cols. 2 & 3.  The specification explains that both prior art systems have weaknesses, including expense, slow growth and administrative

difficulties.  The '660 patent purports to address these weaknesses by disclosing and claiming a method, system and computer program for providing "virtual affiliates" access to an existing affiliate system.  '660 pat., Abstract, col. 3, lns. 66-67, claims 1, 15 and 28.

"Virtual affiliates" are affiliates of one affiliate system, referred to in the patent as the "affiliate pool of source Webmasters" which can send traffic to an existing system, the "target system" without actually joining the target affiliate network.  Id. at col. 7, ln. 49-50, col. 21, lns. 49-50.  The applicants for the '660 patent do not claim to have invented the concept of virtual affiliates; they claim a particular multi-step technique for providing virtual affiliates access to an existing affiliate system.  The invention requires that each member of the source pool be assigned a unique ID, known as the "source webmaster unique identifier," which is then correlated to another unique ID, known as the "target webmaster unique identifier," that functions in the existing target system.  Id. at col. 22, lns. 1-7.  In the process of directing an internet user to the target system, the source pool generates a URL for the existing target system that includes the target webmaster unique identifier.  Id.  The correlation of the source webmaster unique identifier and the target webmaster unique identifier allows the merchant system to track the referral from the virtual affiliate using the target webmaster unique identifier.  Id. at col. 22, lns. 6-7.

### C.  Defendant's Accused Epic Direct System

Defendant Epic Media operates an affiliate network known as the Epic Direct System. The system consists of affiliated webmasters and Epic's merchant customers.  Through the system, the affiliated webmasters are able to promote offers for the merchants and receive

a commission for completed offers.

To enable affiliate advertising through the Epic Direct system, a merchant first contracts with Epic to make an offer available for promotion by Epic's affiliates. The merchant must have a "landing page" for each offer, which is the place where an internet user ultimately would be directed after clicking on an affiliate's promotion of an offer. On the landing page, the user can complete some action, such as making a purchase or signing up for a service. The format and content of the landing page and its URL are determined by the merchant. Commonly, the merchant will set up a landing page to receive users from affiliate networks that is distinct from its standard home page or signup page. Merchants use many variations on how they structure their landing pages and the landing page URLs to suit their own purposes.

Before arriving at the landing page, the internet user must click on a "jump link," a link that is created by Epic for each affiliate who would like to promote a particular offer. To promote the offer, the Epic affiliate will place the jump link on its own materials that it publishes. For example, the affiliate might place the jump link in an email or on its website as part of a banner advertisement.

A jump link in the Epic Direct system is in a format like this: <x.azjump.com/009Gv>. In this example, "x.azjump.com" is the domain and subdomain on the Epic Direct system where the user request will be processed. "009Gv" is the Epic link ID that encodes pertinent information for this link, including at least the "affiliate ID," the "offer ID" and the "traffic type." The affiliate ID is the numerical code that Epic assigned to each affiliate in the Epic Direct system. This allows Epic to identify the affiliate ID for

6

the originating Epic affiliate when that link is clicked by a visitor to the Epic affiliate network. The offer ID is a numerical code that is assigned to each offer. A merchant will have as many offer IDs as it has separate offers. The traffic type indicates what type of user traffic the affiliate would provide, such as web traffic from a website or traffic from an email campaign. Other variables might also be encoded in the link ID, depending on the offer and needs of the merchant and the affiliates.

When a user clicks on a banner ad or other promotion on an affiliated webmaster's website, the user is directed by the jump link to the Epic Direct system, where the Epic system decodes the link ID. The Epic system makes a record of the user request and places a cookie (a small, hidden text file) on the user's computer. The Epic system then redirects the user to the merchant's landing page URL. These steps are largely invisible to the user, to whom it appears that the banner ad linked directly to the merchant's website. (A user may be able to recognize the transmission path on its browser address bar and browser history if the user is paying attention.)

If a user completes the transaction, the user is brought to a "lead conversion page" on the merchant's system. The lead conversion page, or the "success" page, will typically say something like "thanks for signing up" to the user. The purpose of the lead conversion page in the Epic Direct system is that it includes a "tracking pixel." The pixel is invisible to the user, because it is set up to display as a one-pixel by one-pixel transparent square. The function of the pixel is to prompt the user's browser to process a line of code that triggers the execution of a script on the Epic system. The script reads the cookie from the user's computer, and the Epic system makes a record of the successful transaction. After recording

both the offer ID and the affiliate ID from the cookie on the user's computer, Epic tracks the required payment information. This transaction tracking method used by the Epic Direct system is referred to variously as "cookie tracking" or "cookie and pixel tracking."

Some Epic merchants have their own merchant affiliate systems through which they can track transactions. However, if a promotion is going through the Epic Direct system, Epic does not rely on the merchant system for tracking transactions or commissions. Because the Epic system does not rely on merchants to track transactions and commissions for particular affiliates, there is no need for the Epic system to provide the identity of the affiliate to the merchant for Epic's tracking purposes. However, some merchants request that the affiliate ID or other information be passed to them for their own internal tracking or reconciliation purposes. Some merchants would like to determine which affiliates are most productive and which affiliates are sending low-quality traffic. If, for example, some affiliates produce a large number of bogus transactions, the merchant may investigate and seek to disqualify that affiliate. On request, Epic allows certain preset variables to be passed along to the merchant system. These variables include the affiliate ID, affiliate sub-ID, a "click hash" value and a fixed code to represent the Epic system, "aZ2." The requested variables are appended to the merchant landing page URL.

If a merchant has requested that certain variables be passed along, the merchant landing page URLs are formatted to include variables that will be filled in when the user clicks on the jump link. For example, if Netflix had requested that the affiliate ID be passed along, the Netflix landing page URL would be pre-formatted on the Epic system like this: www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIATE_ID%%. In the syntax

of protocols used on the Epic system (and in internet protocols generally), the "?" designates the end of the location part of the URL.  The "%%" designates the beginning and the end of the label of the variable.  Then, when a user clicks on the jump link, the Epic system fills in the variables in the pre-formatted URL to complete the merchant landing page URL.  If the affiliate's ID were 12345, the landing page URL would look like this: www.netflix.com/affiliates/signup.html?affiliate_id=12345.  The merchant would then be able to record the affiliate's ID for whatever purposes it wanted.  The Epic system would still use the cookie and pixel method for tracking this transaction and any resulting commissions, just as though the affiliate ID had not been passed on to the merchant.

If a merchant requests it, the Epic system can also allow use of a sub ID variable, which can be useful for merchants and affiliates.  For example, an affiliate that operates a local newspaper might have a website with various sections, including news, sports and arts. The affiliate promotes Epic offers and may like to know whether the offers were more successful in the sports section or the arts section.  When the affiliate places an offer, for Netflix for example, in the sports section, the "sub_ID=001" is appended to the jump link. When the affiliate places the offer in the arts section, it appends "sub_ID=002."  When the user clicks on the jump link, the landing page URL is completed by filling in the variables. The preformatted landing page URL would look like this: www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIATE_ID%%&sub_id=%% SUB_ID%%.  If the user clicked on the jump link in the sports section, the landing page URL would be completed to look like this: www.netflix.com/affiliates/signup.html?affiliate_id=12345&sub_id=001. In transaction and

9

commission reports, both the merchant and the affiliate would know that the commission was earned by affiliate 12345 and that the traffic came from a link that had sub ID 001 associated with it.  In this example, the affiliate would know that this successful transaction came from the sports page.  Again, Epic would be tracking the transaction and commission by using its cookie and pixel tracking method and Epic would not use the passed-along variables for its own transaction and commission reports.

Although Epic generally uses the pixel and cookie tracking method, some merchants are unwilling or unable to include a pixel on their lead conversion page.  In such cases, Epic can track transactions using a "click_hash" variable that is included in a destination landing page URL.  The click_hash is an alpha-numeric value which, when decoded by the Epic system, identifies affiliate, click and offer data.  The "click_hash" variable can be included by using the string "%%CLICK-HASH%%" in a specified value field which causes the destination landing page URL to include the click hash.  If an offer is completed, the merchant notifies Epic by submitting the click_hash variable.  The merchant would not know the meaning of the variable, but simply would pass it back to Epic after a completed transaction.

### D.  SpeedDate.com Example

In his expert report, plaintiff's expert George Edwards analyzed a transaction involving the Epic Direct System and SpeedDate.com to reach his conclusion that the Epic Direct system infringed the '660 patent.  SpeedDate.com is a merchant that uses the Epic system.  A 2009 insertion order documents the relationship between SpeedDate.com and

Epic.  The insertion order states that Epic would provide an http tracking pixel to SpeedDate.com, that SpeedDate.com would place Epic's tracking pixel on its conversion page and that Epic would pass on the variables "affiliate_id" and "sub_id" to SpeedDate.com. Dkt. #88-1.

The transaction considered by Edwards involved an Epic affiliate in Colorado, with the affiliate ID number 48192.  The click URL Epic provided to the affiliate for a SpeedDate.com offer was <http://x.azjump.com/4b4Gq?sub=12268>, with 4b4Gq being the Epic link ID and 12268 being the sub-ID selected by the affiliate.  If a user clicked on the URL, the click would constitute a request for the Epic jump link that would lead to SpeedDate.com.  The destination landing page URL for SpeedDate.com on the Epic system is  http://mysdate.com/?a=53&c=1&s1=%%AFFILIATE_ID%%&s2=%%SUB_ID%%. Thus, for this particular transaction, the URL generated was <http://mysdate.com/?a=53&c=1&s1=48192&s2=12268>. The affiliate ID is 48192 and the sub ID chosen by the affiliate for its purposes is 12268.  (It is unclear as to what a=53&c=1 refer.  Although plaintiff proposes an explanation, it offers no foundation for it. It is clear that these variables were chosen by SpeedDate.com for its own purposes.)

OPINION

A.  Infringement

Plaintiff contends that defendants infringe claims 1, 3, 6, 10, 13, 14, 15, and 28 of the '660 patent.  Defendants have moved for summary judgment of noninfringement on all of these claims.  Patent infringement analysis has two steps:  first, the patent claims must be

interpreted or construed to determine their meaning and scope; second, the properly-construed claims are compared to the process or product accused of infringing.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995).  The first step of this analysis, claim construction, is a matter of law reserved to the court.  Id. at 970-71.

1.  Claim construction

The parties disagree about the meaning of several of the terms of the asserted claims, but I need not resolve most of their disputes.  With respect to two of their disputes, the parties do not explain why the disputes or proposed constructions are relevant to any arguments presented in their briefs ("source webmaster unique identifier"; "generating a URL").  Additionally, the parties' proposed constructions for some terms are so similar that it appears that there are no real disputes about the meaning of those terms ("source webmaster unique identifier"; "target webmaster unique identifier").  However, to resolve the parties' summary judgment disputes, I must construe the terms "virtual affiliates" and "target merchant affiliate system" and provide scope and meaning to the "configuring" "correlating" steps of the asserted claims.

All of the disputed terms and phrases appear in the asserted independent claims of the '660 patent, claims 1, 15 and 28.  Claim 1 is representative:

1.  A method for providing **Virtual Affiliates** to an **existing target affiliate system**, the method comprising the operations of:

configuring an **existing target affiliate system** to receive referrals from a first plurality of Webmasters in an affiliate pool of source Webmasters such that the **target Merchant affiliate system** recognizes a transaction as originating from a source Webmaster in an affiliate pooling system, including the step of:

12

assigning a source Webmaster unique identifier for each of said first plurality of Webmasters each operating at least one web site;

receiving a user request for a **target Merchant affiliate system** URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters, wherein the user request includes the source Webmaster unique identifier for the particular referring Webmaster, and wherein the target **Merchant affiliate system** includes a unique identification system for its own affiliated Webmasters;

**correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system**; and

generating a URL for the requested Merchant affiliate system, wherein the URL includes the correlated target Webmaster Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Webmaster for requisite tracking.

'660 pat., col. 21, ln. 45–col. 22, ln. 8.

Many of plaintiff's claim construction arguments rely on a decision issued by a district court in the Central District of California in a patent case in which plaintiff sued several defendants for infringement of the '660 patent. Essociate, Inc. v. Blue Whaler Investments, LLC, 10-2107-jvs (C.D. Cal. Feb. 6, 2012). In that case, the court construed all of the terms at issue here, often adopting the constructions proposed by plaintiff and rejecting the defendants' proposed constructions on the grounds that they read in limitations from the specification that were not supported by the claim language. Although plaintiff contends that the claim construction decision has some persuasive value, it is of little use in the context of the parties' summary judgment arguments in this case. The district court in California adopted specific definitions of the claims at issue, and to some degree focused on the words it believed would best define the term. The court did not focus on the related

disputes about the scope of the claim terms but instead focused on clarifying the language of the terms.

At this stage of the proceedings, the only disputes that must be resolved are ones relating to the presence of specific limitations in the claims, not the ability of a juror or anyone else to understand the language. It is unnecessary to provide complete definitions for any of the terms below in order to resolve the parties' disputes about those limitations. Therefore, rather than adopt specific definitions in the manner of the California court, I will resolve only the specific disputes stemming from the following terms and phrases. Plaintiff's citations to the California court's opinion provide little help in this regard.

a. "Virtual Affiliates"

The dispute between the parties is whether the reference to "Virtual Affiliates" in the preamble of the independent claims is limiting. The term "virtual affiliates" is not used anywhere else in the claims. Plaintiff contends that the statement "method for providing Virtual Affiliates to an existing target affiliate system" is non-limiting because it does nothing more than cite the intended purpose or use for the claimed invention and provide an introduction. In other words, plaintiff contends that a system could be infringing even if it does not provide *virtual* affiliates access to an existing target affiliate system, so long as it performs all steps of the asserted claims. Defendants disagree, contending that the preambles include essential structures for the performance of the elements recited in the claims.

Generally, a preamble does not limit a claim. <u>Allen Engineering Corp. v. Bartell</u>

14

Industries, Inc., 299 F.3d 1336, 1346 (Fed. Cir. 2002). However, this general rule has numerous exceptions. The preamble may limit the meaning of claim when (1) the preamble "recites essential structure or steps," Catalina Marketing International, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002); (2) the preamble is "necessary to give life, meaning, and vitality" to the claim, Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999); (3) "the claim drafter chooses to use *both* the preamble and the body to define the subject matter of the claimed invention," Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 620 (Fed. Cir. 1995); (4) the preamble is essential to understand limitations or terms in the claim body, Pitney Bowes, 182 F.3d at 1306; or (5) "limitations in the body of the claim rely upon and derive antecedent basis from the preamble," Eaton Corp. v. Rockwell International Corp., 323 F.3d 1332, 1339 (Fed. Cir. 2003). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" Catalina, 289 F.3d at 808 (citing Rowe v. Dror, 112 F.3d 473, 478 (Fed. Cir. 1997)). See also Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc., 98 F.3d 1563, 1572-73 (Fed. Cir. 1996) ("Whether a preamble stating the purpose and context of the invention constitutes a limitation of the claimed process is determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history.").

As an initial matter, I note that plaintiff's argument is disingenuous in light of other arguments and statements it makes throughout its brief in opposition to defendants' motion

for summary judgment.  In particular, plaintiff concedes in its brief that the '660 "invention provides 'virtual affiliates' to a target affiliate system."  Plt.'s Br., dkt. #109, at 25.  See also id. at 60 (stating that '660 patent "claim[s] . . . a specific improvement" to "virtual affiliate networks").  Later, plaintiff distinguishes prior art on the basis that it did not "disclose an existing target merchant affiliate system which receives traffic from virtual affiliates."  Id. at 53.  Plaintiff's expert and inventor of the '660 patent also states in his expert report that "the '660 patent claims a specific kind of virtual affiliate system."  Landau Expert Rep., dkt. #85, at 18.  Plaintiff cannot argue that the invention is limited to specific systems involving virtual affiliates for the purposes of its validity arguments but deny that the system is so limited for the purpose of infringement.  Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("It is axiomatic that claims are construed the same way for both invalidity and infringement").

In any event, I agree with defendants that the preamble is limiting because it defines the environment in which the claimed method, program and system operate or function and provides essential structure and meaning to the specific steps set forth in the body of the claims.  The background and specification of the '660 patent make it clear that the claimed invention is a method, program and system for providing virtual affiliates access to an existing target affiliate system.  E.g., '660 pat., col. 3, lns. 65-67 ("Summary of the Invention") ("The present invention addresses these needs by providing a method for affording virtual affiliates access to an existing affiliate system.").  This is one reason why the invention is purportedly novel and an improvement over prior systems.  As is explained in the background section, prior art already provided methods for affiliate webmasters to send

traffic to an existing merchant affiliate system, either directly or through an affiliate hub. '660 pat., cols. 2 & 3 (describing the Amazon and Linkshare systems). The '660 invention was meant to be an improvement of these systems because it allowed webmasters to refer traffic without creating a burden on the merchant affiliate systems. Id. at col. 4, lns. 53-56. ("Advantageously, the present invention allows groups of Webmasters to participate in existing Merchant affiliate systems without the need of joining those Merchant affiliate systems."); col. 7, lns. 40-45 ("Each Virtual Affiliate sends traffic to the Merchant through the Merchant's existing affiliate system, and thus has the ability to benefit from advertising the goods and/or services of the Merchant while not wholly a party of the Merchant's existing affiliate system."); col. 7, lns. 49-50 ("The Virtual Affiliate remains independent from the Merchant's affiliate system."); col. 9, lns. 47-50 ("Use of the Virtual Affiliate system allows for some responsibility to be removed from the Merchant, in terms of maintaining and expending system resources toward its relationship with the referring Webmaster."). The repeated references to virtual affiliates throughout the '660 specification make it clear that the claimed invention was a method relating to virtual affiliates.

In addition, the preamble language regarding virtual affiliates is needed to understand the limitations in the claim body. For example, the configuring step requires "configuring an existing target affiliate system to receive referrals from a first plurality of Webmasters in an affiliate pool of source Webmasters such that the target Merchant affiliate system recognizes a transaction as originating from a source Webmaster in an affiliate pooling system. . . ." '660 pat., col. 21, lns. 48-50. This language makes sense only if the "Webmasters" in the pool of affiliate webmasters are "virtual" affiliates. If the webmasters

17

had already joined or enrolled in the existing target affiliate system (the existing merchant affiliate system), there would be no reason to configure the system to receive referrals from the webmasters.  Rather, the webmasters would simply refer traffic in accordance with the prior art cited in the '660 patent, by either registering with the merchant affiliate system or by registering with an affiliate hub system that conducts business with the merchant.

The language of the receiving step also confirms that the "first plurality of Webmasters in an affiliate pool of source Webmasters" are virtual affiliates.  This step requires "a user request for a target Merchant affiliate system URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters" to include "the source Webmaster unique identifier for the particular referring Webmaster."  The step goes on to explain that the target merchant affiliate system for which a request is made "includes a unique identification system for *its own affiliate Webmasters*."  Id. at col. 21, lns. 58-65 (Emphasis added).  This explanation distinguishes the webmasters in the first plurality of webmasters (virtual affiliates) from webmasters that are actual affiliates of the existing target merchant system.

Finally, the correlating step requires "correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the required Merchant affiliate system."  Id. at col. 21, lns. 66-67, col. 22, lns. 1-2.  The reason the source webmaster unique identifier must be correlated to a target webmaster unique identifier is because the referring webmaster is not an affiliate of the merchant affiliate system.  If the webmaster were an affiliate enrolled in the merchant affiliate system, the system would be able to recognize the webmaster without the correlation

18

step.  Thus, this step makes sense only if the webmaster is a virtual affiliate, not an actual affiliate of the merchant affiliate system.

In sum, a "virtual affiliate" limitation in the preamble is necessary to describe the invention "in complete and exacting structural detail." Intirtool, Ltd. v. Texar Corp., 369 F.3d 1289, 1295 (Fed. Cir. 2004).  Thus, I conclude that the asserted claims require a method for allowing virtual affiliates to gain access to an existing merchant affiliate system and thus, that the webmasters in the "pool of affiliate webmasters" must be "virtual affiliates."

b.  "target Merchant affiliate system" and "existing target affiliate system"

These two terms are used several times in the asserted independent claims.  The parties agree that they are synonymous for the purposes of their present disputes.  The parties also agree that a merchant affiliate system is a system through which a merchant can receive traffic from a group of webmasters.  However, the parties disagree about the extent to which the "target merchant affiliate system" referred to in the '660 patent must be a "complete" affiliate system that performs its own tracking functions.  Plaintiff contends that a merchant affiliate system is simply "a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant."  Plt.'s Br., dkt. #109, at 26. Defendants contend that merchant affiliate system, as used in the '660 patent, entails much more structure.  Defendants' proposed construction is "[a] complete system that operates the merchant's affiliate program, including the tracking of transactions and commissions." Dfts.' Br., dkt. #93, at 26.

19

Plaintiff's proposed construction is too broad because it would encompass virtually any online linking arrangement. As defendants point out, plaintiff's proposed construction would cover a situation in which fans of an online merchant linked to the merchant's website. However, nothing in the patent suggests that it would cover such relationships. Defendants' proposed construction is too vague because it is unclear what qualifies as a "complete system." Further, although the specification states that "generally" a merchant affiliate system includes "the Merchant's back-end tracking mechanism, which keeps track of transactions and credits affiliates; the accounting system for payout of affiliates; the reporting system for reporting transaction statistics back to affiliates; and the support system for affiliate and technical support," '660 pat., col. 7, lns. 16-21, neither the claims nor the specification requires that the merchant affiliate system include all of these capabilities.

For the purpose of resolving the parties' present disputes, the claim language provides sufficient guidance about merchant affiliate systems contemplated by the claims. According to the claim language, the merchant affiliate system must (1) have its own affiliates and have a unique identification system for those affiliates; and (2) must recognize and track transactions as originating from particular source webmasters. '660 pat., col. 21, lns. 50-51, 63-65, col. 22, lns. 7-8. Even plaintiff concedes that a merchant affiliate system must meet these requirements. Plt.'s Br., dkt. #109, at 41-44 (arguing in context of its validity arguments that merchant affiliate system reads on the '660 patent only if it has "unique" identification for its affiliates and is "capable of tracking," as opposed to having the affiliate pool do tracking).

20

c.  correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system

The parties are in substantial agreement as to the meaning of the terms "source Webmaster unique identifier" and "target Webmaster unique identifier."  They agree that the source identifier is a unique code assigned to a webmaster within the affiliate pool of source webmasters.  Dfts.' Br., dkt. #93, at 22; Plt.'s Br., dkt. #109, at 22.  As for the target Webmaster unique identifier, they agree that it is a unique identifying code assigned to a webmaster in the source affiliate pool that is functional in the target merchant's affiliate system and that corresponds to the unique identification system of the target merchant's affiliate system.  Plt.'s Br., dkt. #109, at 25; Dfts.' Br., dkt. #113, at 20; 660 pat., col. 21, ln. 67- col. 22, ln. 2.  This definition is supported by the patent's specifications, which describe the target webmaster ID as a "unique identifying code functional within the target Merchant's home affiliate system and which corresponds to the unique identification system of the request Merchant's home affiliate system."  '660 pat., col. 4, lns. 7–11.  See also id. at col. 8, lns. 7-9 (target webmaster ID must be a "code that can be utilized by the particular Merchant's existing affiliate system").

However, the parties disagree as to what it means to "correlate" the source webmaster unique identifier to a target webmaster unique identifier.  The parties' proposed definitions of the term "correlating" are not helpful.  Plaintiff proposes "creating or recognizing a relationship between," Plt.'s Br., dkt. #109, at 24, while defendants propose "establishing a mutual or reciprocal relation between."  Dfts.' Br., dkt. #93, at 25.  Neither of these

definitions resolves the dispute between the parties, which is whether a system performs the "correlating" step if it merely "passes on" the source webmaster unique identifier to a merchant affiliate system that can use the source webmaster unique identifier for some purpose. Plaintiff contends that simply passing on the source ID can qualify as "correlating," while defendants contend that passing on the source ID is not enough.

Once again, plaintiff's argument seems disingenuous in light of statements it makes in its brief regarding validity and statements Landau made during his deposition to distinguish his prior art invention. Plaintiff states in its brief that "[t]he correlating step contemplated by the '660 patent involves an algorithmic process whereby the value in the affiliate ID field of the Click URL determines what value appears in the Sub ID value field of the Destination Landing Page URL." Plt.'s Br., dkt. #109, at 41. Similarly, Landau testified that his original system did not perform the "correlating" step because it merely "substituted" a source affiliate ID (the source webmaster unique identifier) for a placeholder or variable in the URL that was sent to the merchant affiliate system. 2012 Landau Dep., dkt. #76, at 127, 159; 2010 Landau Dep., dkt. #80, at 38-44. Landau testified that although the affiliate ID was included in the URL passed to the merchant affiliate system, there was no "correlating" step because there was no "logic" used to determine whether that was the appropriate way to set up a link for the merchant system. Id. Plaintiff makes no attempt to explain why "passing on" an affiliate ID without using any logic or algorithmic process would satisfy the "correlating" step if simply "substituting" the affiliate ID for a placeholder would not.

Although I cannot determine from the parties' arguments or the patent itself the

22

entire range of actions that would or would not satisfy the "correlating" step, I can conclude that the correlating step requires more than simply passing on the source webmaster unique identifier. Plaintiff essentially conceded this point in its validity arguments and any other conclusion would render the correlating step meaningless. The patent's specification states repeatedly that correlation occurs between unique codes assigned to source webmasters and unique codes functional in the target merchant system. This occurs when the affiliate pooling system determines which merchant is the target of a request. '660 pat., col. 10, lns. 63-65. The pooling system then determines which target webmaster unique identifier functional in the merchant system corresponds to the webmaster's source webmaster unique identifier. Id. at lns. 65-67. The affiliate pooling system may find this target webmaster unique identifier in a number of ways, including from a table provided by the merchant. Id. at col. 11, lns. 1-15. The purpose of this step is to hand off an ID code that is recognizable and functional within the merchant's own tracking system. Id. at lns. 40-45. Simply passing along the ID that was assigned to a webmaster by the affiliating pooling system does not satisfy these requirements.

2. Infringement by Epic Direct

Plaintiff contends that the Epic Direct system infringes the '660 patent because it provides a method using all steps of the asserted claims by which affiliate webmasters may refer traffic to merchant affiliate systems. Specifically, Epic Direct: (1) configures merchant affiliate systems by assigning unique IDs to webmaster affiliates and formatting URLs and offers by which affiliates can refer internet traffic to merchants; (2) receives user requests

23

when an internet user clicks on webmaster affiliate's promotion of a merchant's offer; (3) correlates its webmasters' unique IDs to unique IDs that are functional in the merchants' systems; and (4) generates URLs for merchant affiliate systems containing the correlated unique IDs by which the merchant system can track the transaction. Plaintiff relies specifically on Epic Direct's ability to pass on pre-set variables at the merchant's request, including the affiliate_id, sub_id and click_hash.

Defendants have moved for summary judgment on all asserted claims, contending that plaintiff cannot show that the Epic affiliate system performed every step of the asserted claims. Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1328 (Fed. Cir. 2008) ("[A] method claim is directly infringed only if each step of the claimed method is performed."). Defendants contend that plaintiff has adduced no evidence showing that the Epic Direct affiliate system provides a method by which virtual affiliates access an existing merchant affiliate system. Rather, the evidence in the record shows only that Epic Direct acts as an affiliate hub through which webmaster affiliates access merchants directly. Because plaintiff cannot show that Epic's system satisfies this threshold requirement, plaintiff cannot show that Epic's system performs the configuring or correlating steps of the claims. (The parties agree that all asserted independent claims contain the same steps and requirements.)

Every step of the asserted claims involves an affiliate system acting in relation to an existing merchant affiliate system for the purpose of providing access for virtual affiliates. At the very least, that existing merchant affiliate system must have a unique identification system for its own affiliated webmasters and must have the ability to recognize and track referrals from particular webmasters. Thus, it is not enough for plaintiff to show that Epic

24

Direct provides a method for webmasters to send traffic to a merchant because those methods already existed in the prior art and were disclaimed in the '660 patent.  Only transactions between the Epic system and another affiliate network can be infringing. Plaintiff must show that Epic Direct provides webmasters a method for accessing established merchant affiliate systems of which the webmasters are not affiliates.

Defendants submitted evidence showing that Epic Direct does not work with existing merchant affiliate systems to provide access for virtual affiliates but acts as an affiliate hub that contracts with merchants directly.  In particular, Epic tracks all of its affiliates' transactions using the cookie and pixel method of transaction tracking and does not rely on merchant affiliate systems to track referrals.  Plaintiff concedes in its brief that to read on the '660 patent, the affiliate pooling system must hand off traffic to a merchant affiliate system that "recognizes that a transaction originates from the respective source system and recognizes the new target Webmaster ID such that the Merchant's existing tracking can take over."  Plt.'s Br., dkt. #109 at 42.

Defendants also submitted evidence showing that the SpeedDate.com transaction identified as infringing by plaintiff did not involve SpeedDate.com's affiliate system.  A 2009 insertion order documenting the relationship between Epic and SpeedDate.com shows that SpeedDate.com agreed to pay Epic $4.50 for each referral.  The order also shows that Epic would use the cookie and pixel method of transaction tracking, meaning that Epic would not rely on SpeedDate.com's own merchant affiliate system to track referrals.  Additionally, the SpeedDate.com domain used by SpeedDate.com affiliate system is "affiliates.speeddate.com."  However, the SpeedDate domain used by the Epic Direct system

in the accused example transaction was "mysdate.com."

Plaintiff produced no evidence showing that the Epic Direct system sends virtual affiliates to existing merchant affiliate systems. Plaintiff states in its brief that "Epic provided offers from merchants with existing affiliate systems" and that the Epic Direct system generated URLs in order to refer traffic to existing merchant affiliate systems, Plt.'s Br., dkt. #109, at 29, but the evidence it cites to support this assertion is not admissible.

First, plaintiff cites the conclusory declaration of Michael Landau, the inventor of the '660 patent. As discussed above, Landau's opinion constitutes untimely expert opinion for which he fails to establish any foundation. Moreover, Landau's statements are primarily about plaintiff's own dealings with the SpeedDate.com and other affiliate systems. Landau Dec., dkt. #108, at ¶¶ 99-114. Plaintiff's dealings with affiliate networks do not establish whether and how Epic Direct interacted with affiliate networks.

Plaintiff also cites the opinion of George Edwards, its infringement expert, who states in his report that the Epic Direct system referred traffic to SpeedDate.com's "affiliate system." Edwards Rep., dkt. #84, at 6. Edwards uses the single SpeedDate.com offer as his one and only example of Epic's infringement. However, Edwards does not provide any foundation for his conclusion that Epic Direct referred traffic to SpeedDate.com's own affiliate system, rather than to an independent webpage created solely for affiliates of Epic Direct. Edwards states only that "[o]n information and belief," SpeedDate.com maintains a unique identification system for its own affiliates. Id. at 7. Edwards cites no evidence to support this assertion and plaintiff submitted no other evidence to confirm that SpeedDate.com provides a unique identification system for its affiliates, what that system

26

is or that Epic Direct affiliates engaged with such a system.

Because plaintiff has failed to show that the Epic Direct system allows webmasters to send traffic to existing merchant affiliate systems, plaintiff cannot show that the Epic Direct system "configur[es] an existing target affiliate system to receive referrals from a first plurality of Webmasters. . . ." '660 pat., col. 21, lns. 48-49.  Plaintiff contends that the Epic Direct system "configured" merchant affiliate systems by setting up destination landing page URLs to include "sub_id" macros that would include an identifier to the referring webmaster. Plaintiff states that "[t]his step is satisfied by any offer in the [Epic system's] offer_urls table relating to an existing merchant affiliate system."  Plt.'s Br., dkt. #109, at 32.  However, plaintiff's argument fails because plaintiff did not adduce admissible evidence establishing that any offer in the offer_urls table related to an existing merchant affiliate system.  With respect to the SpeedDate.com example transaction, plaintiff submitted no evidence showing that the URLs "configured" the SpeedDate.com system to recognize a transaction as coming from an affiliate in the Epic system.  Without such evidence, plaintiff cannot prove that the Epic Direct system performs the "configuring" step of the asserted claims.

Plaintiff also has not shown that the Epic Direct system performs the "correlating" step of the asserted claims, which includes "correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system."  '660 pat., col. 21, lns. 66-67—col. 22, lns. 1-2.  Plaintiff cites only the SpeedDate.com example as proof that the Epic Direct system performed the correlating steps of the asserted claims.  However, as discussed above, plaintiff has no evidence that the Epic system engaged the SpeedDate.com affiliate

27

system, rather than engaging SpeedDate.com directly as a merchant in the Epic system. If there is no virtual affiliate arrangement through which virtual affiliates may refer traffic to an existing merchant affiliate system, there can be no target webmaster unique identifier. Even assuming that Epic did engage SpeedDate.com's affiliate network, plaintiff has not shown that there is a target Webmaster unique identifier in the example transaction.

Plaintiff contends that, in the example transaction, the target webmaster unique identifier is a portion of the SpeedDate landing page URL: <a=53&c=1&s1=48192&s2=12268>. However, plaintiff has not shown that this string of variables meets the definition of target webmaster unique identifier. In particular, plaintiff adduced no evidence that this string of variables corresponds to a unique identification system of the SpeedDate affiliate system, that the expression is "functional" in the SpeedDate affiliate system, to the extent such a system even exists. '660 pat., col. 22, lns. 5-8. Although plaintiff's expert George Edwards states in his report that SpeedDate.com assigned a target webmaster unique identifier to each of its affiliates, Edwards Rep., dkt. #84, at 7, Edwards establishes no foundation for this statement.

Additionally, the expression identified by plaintiff, <a=53&c=1&s1=48192&s2=12268>, is not a unique code assigned to each webmaster in the Epic Direct system. Rather, it is a string of four independent and preset variables. It is not clear to what the first and second variables in the string correspond, but it is undisputed that SpeedDate.com chose them for its own purposes. The third variable is the Epic ID for the affiliate in Denver. The fourth variable is the sub_id chosen and used by the Denver affiliate for his own purposes. The only unique code assigned to the webmaster in

28

this transaction is 48192, which all parties agree is the "source webmaster unique identifier" for purposes of the '660 patent. These variables were appended to the landing page link and passed on to SpeedDate.com. Plaintiff has not shown that the variables were "correlated" using logic or algorithms or that anything happened other than the passing on of pre-set variables. As discussed above, the "correlating" step requires more than simply passing an unmodified affiliate ID and other preset variables to the target merchant affiliate system.

In sum, plaintiff has introduced insufficient evidence to meet its burden at summary judgment. Although plaintiff contends that Epic Direct has engaged in at least 1200 infringing transactions, plaintiff failed to adduce evidence to prove that even one of Epic Direct's transactions was infringing. E–Pass Technologies v. 3Com Corp., 473 F.3d 1213, 1222–23 (Fed. Cir. 2007) ("If, as [plaintiff] argues, it is 'unfathomable' that no user in possession of one of the accused devices and its manual has practiced the accused method . . . [plaintiff] should have had no difficulty in meeting its burden of proof and in introducing testimony of even one such user."); Lucent Technologies, Inc. v. Gateway, Inc., 543 F.3d 710, 723 (Fed. Cir. 2008) (finding no error in court's analysis that if using infringing combination of software was "so common and so routine, then certainly [plaintiff] could have produced evidence of at least one instance" when infringement occurred); Minsurg International, Inc. v. Frontier Devices, Inc., 2011 WL 486120, *3 (M.D. Fla. Feb. 7, 2011) ("If infringement among surgeons is an inescapable conclusion, [plaintiff] should have been able to timely identify at least one instance of direct infringement."). Accordingly, defendants are entitled to summary judgment of noninfringement as to all asserted claims of the '660 patent.

B.  Invalidity and Unenforceability

Defendants have moved for summary judgment on their invalidity counterclaims, contending that all asserted claims of the '660 patent are invalid as anticipated by the inventor's own prior art system and because the claims are obvious in light of that system and in light of well known features of internet commerce.  The Court of Appeals for the Federal Circuit has held that a district court has the discretion to dismiss invalidity and unenforceability counterclaims upon a grant of summary judgment of non-infringement. Phonometrics, Inc. v. Northern Telecom Inc., 133 F.3d 1459, 1468 (Fed. Cir. 1998); Cardinal Chemical Co. v. Morton International, Inc., 508 U.S. 83, 95 (1993) (in addressing motion for declaratory judgment district court has discretion to decide whether to exercise jurisdiction even when established).  It is appropriate for a district court to dismiss counterclaims of unenforceability and invalidity when non-infringement is clear and invalidity and unenforceability are not plainly evident.  Phonometrics, 133 F.3d at 1468 (citing Leesona Corp. v. United States, 530 F.2d 896, 906 n.9 (Ct. Cl. 1976)).

Discretionary dismissal of defendants' invalidity and unenforceability counterclaims is appropriate in this case.  It is clear that plaintiff has failed to prove infringement and it is less clear whether these patents are invalid or unenforceable.  It would be a poor use of judicial resources to explore these issues at this time, particularly because defendants have given the court no reason to believe that they are at risk of a future infringement suit based on the '660 patent.  Thus, I will exercise my discretionary authority and dismiss defendants' invalidity and unenforceability counterclaims without prejudice.

ORDER

IT IS ORDERED that

1.  The motion for summary judgment filed by defendants Azoogle.com, Inc., Epic Media Group, Inc. and Social Assets LLC, d/b/a Kinetic Social, dkt. #87, is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED with respect to plaintiff Essociate, Inc.'s claim that defendants infringe claims 1, 3, 6, 10, 13, 14, 15, and 28 of the United States patent 6,804,660.

2.  Defendants' counterclaims asserting invalidity and unenforceability are DISMISSED without prejudice.

3.  The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 17th day of May, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge